## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF FLORIDA, STATE OF GEORGIA, STATE OF HAWAII, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA, STATE OF LOUISIANA, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF MONTANA, STATE OF NEVADA, STATE OF NEW HAMPSHIRE, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NORTH CAROLINA, STATE OF OKLAHOMA, STATE OF RHODE ISLAND, STATE OF TENNESSEE, STATE OF TEXAS, COMMONWEALTH OF VIRGINIA, STATE OF WASHINGTON, *ex rel.* LENA STURGEON, ANTHONY FERRANTE ANTHONY SCIOLE AND NATHAN NILES, <br><br> v. <br><br> PHARMERICA CORPORATION, <br><br> PharMerica. | CIVIL ACTION NO.: 15-6829-CMR <br><br><br> <u>**JURY TRIAL DEMANDED**</u> |

### FIRST AMENDED COMPLAINT FOR DAMAGES AND
### OTHER RELIEF UNDER THE *QUI TAM* PROVISIONS OF THE
### <u>FALSE CLAIMS ACT AND SIMILAR STATE PROVISIONS</u>

### <u>INTRODUCTION</u>

1.    Relators Lena Sturgeon ("Sturgeon"), Anthony Ferrante ("Ferrante"), Anthony Sciole ("Sciole") and Nathan Niles ("Niles") (collectively "Relators"), by and through undersigned counsel, bring this action to recover treble damages and civil penalties arising from false statements and claims made or caused to be made by PharMerica Corporation (the

"Company" or "PharMerica") to the United States Government ("United States") and various state governments (collectively, the "Government"), in violation of the federal False Claims Act, 31 U.S.C, §§ 3729-32, and the corollary State false claims statutes identified herein.

2.    PharMerica is the second largest nationwide distributor of pharmaceuticals for nursing homes in the United States, and an estimated 18-19% of the entire U.S. nursing home market.

3.    From August 2013 through to the present ("Relevant Time Period"), PharMerica defrauded the Government by obtaining hundreds of millions of dollars in reimbursements for controlled substances and other medications that it knowingly dispensed to patients ***without a valid legal prescription***.

4.    Relators have provided the Government: (a) a complete set of data on a significant sample of illegal alterations; and (b) evidence and analysis showing that the conduct was intentional, profit-driven, systematic, and not in any way the result of human error, innocent mistake, or related to the acquisition and integration of any pharmacy, including Millennium Pharmacy Systems ("Millennium").

5.    Relators' evidence demonstrates that PharMerica engaged in a persistent pattern and practice of dispensing drugs of every class— from the most addictive opioids to the most highly prescribed antacid— without a legal prescription. For example, Relators' evidence shows that PharMerica altered everything from popular stomach drugs such as Omeprazole to highly addictive, Schedule II narcotics, such as OxyContin. PharMerica also made it its practice of dispensing brand name drugs, including Abilify, Namenda, and Cymbalta, in lieu of their cheaper generic drug equivalent for many months after the generic-equivalents had entered the market**.**

6.     The electronic fill notes and other data fields related to numerous drug orders for these and the types of drugs show that PharMerica altered prescriptions without a physician's consent by either changing the dosage, quantity, and/or form of the drugs prescribed, or by dispensing brand name drugs when generics were requested and available.

7.     Significantly, Relators' evidence shows that these alterations were common practice at PharMerica and consistently resulted in increased profits for PharMerica and, conversely, increased costs for the Government.

8.     Based on audits of billings from PharMerica, Sturgeon has determined that these illegal practices were pervasive and impacted all PharMerica clients, no matter where the nursing home was located. PharMerica's billing systems were centralized and operated out of only two locations in Arlington, Texas and Brockton, Massachusetts.

9.     By dispensing numerous types of prescription drugs absent confirmation that a physician had exercised his or her medical judgment about whether those prescriptions were issued for legitimate medical purpose, as well as being appropriate in form, strength, or quantity for the patient, PharMerica violated the most basic rules established by the State Boards of Pharmacy. All told, based on a significant sample, PharMerica dispensed tens of thousands of drugs without physicians overseeing the fulfillment and administration of these drugs.

10.     As a result and as detailed below, PharMerica's alterations violated a series of federal and state laws and regulations. Sturgeon also personally determined that PharMerica dispensed prescription drugs without a prescription ***in direct contravention of Medicare and Medicaid reimbursement criteria***.

11.      Indeed, the nature of PharMerica's infractions were so grave and numerous that it violated the Controlled Substances Act, 21 U.S.C. § 801- *et seq.* ("FCSA") and the Uniform

Controlled Substances Act of the states ("UCSA"). The misconduct identified and detailed below subjects PharMerica and its executives to criminal liability including imprisonment and steep multi-million dollar penalties. Yet, despite the gravity of the misconduct, not one PharMerica executive has been held accountable.

12.     In late 2014, when Sturgeon brought PharMerica's material weaknesses in its controls, systems and processes for dispensing drugs and billings to the attention of PharMerica's executives, PharMerica immediately retaliated against her by revoking her managerial authority and ordering her to stop the investigation. PharMerica's executives explicitly rejected the corrective actions Sturgeon demanded.

13.     Worst of all, in 2015, while Sturgeon was showing PharMerica executives evidence of FCSA violations, PharMerica was entering into a Corporate Integrity Agreement ("CIA") between itself and the U.S. Department of Health and Human Services' ("HHS") Office of Inspector General ("OIG") and a Memorandum of Agreement with the Drug Enforcement Agency ("DEA"), signed on May 11, 2015. The CIA and MOA required PharMerica to maintain controls over its practices and assure compliance with the FCSA.

14.     Despite rigorous obligations and commitments made by PharMerica to the HHS, OIG, and DEA, PharMerica continued dispensing Schedule II drugs without a legal prescription and without confirmation that a practitioner had exercised medical judgment about whether the prescriptions were being issued for a legitimate medical purpose in an appropriate form, strength and quantity for the patient.

15.     Concerned about PharMerica's management's refusal to correct the persistent problems, and fearful that staying at PharMerica would make her an accomplice to criminal

activity, Sturgeon resigned from her post and commenced consulting for nursing homes in May 2015, the same month PharMerica entered into the CIA and MOA.

16.     After leaving PharMerica, and while in the course of her consulting work with nursing homes doing business with PharMerica, Sturgeon confirmed that PharMerica was continuing to alter prescriptions illegally and dispense drugs without a legal prescription through at least 2016.

17.     When Sturgeon analyzed PharMerica's alterations further, she found a consistent theme—Pharmerica's alterations always led to increased profit for the Company and increased cost for the Government when compared to the cost of dispensing the drugs originally prescribed by physicians. Upon information and belief, PharMerica designed its system and process to prompt data clerks to alter prescriptions in a manner that secured the highest level of profit and, significantly, rebates provided by drug manufacturers and suppliers. By securing the highest level of rebates, PharMerica reduced its overall costs and increased its profit margins.

18.     PharMerica's consistent profiteering from its alterations and management's knowledge of the material weaknesses in its controls, systems and processes for dispensing of medication and billings demonstrate that PharMerica and its management knew that it was submitting fraudulent claims to the Government and requesting illegal reimbursements from Medicare and Medicaid programs.

19.     All told, Relators identified 2,432 altered prescriptions for a total of 86,152 illegally dispensed doses in a small sample set of approximately 2,500 patients during a mere eighteen-month period. Extrapolating from this narrow sample of 0.07% of PharMerica's patients, Relators believe that PharMerica has potentially obtained reimbursements from the Government for *hundreds of thousands of false claims*. PharMerica should be compelled to

120924406_2

repay every dollar of the tens of millions of dollars PharMerica was paid by the Government on the basis of illegally altered prescriptions.

## JURISDICTION AND VENUE

20.    These claims arise under the *qui tam* provisions of the FCA. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, which specifically confer jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

21.    This Court has supplemental jurisdiction over the claims brought pursuant to the states' named herein *qui tam* FCA statutes pursuant to 28 U.S.C. § 1367 which provides that "in any civil action of which the district courts have original jurisdiction, the district court shall have supplemental jurisdiction over all claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

22.    Personal jurisdiction and venue for this action are predicated on 31 U.S.C. § 3732(a) which provides: "Any action brought under § 3730 may be brought in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant can be found, resides, transacts business or which any act described by § 3729 occurred. PharMerica is currently doing business in the Commonwealth of Pennsylvania and in the Eastern District of Pennsylvania.

23.    There are five PharMerica pharmacies in the Commonwealth of Pennsylvania, doing business at: (a) 489 Shoemaker Road, #106, King of Prussia, PA; (b) 4000 Hempfield Blvd., #900, Greenburg, PA; (c) 123 Stewart Road, Hanover, PA; (d) 491 Blue Eagle Avenue, Harrisburg, PA; and (e) 175 Snyder Road, Hermitage, PA.

120924406_2

24.     Among other nursing homes located in the Eastern District of Pennsylvania, PharMerica has done business with Relators' Ferrante, Sciole and Niles' place of business, Reliant Health Management Services ("Reliant"), located at 1510 Chester Pike, Baldwin Towers, Eddystone, PA 19022.

25.     Under the FCA, this Amended Complaint is to be filed *in camera* and remain under seal for a period of at least 60 days and shall not be served on the Company until the Court so orders. The United States and the states named herein may elect to intervene and proceed with the action within 60 days after the receipt of both the Complaint and the material evidence and information.

## PARTIES

26.     Sturgeon is a former Executive Vice President at PharMerica. She is a registered nurse and has worked in the long term care industry for the past 30 years. During that time, she has held positions as Director of Nursing and was a Regional Clinical Director for both the Beverly and Mariner Nursing Homes.

27.     Sturgeon was hired by Millennium Pharmacy Systems, Inc. ("Millennium") as Chief Operating Officer in 2001. As Chief Operating Officer, Sturgeon performed a number of duties, including, but not limited to, the day to day management of customer relationships, sales and account management.

28.     Sturgeon worked as Millennium's Chief Operating Officer for approximately seven (7) years until 2008 when her title changed to Executive Vice President of Millennium. As Executive Vice President of Millennium, Sturgeon was in charge of formulating and testing the accuracy of the Millennium billing and electronic prescribing systems.

120924406_2

29.     In September, 2014, Millennium was sold to PharMerica and Sturgeon was named Executive Vice President of PharMerica. In that role, Sturgeon was asked to assist with the integration of Millennium clients onto PharMerica's systems.

30.     While at PharMerica, Sturgeon had the opportunity to personally review customer billings of PharMerica clients and identified a series of problems in the Company's drug dispensing controls, systems and processes.

31.     Specifically, Sturgeon identified thousands of instances where PharMerica had filled discontinued prescriptions and, thus, billed for those drugs without a legal prescription. Sturgeon left PharMerica in May 2015, when her protests against the pervasive fraudulent activity at PharMerica continued to go unheeded by PharMerica's top management, particularly Mark Lindemoen, Vice President of Sales and Marketing and Suresh Vishnubhatala, Executive Vice President of PharMerica.

32.     As a result of her position with PharMerica, Sturgeon has first-hand knowledge of the business operations of PharMerica, the problems and limitations of its proprietary drug dispensing software and database LTC400, and the fraudulent and illegal conduct and actions of PharMerica.

33.     Relators Ferrante, Sciole and Niles are corporate officers at Reliant. Reliant has been the owner/operator of more than twenty (20) nursing homes in Pennsylvania overseeing medication for approximately 2,500 patients at any given time. Reliant used the pharmacy services of Millennium but in June 2013 Reliant switched to PharMerica as its long term care pharmacy provider. Reliant's nursing homes used PharMerica's computer systems and software programs from October 2013 through 2016, when Reliant terminated its business relationship on account of the fraudulent conduct alleged herein.

120924406_2

34.    Relators bring this action based on direct and independent knowledge. None of the actionable allegations set forth in this Complaint are based upon a public disclosure as set forth in 31 U.S.C. § 3730(e)(4). Notwithstanding the same, Relators are original sources of the facts alleged in this Complaint.

35.    Relators have first-hand knowledge of the business operations of PharMerica and its intentional and/or reckless disregard and fraudulent conduct in connection with its dispensing of controlled substances and its billing practices. In or about October, 2015 and prior to filing this Complaint, Relators voluntarily provided information regarding PharMerica's fraudulent and illegal conduct to the United States Department of Justice.

36.    Defendant PharMerica is a Delaware corporation whose principal place of business is 1901 Campus Place, Louisville, Kentucky 40299.[1]

## FACTUAL BACKGROUND

### A.  As the Second Largest Institutional Pharmacy in the United States, PharMerica Receives Billions of Dollars From Government Programs And Drug Manufacturer and Supplier Rebates

37.    PharMerica describes itself as a "premier institutional pharmacy services provider, dedicated to providing quality patient care and innovative pharmacy solutions to institutional customers and patients in long-term care settings."

38.    It is the second largest institutional pharmacy company in the United States, operating more than 100 institutional pharmacies operating in 46 States. Each institutional pharmacy operated and controlled by PharMerica is individually registered with the Drug Enforcement Administration ("DEA"), 21 U.S.C. §§ 822 and 823.

---

[1] On or around, December 11, 2018, BrightSpring Health Services acquired PharMerica. The merged entity is owned by KKR and an affiliate of Walgreens Boots Alliance.

39.     PharMerica provides pharmaceuticals to over 350,000 patients annually, comprised primarily of elderly and disabled clients whose benefits are paid by the Government.

40.     According to its 2017 Form 10-K, over 75% of PharMerica's annual revenue (or approx. $1.5 billion) in 2016 was for drugs dispensed through Medicare, Medicaid and other government programs. Specifically, PharMerica received payments for drugs dispensed under Medicare Part A, Part B and Part D Plans, and Medicaid.

41.     According to PharMerica, it also received payments in the form of "rebates" from pharmaceutical manufacturers "for undertaking certain activities that the manufacturers believe may increase the likelihood that we will dispense their products." According to PharMerica, those "[r]ebates [we]re largely based on market share and purchase volume. . . ."

42.     PharMerica reported that the rebates "for brand name products are generally based upon achieving a defined market share tier within a therapeutic class and can be based on either purchasing volumes *or actual prescriptions dispensed*," and the rebates for generic products are achieved on "purchasing volume requirements. . . ." *See* PharMerica's 2017 Form 10-K, at F-12 (emphasis added).

43.     While PharMerica considers rebates to represent product "discounts" on the sale of related inventory, CMS has long questioned the propriety of companies like PharMerica receiving performance rebates from manufacturers in connection with the activity of dispensing drugs.

44.     As a general matter, rebates attach to purchasing volume on specific drug quantities, doses, and forms.  For example, companies like Perdue, one of the largest manufacturers of opioids, incentivized companies like PharMerica to dispense higher quantities of lower 25 mg doses of opioid pills versus lower quantities of higher 50 mg doses of opioid

pills, by providing PharMerica and companies like it, multi-million payments in the form of "rebates". By financially incentivizing PharMerica to dispense specific drug quantities, forms, and dosages, PharMerica was incentivized to alter and dispensed prescription drugs without a legal prescription.

**B. PharMerica's Systems and Processes for Dispensing Drugs To Nursing Home Patients**

45.     PharMerica is supposed to dispense and then bill for medications prescribed by physicians working onsite at the nursing homes or other facilities for which PharMerica provides pharmacy services.

46.     Generally nursing home physicians give prescription orders to PharMerica electronically through a widely-used nursing home platform called Point Click Care ("PCC").

47.     PCC is a single, cloud-based platform that houses all of the information pertaining to a pharmaceutical order (*i.e.,* the unique prescription numerical identifier referred to as RX number, order date, fill notes, dispensed date, discontinuation notes, billing information, among other information).

48.     Once a prescription is ordered and submitted through PCC, PharMerica receives that order and either a pharmacy technician or data entry clerk inputs the PCC order information into PharMerica's proprietary medicine dispensing system known as the LTC400.

49.     The data entry clerk is supposed to enter the electronic prescription order information into the LTC400 as reflected on the prescription without altering the drug, the dosage, quantity, or form.

50.     If the pharmacist has some alternative means for filling the order— whether through a comparable drug, an alternative form (*i.e*., tablet vs. capsule), or dosage of the same

drug (*i.e.,* two 25 mg tablets instead of one 50 mg tablet), the pharmacist is legally obligated to and must advise the facility's prescribing physician.

51.    To amend a prescription order, the prescribing physician must issue a discontinue order on the original prescription and submit an entirely new order with a unique prescription drug identification number for the altered prescription.

52.    Federal and state laws mandate that prescription drugs be ordered, altered, and/or dispensed in this manner.

53.    PharMerica's system and processes, however, were rigged to increase the probability that a prescription would be altered without the consent of the prescribing physician and drugs were being dispensed without legal prescriptions.

54.    PharMerica's LTC400 computerized drug dispensing system maintained a master file on each drug maintained in PharMerica's inventory nationwide. If a drug ordered by a physician was not in PharMerica's inventory, the LTC400 would provide a data entry clerk with other alternatives for filling the prescription. The master drug files were at all relevant times managed by executives at PharMerica's corporate headquarters who also controlled procurement of drugs and drug rebates from drug manufacturers and suppliers.

55.    These master drug files were designed to steer pharmacists into filling prescriptions in a manner that was more profitable for PharMerica. Thus, PharMerica's pharmacists had less control over, and fewer options on how to fill a given drug prescription.

56.    When a data clerk entered a prescription onto the LTC400, the clerk would be confronted with options for filling the prescription orders based on PharMerica's inventory and what was most profitable for PharMerica (*i.e.*, which drug would result in the highest rebate).

120924406_2

Indeed, PharMerica's purchasing, inventory and drug dispensing was driven by rebate deals struck with drug manufacturers and suppliers.

57.     Thus, if a prescription drug ordered was not available in PharMerica's inventory, the clerk would be prompted to select a drug option that was in PharMerica's inventory and would be more profitable to dispense.

58.     As set forth above, the law required that if a pharmacy did not have a particular drug ordered by a physician in stock, the physician had to be notified and the order discontinued.

59.     However, upon receiving prescriptions on drugs that PharMerica did not carry in its inventory, PharMerica instructed their clerical personnel to physically alter the prescriptions to make it appear as though the physician had prescribed the drug in a different form, quantity and/or dosage. After such a changes were made, the data entry personnel would then enter the altered prescription information into LTC400, making the alteration appear as though it was ordered by the prescribing physician.

60.     After a prescription order was submitted and entered into PharMerica's LTC400, the pharmacist reviewed and filled the order based on the instructions set forth therein as opposed to the instructions in the actual prescription.

61.     After the prescription order was filled by the pharmacist, the altered prescription was shipped to the nursing home facility where the patient resided.

62.     At least once per day, and often more frequently, each PharMerica pharmacy batched its Medicaid claims and submitted them electronically to the State Medicaid programs. Likewise, at least once a day, PharMerica would seek reimbursement from facilities under Medicare Part A Plans or Sponsors of Medicare Part D Plans for drugs dispensed to beneficiaries of these federal programs.

120924406_2

63.     As part of each electronic claim, PharMerica affixed its unique Medicare and Medicaid provider identification number, which served as an electronic stamp indicating, that, as a Medicare and State Medicaid provider, PharMerica was in compliance with all applicable federal and state regulations and then the claims were adjudicated instantaneously.

64.     PharMerica was reimbursed on a monthly basis by the Medicare and State's Medicaid programs for all approved claims.

65.     PharMerica made false representations and claims to the Government concerning Medicare and Medicaid reimbursements on a daily basis including on thousands of prescriptions that were altered and ultimately dispensed without a legal prescription.

## C. By December 2014, Sturgeon had Discovered and Reported Material Weaknesses In PharMerica's LTC400 Dispensing and Billing Systems, Controls and Processes for Dispensing Drugs

66.     In 2013, in connection with a *qui tam* lawsuit captioned as *United States ex rel. Denk v. PharMerica Corp.*, No. 09-cv-720 (E.D. Wis.) (the "Denk Action"), the federal government, specifically HHS's OIG and the DEA, commenced an investigation of PharMerica for dispensing controlled substances out of lockers located onsite at the nursing homes facilities it serviced. The controlled substances were being dispensed without a legal prescription.

67.     While that government investigation was taking place, in October 2014, PharMerica's Senior Vice President for Sales and Marketing Mark Lindemoen ("Lindemoen"), asked Sturgeon to review complaints made by Relator Sciole concerning medications charged by PharMerica to Reliant nursing homes. Sciole's concern was that after Reliant began working with PharMerica in 2013, its nursing home facilities experienced a significant increase in pharmacy costs ranging from $2.00 - $3.00 per patient per day.

68.     At Lindemoen's request, Sturgeon reviewed Reliant's account and charges from PharMerica and in performing her review, Sturgeon started noticing significant discrepancies in

14

the pharmacy records and billings of PharMerica that consistently favored PharMerica's bottom line.

69.     In particular, Sturgeon found that the dispensing information on PharMerica's LTC400 was not matching up with the order data on the PCC system, the system used by nursing homes across the country to electronically communicate orders to PharMerica.

70.     In November 2014, Sturgeon discussed the dispensing and billing problems with Lindemoen, but he refused to acknowledge the problems, let alone remedy them, because the Company was under a government investigation into its dispensing practices.

71.     In an email dated November 7, 2014, Sturgeon told Lindemoen that "we absolutely need to review the findings - it just keeps getting deeper and deeper," but PharMerica and specifically its management refused to investigate further or take corrective action.

72.     From December 2014 through part of January 2015, Sturgeon took a medical leave of absence but upon her return, Sturgeon again raised with PharMerica's management the ongoing need to address certain dispensing and billing system problems at PharMerica.

73.     On February 17, 2015, Sturgeon presented detailed evidence of the dispensing and billing problems to Lindemoen and PharMerica's supervisory billing staff and showed them ongoing, systematic dispensing and billing problems.

74.     Lindemoen shut down the meeting and ordered Sturgeon to stop her investigation. He also demanded that she stop conferring with management and the billing staff about the dispensing system issues that she had identified.

75.     By the end of February 2015, Sturgeon advised PharMerica's management that the problems with PharMerica's system were even worse than she had previously anticipated and

120924406_2

advised management that PharMerica was dispensing prescriptions for controlled substances without a legal prescription.

76.     Sturgeon advised PharMerica's management that the source of the dispensing problem was PharMerica's proprietary system, the LTC400. Sturgeon told management that electronic orders arriving through PCC from prescribing physicians at the nursing facilities were not being inputted correctly into the LTC400 system.

77.     PharMerica was dispensing prescription drugs without a legal prescription, which was *per se* illegal. Such errors were the result of material weaknesses in PharMerica's proprietary electronic system used nationwide and its processes. Sturgeon warned management that these weaknesses were impacting clients throughout the United States.

78.     Despite the scope and severity of the problems and after having raised these concerns with key members of management, PharMerica's management consciously disregarded Sturgeon's warnings and sought to conceal her findings by discrediting her work, limiting her authority, redefining her role, narrowing her responsibilities, and shutting down her investigation.

79.     PharMerica could not afford for the government to learn about its ongoing noncompliance with pharmacy regulations on dispensing controlled substances and sought to conceal its continued misconduct while the Company negotiated the terms of the CIA and MOA.

80.     By email dated March 11, 2015, PharMerica Chief Executive Officer Gregory Weishar ("Weishar") sought to diffuse the situation by having Sturgeon speak with Executive Vice President of Long Term Care Suresh Vishnubhatla ("Suresh").

81.     On March 17, 2015 Sturgeon met with Suresh to express the concerns she had over the questionable billing practices she had uncovered in her earlier investigation and the

resulting diminution in her authority and responsibilities. Sturgeon offered to create and implement a corrective action plan to remedy the dispensing and billing errors, but PharMerica executives Lindemoen, Suresh, and Weisher refused. They simply could not afford to draw attention to the material weaknesses in its systems that were causing PharMerica to dispense drugs without a legal prescription, while being investigated by the Government. Instead of redressing the issues, management initiated a plan to sell the Company, which it succeeded in doing in December 2018.

82.     Meanwhile, Sturgeon's job duties continued to be diminished and she was discouraged and directed not to spend any time addressing the various issues she had raised with PharMerica management.

83.     After putting management on notice of the material weaknesses in its systems and processes, there was an unexplained and sudden diminution of Sturgeon's duties and responsibilities, coupled with PharMerica's repeated disregard for those important legal and safety concerns Sturgeon raised with respect to PharMerica's billing practices and dispensing of discontinued prescriptions, created an intolerable work environment where Sturgeon was unable to perform her job duties on a daily basis.

84.     Sturgeon was placed in the difficult position of having to resign from her position because of the intolerable nature of her work environment, or continue performing those few duties she had left for an employer that was routinely and unapologetically violating health care law and prudent billing practices.

85.     Feeling as though she had no choice but to resign from her position, Sturgeon sent a formal notice of resignation ("Resignation Letter") on March 27, 2015 to Weishar indicating

120924406_2

her intention to resign for good reason per the terms of the Employment Agreement if corrective action was not taken within thirty (30) days to address the above-mentioned issues.

86.     In her Resignation Letter, Sturgeon detailed the many ways in which her responsibilities and duties were significantly curtailed since PharMerica's acquisition of Millennium, including but not limited to:

(a)  having never been provided any detailed, written explanation of description of her job duties and/or responsibilities with respect to the company following the acquisition, despite her remaining an Executive Vice President;

(b)  Being removed from the Mid-Atlantic region sales and marketing strategies and development initiatives, despite assurances and representations from PharMerica that she would be integral in those initiatives;

(c)     Being removed from the contract termination dispute processes, a central job duty and/or responsibility related to those customer relationship duties which Relator held in her prior role as Executive Vice President of Millennium and was assured would remain her duty and responsibility;

(d)     Having her authority to negotiate customer relationships, contracts, and pricing, which was always an integral part of her duties and/or responsibilities as Executive Vice President;

(e)     Having her responsibilities for all customer relationships in Florida removed, despite being directed by PharMerica to concentrate on Pennsylvania and Florida customers;

120924406_2

(f)     Having her authority to review and approve capital expenditures and development

projects for Millennium's proprietary software systems being removed with no notice or

explanation.

Resignation Letter, dated 3/27/2015.

87.    Sturgeon provided PharMerica thirty (30) days per the terms of the Employment

Agreement to remedy the detailed issues. Instead of addressing the issues, PharMerica,

specifically Suresh, responded on April 24, 2015 via letter that PharMerica would not treat her

resignation as with "good reason" and further stated that "[a]t this time, it would be counter-

productive to respond to each of the specific allegations contained in your Notice."

88.    On May 11, 2015, Sturgeon resigned, stating that PharMerica's inability and

disinterest in addressing those issue set forth made it impossible for her to continue and her final

day would be May 15, 2015.

89.    Sturgeon was unable to continue in her role as Executive Vice President because

PharMerica's constant disregard for real and important legal, billing, and health safety issues,

coupled with its retaliatory diminishing of her job duties and responsibilities, created an

intolerable work environment in which Sturgeon could no longer perform her duties and

responsibilities to the best of her ability.

90.    Sturgeon had been constructively discharged because she could not continue

working for a Company that engaged in legal noncompliance and a knowing disregard for the

safety of its customers and patients. No reasonable person in Sturgeon's shoes would have been

able to continue working for PharMerica in such an environment.

19

91.     Following her confrontations with Messrs. Lindemoen and Vishnubhatala, PharMerica management made it impossible for her to continue in her role as Executive Vice President by:

(a)     Deliberately embarrassing her in front of other employees, explicitly advising them to disregard her warnings concerning the likely consequences of submitting invalid claims to CMS for reimbursement; and

(b)     Wrongfully curtailing her duties and responsibilities as set forth in her March 27, 2015 resignation for good cause letter to Greg Weishar, CEO of PharMerica.

92.     Sturgeon involuntarily left PharMerica in May 2015, as a direct consequence of her inability to convince Messrs. Lindemoen and Vishnubhatala of the need to correct PharMerica's erroneous false billings and deficient pharmacy dispensing practices and the retaliatory action taken against her as a result of her statements to them.

### D. By 2015, the Government Had Determined That PharMerica Was Violating the FCSA By Dispensing Controlled Substances Without A Legal Prescription

93.     On May 7, 2015, after the federal government intervened in the Denk Action, PharMerica settled the various claims brought against Pharmerica for violating the FCSA and the False Claims Act by agreeing to enter into a five-year Corporate Integrity Agreement ("CIA") with the OIG of HHS and a Memorandum of Agreement ("MOA") with the DEA.

94.      The CIA required PharMerica, among other things to: (i) create procedures designed to ensure it complies with the FCSA and related regulations, (ii) retain an independent review organization to review PharMerica's compliance with the terms of the CIA and report to the OIG regarding that compliance; and (iii) provide training for certain PharMerica employees as to PharMerica's requirements under the FCSA.

95.     Moreover, Section III of PharMerica's CIA required PharMerica to appoint a Compliance Officer and Compliance Committee to develop and implement policies, procedures and practices, to ensure compliance with the requirements of all federal healthcare programs, as well as those of the FCSA, including the monitoring of day-to-day compliance activities. Steve Lariviere was appointed as Chief Compliance Officer in April 2015, replacing Thomas Caneris. Mr. Caneris remained as general counsel to Pharmerica.

96.     According to PharMerica's last filed Form 10-K, dated February 24, 2017, if PharMerica materially breached its obligations under the CIA, then the OIG could exclude PharMerica from participating in federal healthcare programs and this exclusion would result in the revocation or termination of contracts with Part D Sponsors, and state licenses to engage in pharmacy services.

97.     Likewise, the MOA required PharMerica to comply with all requirements of the FCSA, specifically relating to the dispensing of scheduled prescription drugs. If PharMerica failed to comply with the terms of the MOA, the DEA could suspend PharMerica's pharmacy DEA Certificate of Registration and begin an administrative hearing process pursuant to 21 U.S.C. § 824. Any such suspension would prohibit PharMerica pharmacies from dispensing scheduled prescription drugs.

98.     The CIA was signed by PharMerica's executives Mark Lindemoen, then Vice President of Sales and Marketing, and Suresh Vishnubhatla, then Executive Vice President of Long Term Care.  In their day-to-day duties and managerial responsibilities, Lindemoen and Vishnubhatla were aware of PharMerica's CIA and MOA obligations as well as the material weaknesses in PharMerica's systems and processes for dispensing drugs to nursing home customers.

99.     PharMerica's executives understood the importance of the CIA and MOA, including the Chief Executive Officer and Director Gregory S. Weishar; Chief Financial Officer and Treasurer Robert E. Dries; Senior Vice President and Chief Accounting Officer Berard E. Tomassetti; Director Frank E. Collins, Director W. Robert Dahl Jr., Director Marjorie W. Dorr, Director Dr. Thomas P. Gerrity; Director Thomas P. MacMahon; Director Geoffrey G. Meyers; Director Dr. Robert A. Oakley; and Director Patrick G. LePore.   Under the CIA, PharMerica's executives were responsible for implementing the new oversight and compliance requirements imposed by the CIA and MOA.

**E.    The Full Extent of PharMerica's Illegal Altering of Medication Was Revealed and Confirmed After Sturgeon Left The Company and Began Auditing PharMerica On Behalf Of Various Nursing Homes Clients**

100.    Following her departure from PharMerica, Sturgeon became an operational consultant to both the nursing home and pharma industries. She was retained by Reliant to do an additional audit of the financial arrangements between itself and PharMerica.

101.    Relators uncovered evidence that PharMerica regularly and systematically, and without the written authorization of the prescribing physician, altered the prescription order and dispensed an alternative drug without a legal prescription since at least 2013 and did so to enhance its profit margins and increase its rebates from manufacturers and suppliers.

102.    Sturgeon's audit of over [20,000] of Reliant's claims regarding the billing and pharmacy records showed that PharMerica had regularly altered prescriptions for non-controlled and controlled drugs.

103.    PharMerica altered prescription drug orders by dispensing: (a) a brand name drugs in lieu of the generic drugs prescribed; (b) a different form of the drug prescribed; and/or (c) a different dosage of the drug prescribed.

120924406_2

104.   Such alterations occurred on a near daily basis, involved thousands of transactions and a tremendously wide assortment of drugs, from the highly-controlled to the highly-prescribed.

105.   Despite the clear terms of the CIA and MOA, PharMerica designed, implemented and used a computerized dispensing system that promoted its bottom line and materially weakened PharMerica's controls over drug dispensing. Sturgeon found evidence that in every instance in which  Pharmerica altered a drug prescription without consent, PharMerica benefited financially.

106.   In the Reliant audit, Sturgeon found at least [5,687] instances of PharMerica altering the written dosage of original prescriptions without notification to either the facility or physician. The effect of these alterations was to deny the physician the opportunity to review and approve the alteration and/or the facility to acknowledge the change so as to avoid potential impact on patient care and treatment.

107.   Sturgeon was able to confirm the altered prescriptions because they did not correspond to original chart orders and the Medication Administration Records. Electronic recordkeeping and receipt of hard copy prescriptions are designed to protect against such occurrences by ensuring the information is received accurately and can be reconciled in accordance with DEA requirements and pharmacy needs.

108.   Sturgeon's audit of the PharMerica/Reliant records revealed that:

a.     PharMerica inaccurately or incompletely represented drugs to be dispensed upon a legal prescription, when they were not;

b.     PharMerica inaccurately or incompletely identified the prescriber of the drug and the prescriber's instructions; and

c.    PharMerica inaccurately or incompletely submitted Part D drug claim submission information.

109.    Sturgeon's audit of Reliant revealed that between March 2014 through September 2015, PharMerica caused false or fraudulent claims to be submitted on at least [2,432] alterations of prescriptions for a total of [86,152] illegally dispensed doses. That audit also found that PharMerica regularly submitted bills to prescription drug plans and Medicare for brand name drugs when generic products were readily available.

### 1. PharMerica Systematically Altered Prescriptions for Highly Addictive Schedule II Controlled Substances

110.    In only fifteen of the tens of thousands of nursing home facilities doing business with PharMerica over an 18-month period from March 2014 through early September 2015, Relators found that Pharmerica had illegally altered prescriptions for Schedule II controlled substances in 924 instances and 22,871 doses of controlled substances. Of those, 143 instances involved OxyContin and Morphine, or a total of 4,201 *illegally dispensed doses of OxyContin and Morphine* for which it received thousands of dollars in reimbursements from the Government.

111.    For example, Reliant submitted to PharMerica, through the PCC system, order RX# 0565750600  for Oxycodone 5 mg capsule on 6/2/15. The fill notes on RX #0565750600 reflect that PharMerica altered the prescription and dispensed Oxycodone 5 mg tablets instead. The PCC data further reflects that PharMerica never reached out to the facility to advise that RX #0565750600 could not be filled as instructed. As a result the prescribing physician never issued a discontinuation order on RX #0565750600.  Instead, PharMerica altered the prescription when its data clerks entered it into the system and dispensed Oxycodone 5 mg tablets. This was not the controlled substance ordered by the prescribing physician.

112.    By way of another example, on August 24, 2015, Reliant submitted to PharMerica, through the PCC system, RX # 0494564901 for the order of Morphine Sulfate solution 20mg/5ml.  The fill notes on RX #0494564901 reflect that PharMerica altered the prescription without the consent of the prescribing physician. The data from PCC reflects that PharMerica never reached out to the facility to advise that RX # 0494564901 could not be filled as instructed. As a result, the prescribing physician never issued a discontinuation order on RX # 0494564901, nor was a new order made by the prescribing physician for the drugs that PharMerica ultimately dispensed. Instead, PharMerica altered the prescription and dispensed Morphine 100 mg/5 ml.

113.    These alterations (and hundreds more like them) occurred when the PharMerica data clerk entered the order information into the LTC400.

114.    The data clerk was prompted by PharMerica's system to select a drug that is available in PharMerica's inventory and which is comparable to the one ordered by the prescribing physician.

115.    Instead of dispensing the exact drug prescribed by the physician, a data clerk— without medical training—entered an altered order into the LTC400 and dispensed a different prescription without the prescribing physician's consent.

116.    PharMerica, thereafter, submitted claims for payment for dispensing drugs altered prescriptions and falsely attested under penalties of perjury that it has complied with federal and state pharmacy and dispensing laws.

117.    PharMerica was knowingly prompting its employees to alter prescriptions, dispense controlled substances available in its inventory as it was more profitable to do so and

falsely claiming to the Government at the time of reimbursement that it was complying with federal and state law.

> ### 2. PharMerica Systematically and Illegally Altered The Dosage, Quantity and/or Form of Prescriptions of Non-Controlled Drugs Without A Valid Legal Prescription

118. In the same sample set, Relators found hundreds of examples Pharmerica having illegally altered prescriptions for non-controlled substances such as stomach medication and anti-depressants.

119. Fluoxetine (Prozac) prescriptions were illegally switched from tablets to capsules in 9,489 of the 12,239 doses of Fluoxetine dispensed in the Reliant data sample, or 78% of cases and Ranitidine (Zantac) prescriptions was switched from capsules to tablets in 1,051 of the 2,245 doses of Ranitidine dispensed, or 47% of cases.

120. Sturgeon found that none of these alterations were supported by a legal prescription. Thus, for example, on September 11, 2014 Reliant submitted to PharMerica through the PCC system, order RX# 0021039900 for Fluoxetine HCL Tablet 10 mg. The fill notes on RX # 0021039900 reflect that PharMerica altered the prescription and dispensed Fluoxetine HCL 10 mg capsules instead. The PCC data further reflects that PharMerica never reached out to the facility to advise that RX # 0021039900 could not be filled as instructed. As a result the prescribing physician never issued a discontinuation order on RX # 0021039900. Instead, PharMerica altered the prescription when its data clerks entered it into the system and dispensed Fluoxetine HCL Capsules.  This was not the prescription medication ordered by the prescribing physician.

121. By way of another example, on February 4, 2015, Reliant submitted to PharMerica, through the PCC system, RX # 0559508200 for the order of Morphine Sulfate

26

Solution 2mg/ml. The fill notes on RX #0559508200 reflect that PharMerica altered the prescription and dispensed Morphine 10 mg/ml without the consent of the prescribing physician. The data from PCC reflects that PharMerica never reached out to the facility to advise that RX #0559508200could not be filled as instructed. As a result, the prescribing physician never issued a discontinuation order on RX #0559508200, nor was a new order made by the prescribing physician for the drugs that PharMerica ultimately dispensed. Instead, PharMerica altered the prescription and dispensed Morphine 10 mg/ml without a legal prescription.

122.    These alterations (and thousands more like them) occurred when the PharMerica data clerk entered the order information into the LTC400.

123.    The data clerk was prompted by PharMerica's system to select a drug that is available in PharMerica's inventory and which is comparable to the one ordered by the prescribing physician.

124.    Instead of dispensing the exact drug prescribed by the physician, a data clerk-without medical training-entered an altered order into the LTC400 and dispenses a different prescription without the prescribing physician's consent.

125.    PharMerica, thereafter, submitted claims for payment for dispensing drugs altered prescriptions and falsely attested under penalties of perjury that it has complied with federal and state pharmacy and dispensing laws.

126.    PharMerica was knowingly prompting its employees to alter prescriptions, dispense non-controlled substances available in its inventory as it was more profitable to do so and falsely claiming to the Government at the time of reimbursement that it was complying with federal and state law.

**3. PharMerica Systematically and Illegally Altered Prescriptions by Filling Generic Drug Prescriptions with the More Expensive and Profitable Brand Name Drug**

127.    During the Relevant Time Frame, Pharmerica routinely altered and dispensed brand name drugs *in lieu of* the generic drugs ordered and already on the market, and made this alteration without a legal prescription.

128.    For example, PharMerica dispensed brand name drug Abilify when the prescribing physician ordered generic Aripiprazole, a generic that had been available in the market since May 1, 2015.

129.    Likewise, PharMerica converted patients taking Namenda to Namenda XR shortly before the generic of Namenda was released to the market to protect PharMerica's "brand name" profit margins.

130.    Relators identified hundreds of instances of such illegal alterations in violation of the CIA, MOA, FCSA, UCSA, and regulations of the States Boards of Pharmacy.

**F. During The Relevant Time Frame, PharMerica Received Billions of Dollars From Government Programs And Millions More from Drug Manufacturers and Suppliers In the Form of Rebates Based on Purchasing Volumes and Amounts Dispensed**

131.    PharMerica, as a result of its misconduct, violated numerous state and federal dispensing laws, made false claims to government programs for payment on prescriptions that it filled without a legal prescription, and under both the CIA and MOA can lose its CMS license and DEA registration number.

132.    In total, Relators identified over 2,400 instances of such illegal alterations in violation of the CIA, MOA, FCSA, UCSA, and CMS regulations, and state pharmacy board regulations in a sample set of only 2,500 patients.

133.    Meanwhile, PharMerica operates nationwide and the same weaknesses in its standards, policies, and procedures impact the estimated more than 350,000 patients serviced by PharMerica annually.

134.    The systematic altering of prescriptions of controlled substances without physician approval amounts to illegal drug trafficking subjecting PharMerica *and its management* to stiff penalties.  As set forth above, violations of the FCSA subject wrongdoers to multi-million penalties and prison sentences. Relators had identified over 924 violations of the FCSA and UCSA and 22,871 illegally dispensed doses and, upon information and belief, thousands more will be identified once PharMerica produces its data.

135.    If each of these violations are deemed separate offenses, which they likely are, PharMerica would be subject to criminal penalties *in the billions of dollars*, and would lose its federal and state certifications, its pharmacy licenses in the 46 states in which it operates, and will be in material breach of its contracts with Medicare Part D Sponsors and its nursing home and other customers.

**G.  PharMerica's Conduct Violated Various Federal and State Laws and Regulations**

136.    To fully understand the gravity and scope of PharMerica's illegal conduct, Relators provide the following overview of the extensive federal and state regulations governing PharMerica's institutional pharmacies and the nursing home facilities that they serve. These laws and regulations relate to PharMerica's pharmacy services and other operations, reimbursements, record keeping, and documentation requirements, among other business activities.

137.    PharMerica's institutional pharmacies are also subject to federal and state laws that regulate financial arrangements between healthcare providers, including the federal anti-kickback statutes and the federal physician self-referral laws.

1. **PharMerica Certifies Compliance with all Applicable Federal Laws, Regulations, and CMS  Instructions Each Time It Seeks Reimbursement**

138.    The Medicare services provided by PharMerica's regional pharmaceutical centers are provided under contractual agreement with nursing home facilities that pay PharMerica using Medicare Part A funds and contractual agreements with Plan Sponsors that pay PharMerica using Medicare Part D funds. All of these contracts require PharMerica to comply with applicable federal laws, regulations, and CMS instructions.

139.    PharMerica contracts with Medicare Part D Plan Sponsors who then contract with HHS. By statute, the contracts between HHS and Plan Sponsors require subcontractors such as PharMerica to comply with:

> a.    applicable requirements and standards of Medicare Part D and the terms and conditions governing payment. 42 U.S.C. § 1395w-112;
>
> b.    federal laws and regulations designed to prevent fraud, waste, and abuse. 42 C.F.R. § 423.505(h)(1); and
>
> c.    applicable federal laws, regulations, and CMS instructions. 42 C.F.R. § 423.505(i)(4)(iv).

140.    PharMerica, as a subcontractor provider for Part D Plan Sponsors, must comply with all applicable federal laws, regulations, and CMS instructions, which include the FCSA, the Social Security Act, and regulations that define the requirements of a legal prescription. 42 C.F.R. § 423.505(i)(4)(vi). PharMerica is also required by federal regulation to certify to the accuracy, completeness and truthfulness of all data related to the claim for payment, pursuant to 42 C.F.R. § 423.505(k)(1), (3).

141.    Moreover, to participate in federal programs and receive payments through the Medicare Part A and Part D programs, PharMerica must certify its compliance with applicable federal laws, regulations, and CMS instructions with ***each and every reimbursement it seeks***.

142.    The Social Security Act also imposes, as a precondition for payment under Medicare Part D, that prescription drugs dispensed to Medicare beneficiaries be dispensed upon a valid prescription under the law. Moreover, CMS will ***only*** pay for Medicare Part D funds for "covered Part D drug[s]," defined as a drug that "may be dispensed only upon a prescription." 42 U.S.C. § 1395w-102(e).

143.    Submissions for payment on drugs dispensed without a legal prescription, or on the basis of a prescription that has been altered in violation of applicable law and regulations, cannot be deemed accurate, complete and truthful and are ineligible for reimbursement under Medicare.

144.    The Medicaid-sponsored services provided by PharMerica's regional pharmaceutical centers operate similarly. Those services are provided under contractual agreement with states through each state's Medicaid provider licensure program, whereby PharMerica agrees to provide pharmaceuticals to State Medicaid patients in the nursing homes it serves in exchange for which States reimburse PharMerica. Those contracts also require PharMerica to comply with the applicable federal and state laws and regulations in effect as well as all policies, procedures, and standards required by the Medicaid program.

145.    PharMerica is ineligible for any and all government reimbursement – whether Medicare, Medicaid or otherwise— on prescription drugs it dispenses without a legal prescription that complies with State Board of Pharmacy requirements.

## 2. Federal and State Laws Require That A Pharmacy Obtain the Approval of the Prescribing Physician Before A Prescription May Be Altered

146.    State Boards of Pharmacy universally require that a valid prescription be issued before a prescription drug may be dispensed.

147.    The definition of a prescription may vary slightly, but all 50 states generally define a legal prescription as a written, electronic or oral order issued by a licensed medical practitioner in the course of professional practice for a controlled substance, other drug or device, or medication which is dispensed for use by a consumer. *See, e.g.,* 49 Pa. Code. § 27.1.

148.    To verify the accuracy of the preparation, pharmacists are required to review every prescription prior to dispensing a drug to determine basic information about the order, such as: name of the drug, strength, dosage and quantity.

149.    A registered pharmacist may not compound, prepare, dispense, fill, sell or give away a drug or device on the basis of a prescription or order in an institution or hospital unless the prescription or order is an original prescription or order or direct copy thereof issued by the authorized prescriber or practitioner who may be using electronic or computerized equipment.

150.    If a pharmacist wishes to deviate from a prescription or dispense a drug other than that specified in a prescription, unless the substituted drug is considered therapeutically equivalent, the pharmacist must first obtain approval from the prescribing medical practitioner.

151.    Drug products are considered to be therapeutically equivalent only if they are pharmaceutical equivalents, which means, *inter alia*, equivalent drug with the same dosage and form. Thus, the *only* alteration permitted without the express consent of a prescribing physician is when an exact generic substitute exists for a brand-name drug and the prescription does not specify that a generic option is prohibited.

152.    Indeed, in nearly every state in which PharMerica operates, the state Medicaid programs *require* pharmacists to dispense a cheaper generic in lieu of the brand-named equivalent, unless the prescribing physician expressly instructs otherwise.

153.    Thus, a pharmacist may not unilaterally substitute the capsule form of a drug when the drug has been prescribed as a tablet, or *vice versa*, as they are not considered therapeutically equivalent.

### 3.  PharMerica Must Comply With Federal and State Laws on Controlled Substances

154.    The FCSA regulates entities that dispense controlled substances by establishing controls over all stages of the chain of distribution of controlled substances in the United States, including practitioners and pharmacies, through a closed and monitored system which makes it unlawful to manufacture, distribute, dispense, or possess any controlled substance except as authorized by the FCSA. 21 U.S.C. § 801— *et seq*. The Attorney General is authorized to promulgate regulations for "the registration and control of the manufacture, distribution, and dispensing of controlled substances." 21 U.S.C. § 821.

155.    The UCSA was originally drafted by the U.S. Department of Justice in 1969 and promulgated by the National Conference of Commissioners on Uniform State Laws in 1970. One of the stated goals in promulgating the UCSA was to foster parallel law between the states and the federal government. The USCA was updated in 1990, and again in 1994, to incorporate relevant changes made in the FCSA. Nearly every state in the United States and its territories has adopted either the 1970, 1990 or 1994 Version of the Uniform Act. Because the UCSA was modeled after the federal drug laws, the provisions therein are substantially similar to the FCSA.

156.    Under the FCSA (and the USCA), "controlled substances are strictly regulated to ensure a sufficient supply for legitimate medical. . . purposes and to deter diversion of controlled

substances to illegal purposes. The substances are regulated because of their potential for abuse and likelihood to cause dependence when abused and because of their serious and potentially unsafe nature if not used under the proper circumstances." 75 Fed. Reg. 61,613– 61,617 (Oct. 6, 2010) (DEA Policy Statement, "Role of Authorized Agents in Communicating Controlled Substance Prescriptions to Pharmacies").

157.    Controlled substances are organized into Schedules according to the characteristics of each substance: drugs included in Schedule I have the greatest potential for abuse and do not have legitimate medical uses, whereas drugs included in Schedule V have legitimate medical uses and have the least potential for abuse. 21 U.S.C. § 812.

158.    Schedule II controlled substances have a high potential for abuse but also have a currently accepted medical use in medical treatment in the United States, but with significant restrictions because of their potential for abuse. 21 U.S.C. § 812(b)(2).

159.    With limited exceptions not applicable here, the FCSA and UCSA prohibit any manufacturer, distributor, or dispenser, including a pharmacy, from distributing or dispensing a controlled substance without a valid prescription. 21 U.S.C. § 829(a) and (b); *See, e.g.,* Hawaii Stat. §329-38 ("Prescriptions. (a) No controlled substance in schedule II may be dispensed without a written prescription of a practitioner….").

160.    For Schedule II controlled substances, the CSA requires that the prescription be in writing except that a practitioner may give an oral prescription in an emergency situation. 21 U.S.C. § 829(a).

161.    Under the FCSA and the USCA, all prescriptions for controlled substances shall:

    a.    be dated as of, and signed on, the day when issued;

    b.    bear the full name and address of the patient;

      c.      bear the drug name, strength, dosage form, quantity prescribed and directions for use; and,

      d.      bear the name, address and registration number of the practitioner.

21 C.F.R. § 1306.05.

162.    Each element of a valid prescription must be specified by the prescribing practitioner and cannot be delegated to an employee or other agent of the practitioner. 75 Fed. Reg. 61,613 – 61,614 (Oct. 6, 2010).

163.    Although the definition of a valid prescription varies slightly across jurisdictions, every state and territory in the United States prohibits the dispensing of nearly every type of controlled substance without a valid prescription from a licensed practitioner.

164.    Under the FCSA, if a pharmacy dispenses a controlled substance without a valid prescription, it is liable for a federal civil penalty of up to $25,000 for each violation. 21 U.S.C. §§ 842(a)(1) and 842(c)(1).

165.    If PharMerica's misconduct is deemed to be the unlawful distribution of controlled substances (*i.e.*, illegal drug trafficking), PharMerica could be subject to multi-million dollar fines and its management could face imprisonment.

## LEGAL COUNTS

### COUNT I
### VIOLATIONS OF FALSE CLAIMS ACT
### PRESENTATION OF FALSE CLAIMS

166.    Relators reallege and incorporate herein all of the foregoing allegations as if fully set forth herein.

167.    In performing the acts described above, PharMerica, through its own acts or through the acts of its officers, knowingly and/or recklessly presented, or caused to be presented,

to an officer or employee of the United States Government, false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

168.     These claims were false and fraudulent because PharMerica made claims for payments knowing that they had sought payment for claims when it had violated various statutes and regulations which made it ineligible for reimbursement.

169.     The United States, unaware of the foregoing circumstances and conduct of PharMerica, made full payments that would otherwise have not been paid and/or were ineligible for payment, which resulted in its being damaged in an amount to be determined.

170.     By reason of PharMerica's wrongful conduct, the United States has been damaged by the payment of false and fraudulent claims.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To the United States:

(a)     Three times the amount of actual damages which the United States has sustained as a result of PharMerica's conduct;

(b)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which PharMerica presented or caused to be presented to the United States;

(c)     Pre- and post-judgment interest; and

(d)     All costs incurred in bringing this action.

To Relators:

(e)     The maximum amount allowed pursuant to § 3730(d) of the False Claims Act and/or any other applicable provision of law;

(f)     Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(g)     An award of reasonable attorney's fees and costs; and

(h)     Such further relief as this Court deems equitable and just.

120924406_2

## COUNT II
## VIOLATION OF FALSE CLAIMS ACT
## <u>FALSE STATEMENTS</u>

171.    Relators reassert the foregoing allegations as if fully set forth herein.

172.    In performing the acts described above, PharMerica through its own acts or through the acts of its officers, knowingly made, used, or caused to be made or used, a false record or statement to get false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(1)(B).

173.    Such records or statements include the false certifications alleged herein.

174.    The United States, unaware of the foregoing circumstances and conduct of PharMerica, made full payments which resulted in its being damaged in an amount to be determined.

175.    By reason of PharMerica's wrongful conduct, the United States has been damaged by the payment of false and fraudulent claims.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To the United States:

(a)    Three times the amount of actual damages which the United States has sustained as a result of PharMerica's conduct;
(b)    A civil penalty of not less than $5,500 and not more than $11,000 for each false record or statement PharMerica made to get false or fraudulent claims paid or approved by the Government;
(c)    Pre- and post-judgment interest; and
(d)    All costs incurred in bringing this action.

To Relators:

(a)    The maximum amount allowed pursuant to § 3730(d) of the False Claims Act and/or any other applicable provision of law;
(b)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(c)    An award of reasonable attorney's fees and costs; and

120924406_2

(d)     Such further relief as this Court deems equitable and just.

## COUNT III
## VIOLATION OF FALSE CLAIM ACT
## REVERSE FALSE CLAIMS

176.    Relators reassert the foregoing allegations as if fully set forth herein.

177.    In performing the acts described above, PharMerica knowingly used false records and statements to conceal the obligation to reimburse the federal government for monies improperly retained in violation of 31 U.S.C. § 3729(a)(1)(G).

178.    The stipulated penalty provisions in the CIA are contractual obligations.

179.    Through PharMerica's actions and improperly retaining funds to which it is not entitled, the United States has been defrauded of the use of the monies and is entitled to damages in an amount to be determined.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To the United States:

(a)     Three times the amount of actual damages which the United States has sustained as a result of PharMerica's conduct;
(b)     A civil penalty of not less than $5,500 and not more than $11,000 for each false record or statement PharMerica made to get false or fraudulent claims paid or approved by the Government;
(c)     Pre- and post-judgment interest; and
(d)     All costs incurred in bringing this action.

To Relators:

(a)     The maximum amount allowed pursuant to § 3730(d) of the False Claims Act and/or any other applicable provision of law;
(b)     Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(c)     An award of reasonable attorney's fees and costs; and
(d)     Such further relief as this Court deems equitable and just.

**COUNT IV**
**CALIFORNIA FALSE CLAIMS ACT**

180.     Relators reassert the foregoing allegations as if fully set forth herein.

181.     This is a qui tam action brought by Relators on behalf of the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't. Code § 12650 et seq.

182.     Cal. Gov't Code § 12651 (a) provides liability for any person who

(a)      knowingly presents, or causes to be presented, to an officer or employee of the state or of any political division thereof, a false claim for payment or approval;

(b)      knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision...

183.     PharMerica furthermore violated Cal. Gov't Code § 12651 (a) and knowingly caused false claims to be made, used and presented to the State of California by its deliberate and systematic violation of federal and state laws, including the FCA, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government health care programs.

184.     The State of California, by and through the California Medicaid program and other state healthcare programs, and unaware of PharMerica's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

185.     Compliance with applicable Medicare, Medi-Cal and the various other federal and state laws cited herein was an implied, and upon information and belief; also an express condition of payment of claims submitted to the State of California in connection with PharMerica's conduct. Compliance with applicable California statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of California.

186.     Had the State of California known of PharMerica's wrongful conduct, it would not have paid the claims submitted by PharMerica and healthcare providers in connection with that conduct.

187.     As a result of PharMerica's violation of Cal. Gov't Code § 12651(a), the State of California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

188.     Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of themselves and the State of California.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To the State of California:

(a)     Three times the amount of actual damages which the State of California has sustained as a result of PharMerica's conduct;
(b)     A civil penalty of not less than $5500 and not more than $11,000 for each false claim which PharMerica presented or caused to be presented to the State of California;
(c)     Prejudgment interest; and
(d)     All costs incurred in bringing this action.

To Relators:

(a)     The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and/or any other applicable provision of law;
(b)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;
(c)     An award of reasonable attorney's fees and costs; and
(d)     Such further relief as this Court deems equitable and just.

## COUNT V
## COLORADO MEDICAID FALSE CLAIMS ACT

189.     Relators reassert the foregoing allegations as if fully set forth herein.

120924406_2

190.     This is a *qui tam* action brought by Relators and the State of Colorado to recover treble damages and civil penalties under the Colorado Medicaid False Claims Act, CRS § 25.5-4-304— *et. seq.* (the "Act").

191.     The Act provides liability for any person who (1) knowingly presents or causes to be presented to an officer or employee of the state a false or fraudulent claim for payment or approval; (2) knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim. CRS § 25.5-4-305.

192.     PharMerica violated CRS § 25.5-4-305 by engaging in the illegal conduct described herein and by virtue of the fact that none of the claims submitted in connection with its illegal conduct were even eligible for reimbursement by the Government Health Care Programs.

193.     PharMerica furthermore violated CRS § 25.5-4-305 and knowingly caused false claims to be made, used and presented to the State of Colorado by its deliberate and systematic violation of federal and state laws, including the FCA and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government health care programs.

194.     Colorado, by and through the Colorado Medicaid program and other state healthcare programs, was unaware of PharMerica's illegal conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

195.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to Colorado in connection with PharMerica's illegal conduct. Compliance with applicable Colorado statutes, regulations and Pharmacy Manuals was also an express condition for payment of claims submitted to Colorado.

120924406_2

196.    Had the State of Colorado known of PharMerica's wrongful conduct, it  would not have paid the claims submitted by PharMerica and healthcare providers in connection  with that conduct.

197.    As a result of PharMerica's violation of CRS § 25.5-4-305, Colorado has been damaged in an amount far in excess of millions of dollars exclusive of interest.

198.    Relators are each private citizens with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to CRS § 25.5-4-306 on behalf of themselves and the State of Colorado.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To Colorado:

(a)    Three times the amount of actual damages which Colorado has sustained as a result of PharMerica's illegal conduct;

(b)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which PharMerica caused to be presented to Connecticut;

(c)    Prejudgment interest; and

(d)    All costs incurred in bringing this action.

To Relators:

(a)    The maximum amount allowed pursuant to CRS § 25.5-4-306 and/or any other applicable provision of law;

(b)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(c)    An award of reasonable attorney's fees and costs; and

(d)    Such further relief as this Court deems equitable and just.

## COUNT VI
## CONNECTICUT FALSE CLAIMS ACT

199.    Relators reassert the foregoing allegations as if fully set forth herein.

200.    This *qui tam* action is brought by Relators and the State of Connecticut to recover

treble damages and civil penalties under the Connecticut False Claims Act, Conn. Gen. Stat. § 4-274- *et seq.* (the "CT Act").

201.    The CT Act provides liability for any person who: (1) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval under a state administered Health or Human Services program; and (2) knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim under a state administered Health and Human Services program.

202.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was and is an express condition of payment of claims submitted to Connecticut. Compliance with applicable Connecticut statutes, regulations and Pharmacy Manuals was also an express condition for payment of claims submitted to Connecticut.

203.    However, PharMerica violated Conn. Gen. Stat. § 4-275 by dispensing prescription drugs without a valid legal prescription and then falsely certified to Connecticut that it had complied with the above laws in seeking and obtaining reimbursement on these drugs.

204.    As a result, PharMerica obtained reimbursement on drugs ineligible for reimbursement by the Government Health Care Programs.

205.    Connecticut was unaware of PharMerica's illegal conduct and paid the claims submitted by PharMerica in reliance upon PharMerica's false certificatopn that it had a valid legal prescription.

206.    Had the State of Connecticut known of PharMerica's wrongful conduct, it would not have paid the claims submitted by PharMerica.

207.    As a result of PharMerica violated Conn. Gen. Stat. § 4-275 and was harmed in an amount to be determined at trial.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To Connecticut:

(a)   Three times the amount of actual damages which Connecticut has sustained as a result of PharMerica's illegal conduct;
(b)   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which PharMerica caused to be presented to Connecticut;
(c)   Prejudgment interest; and
(d)   All costs incurred in bringing this action.

To Relators:

(a)   The maximum amount allowed pursuant to Conn. Gen. Stat. § 4.278 and/or any other applicable provision of law;
(b)   Reimbursement for reasonable expenses which Relators incurred in connection with this action;
(c)   An award of reasonable attorney's fees and costs; and
(d)   Such further relief as this Court deems equitable and just.

## COUNT VII
## DELAWARE FALSE CLAIMS AND REPORTING ACT

208.   Relators reassert the foregoing allegations as if fully set forth herein.

209.   This is a *qui tam* action brought by Relators on behalf of the State of Delaware to recover treble damages and civil penalties under the Delaware False Claims and Reporting Act, Title 6, Chapter 12 of the Delaware Code.

210.   Del. C. § 1201(a) provides liability for any person who-

(a)   knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(b)   knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim.

211.   PharMerica violated 6 Del. C. § 1201(a) and knowingly caused false claims to be made, used and presented to the State of Delaware by its deliberate and systematic violation of

120924406_2

federal and state laws, including the FCA and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

212.    The State of Delaware, by and through the Delaware Medicaid program and other state healthcare programs, was unaware of PharMerica's conduct and paid the claims submitted by PharMerica and healthcare providers in connection therewith.

213.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Delaware in connection with PharMerica's conduct. Compliance with applicable Delaware statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Delaware.

214.    Had the State of Delaware known of PharMerica's wrongful, it would not have paid the claims submitted by PharMerica and healthcare providers in connection with that conduct.

215.    As a result of PharMerica's violation of 6 Del. C. § 1201(a), the State of Delaware has been damaged in an amount far in excess of millions of dollars exclusive of interest.

216.    Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 6 Del. C. § 1203(b) on behalf of themselves and the State of Delaware.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To the State of Delaware:

(a)    Three times the amount of actual damages which the State of Delaware has sustained as a result of PharMerica's conduct;

(b) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which PharMerica caused to be presented to the State of Delaware;
(c) Prejudgment interest; and
(d) All costs incurred in bringing this action.

To Relators:

(a) The maximum amount allowed pursuant to 6 Del C. § 1205, and/or any other applicable provision of law;
(b) Reimbursement for reasonable expenses which Relators incurred in connection with this action;
(c) An award of reasonable attorney's fees and costs; and
(d) Such further relief as this Court deems equitable and just.

## COUNT VIII
## FLORIDA FALSE CLAIMS ACT

217. Relators reassert the foregoing allegations as if fully set forth herein.

218. This is a *qui tam* action brought by Relator on behalf of the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081 et seq. Fla. Stat. § 68.082(2) provides liability for any person who-

(a) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim.

219. PharMerica violated Fla. Stat. § 68.082(2) and knowingly caused false claims to be made, used and presented to the State of Florida by its deliberate and systematic violation of federal and state laws, including the FCA and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

220. The State of Florida, by and through the Florida Medicaid program and other state healthcare programs, was unaware of PharMerica's conduct and paid the claims submitted by

46

PharMerica and healthcare providers.

221.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Florida in connection with PharMerica's conduct. Compliance with applicable Florida statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Florida.

222.    Had the State of Florida known of PharMerica's wrongful conduct, it would not have paid the claims submitted by PharMerica and healthcare providers.

223.    As a result of PharMerica's violation of Fla. Stat. § 68.082(2), the State of Florida has been damaged in an amount far in excess of millions of dollars exclusive of interest.

224.    Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Fla. Stat. § 68.083(2) on behalf of themselves and the State of Florida.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To the State of Florida:

(a)    Three times the amount of actual damages which the State of Florida has sustained as a result of PharMerica's conduct;
(b)    A civil penalty of not less than $5,500 and not more than $ 11,000 for each false claim which PharMerica caused to be presented to the State of Florida;
(c)    All costs incurred in bringing this action.

To Relators:

(d)    The maximum amount allowed pursuant to Fla. Stat. § 68.085 and/or any other applicable provision of law;
(e)    Reimbursement for reasonable expenses which Relators incurred in connection with this action,
(f)    An award of reasonable attorney's fees and costs; and
(g)    Such further relief as this Court deems equitable and just.

## COUNT IX
## GEORGIA FALSE MEDICAID CLAIMS ACT

225.     Relators repeat and reallege each allegation contained in paragraphs.

226.     This is a *qui tam* action brought by Relators on behalf of the State of Georgia to recover treble damages and civil penalties under the Georgia False Medicaid Claims Act, O.C.G.A. §49-4-168(2012) et seq.

227.     O.C.G.A. § 49-4-168.1(a) provides liability for any person who:

(a)      knowingly presents, or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(b)      knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

228.     PharMerica violated O.C.G.A. § 49-4-168 et seq. by engaging in the conduct described herein.

229.     The State of Georgia, by and through the Georgia Medicaid program and other state healthcare programs, was unaware of PharMerica's conduct and paid the claims submitted by PharMerica and healthcare providers.

230.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Georgia in connection with PharMerica's conduct. Compliance with applicable Georgia statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Georgia.

231.     Had the State of Georgia known of PharMerica's wrongful conduct, it would not have paid the claims submitted by PharMerica and healthcare providers.

232.     As a result of PharMerica's violation of O.C.G. A. § 49-4-168, the State of

120924406_2

Georgia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

233.    Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to O.C.G. A. § 49-4¬168.2 on behalf of themselves and the State of Georgia.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To the State of Georgia:

(a)    Three times the amount of actual damages which the State of Georgia has sustained as a result of PharMerica's conduct;
(b)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which PharMerica caused to be presented to the State of Georgia;
(c)    Prejudgment interest; and all costs incurred in bringing this action.

To Relators:

(d)    The maximum amount allowed pursuant to O.C.G.A. § 49-4-168.2 and/or any other applicable provision of law;
(e)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;
(f)    An award of reasonable attorney's fees and costs; and
(g)    Such further relief as this Court deems equitable and just.

## COUNT X
## HAWAII FALSE CLAIMS ACT

234.    Relators reassert the foregoing allegations as if fully set forth herein.

235.    This is a *qui tam* action brought by Relators on behalf of the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21- *et seq.*

236.    Haw. Rev. Stat. § 661-21(a) provides liability for any person who-

(a)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(b)      knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

237.   PharMerica violated Haw. Rev. Stat. § 661-21(a) and knowingly caused false claims to be made, used and presented to the State of Hawaii by its deliberate and systematic violation of federal and state laws, including the FCA and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

238.   The State of Hawaii, by and through the Hawaii Medicaid program and other state healthcare programs, was unaware of PharMerica's conduct and paid the claims submitted by PharMerica and healthcare providers in connection therewith.

239.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief; also an express condition of payment of claims submitted to the State of Hawaii in connection with PharMerica's conduct. Compliance with applicable Hawaii statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Hawaii.

240.   Had the State of Hawaii known of PharMerica's wrongful conduct, it would not have paid the claims submitted by PharMerica and healthcare providers in connection with that conduct.

241.   As a result of PharMerica's violation of Haw. Rev. Stat § 661-21(a) the State of Hawaii has been damaged in an amount far in excess of millions of dollars exclusive of interest.

242.   Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Haw. Rev. Stat. § 661-25(a) on behalf of themselves and the State of Hawaii.

120924406_2

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To the State of Hawaii:

(a)     Three times the amount of actual damages which the State of Hawaii has sustained as a result of PharMerica's illegal conduct;

(b)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which PharMerica caused to be presented to the State of Hawaii;

(c)     Prejudgment interest; and

(d)     All costs incurred in bringing this action.

To Relators:

(e)     The maximum amount allowed pursuant to Haw. Rev. Stat. §661 -27 and/or any other applicable provision of law;

(f)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(g)     An award of reasonable attorney's fees and costs; and

(h)     Such further relief as this Court deems equitable and just.

## COUNT XI
## ILLINOIS FALSE CLAIMS ACT

243.    Relators reassert the foregoing allegations as if fully set forth herein.

244.    This is a *qui tam* action brought by Relators on behalf of the State of Illinois to recover treble damages and civil penalties under the Illinois False Claims Act, 740 ILCS 175— *et seq*.

245.    ILCS § 175/3(a) provides liability for any person who:

(a)     knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(b)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

246.    PharMerica violated 740 ILCS § 175/3(a) and knowingly caused false claims to be made, used and presented to the State of Illinois by its deliberate and systematic violation of

120924406_2

federal and state laws, including the FCA, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

247.    The State of Illinois, by and through the Illinois Medicaid program and other state healthcare programs, was unaware of PharMerica's conduct and paid the claims submitted by PharMerica and healthcare providers in connection therewith.

248.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Illinois in connection with PharMerica's conduct. Compliance with applicable Illinois statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Illinois.

249.    Had the State of Illinois known of PharMerica's wrongful conduct, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

250.    As a result of PharMerica's violation of 740 ILCS § 175/3(a), the State of Illinois has been damaged in an amount far in excess of millions of dollars exclusive of interest.

251.    Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 740 ILCS § 175/4(b) on behalf of themselves and the State of Illinois.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To the State of Illinois:

(a)    Three times the amount of actual damages which the State of Illinois has sustained as a result of PharMerica's conduct;

(b)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which PharMerica caused to be presented to the State of Illinois;

(c)     Prejudgment interest; and

(d)     All costs incurred in bringing this action.

To Relators:

(a)     The maximum amount allowed pursuant to 740 ILCS § 175/4(d) and/or any other applicable provision of law;

(b)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(c)     An award of reasonable attorney's fees and costs; and

(d)     Such further relief as this Court deems equitable and just.

## COUNT XII

## INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT

252.     Relators reassert the foregoing allegations as if fully set forth herein.

253.     This is a *qui tam* action brought by Relators on behalf of the State of Indiana to recover treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code 5-11-5.5- *et seq*. provides:

254.     Section 2.(b) of the statute provides a person who knowingly or intentionally:

(a)     presents a false claim to the state for payment or approval;

(b)     makes or uses a false record or statement to obtain payment or approval of a false claim from the state...

255.     PharMerica violated Indiana Code 5-11-5.5- *et seq*. and knowingly caused false claims to be made, used and presented to the State of Indiana by its deliberate and systematic violation of federal and state laws, including the FCA, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

256.     The State of Indiana, by and through the Indiana Medicaid program and other state healthcare programs, was unaware of PharMerica's conduct and paid the claims submitted

by PharMerica and healthcare providers in connection therewith.

257.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Indiana in connection with PharMerica's conduct. Compliance with applicable Indiana statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Indiana.

258.   Had the State of Indiana known of PharMerica's wrongful conduct, it would not have paid the claims submitted by PharMerica and healthcare providers in connection with that conduct.

259.   As a result of PharMerica's violation of Indiana Code 5-11-5.5— *et seq.*, the State of Indiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

260.   Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Indiana Code 5-11-5.5— *et seq.* on behalf of themselves and the State of Indiana.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To the State of Indiana:

(a)   Three times the amount of actual damages which the State of Indiana has sustained as a result of PharMerica's conduct;
(b)   A Civil penalty of at least five thousand dollars ($5,000);
(c)   Prejudgment interest; and
(d)   All costs incurred in bringing this action.

To Relators:

(e)   The maximum amount allowed pursuant to Indiana Code 5-11-5.5-6 and/or any other applicable provision of law;

(f)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(g)     An award of reasonable attorney's fees and costs; and

(h)     Such further relief as this Court deems equitable and just.

## COUNT XIII
## IOWA FALSE CLAIMS ACT

261.    Relators reassert the foregoing allegations as if fully set forth herein.

262.    This is a *qui tam* action brought by Relators on behalf of the State of Iowa to receive treble damages and civil penalties under the Iowa False Claims Act. Iowa Code § 685.1 *et seq.*

263.    Iowa Code § 685.2 prohibits anyone from:

(a)     Knowingly presenting or causing to be presented a false or fraudulent claim for payment or approval;

(b)     Knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim.

264.    PharMerica violated Iowa Code § 685.2 by engaging in the conduct described herein.

265.    The State of Iowa was unaware of PharMerica's conduct and paid the claims.

266.    Compliance with the applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of the claims submitted to the State of Iowa in connection with PharMerica's conduct. Compliance with applicable Iowa statutes and regulations was also an express condition of payment of claims submitted to the State of Iowa.

267.    Had the State of Iowa known of PharMerica's wrongful conduct, it would not have paid the claims submitted by PharMerica and healthcare providers.

268.    As a result of PharMerica's violation of Iowa Code § 685.2, the State of Iowa has

been damaged.

269.     Relators are private citizens with direct and independent knowledge of the allegations of this Complaint who bring this action pursuant to Iowa Code § 685.3 on behalf of themselves and the State of Iowa.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To the State of Iowa:

(a)     Three times the amount of actual damages which the State of Iowa has sustained as a result of PharMerica's conduct;

(b)     A civil penalty of not less than $5500 and not more than $11,000 for each false claim which PharMerica caused to be presented to the State of Iowa;

(c)     Prejudgment interest; and

(d)     All costs incurred in bringing this action.

To Relators:

(a)     The maximum amount allowed pursuant to Iowa Code § 685.3 and/or any other applicable provision of law;

(b)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(c)     An award of reasonable attorney's fees and costs; and

(d)     Such further relief as this Court deems equitable and just.

## COUNT XIV
## LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW

270.     Relators reassert the foregoing allegations as if fully set forth herein.

271.     This is a *qui tam* action brought by Relators on behalf of the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. 46:437.1-- *et seq*.

272.     La. Rev. Stat. 46:438.3 provides:

(a)     No person shall knowingly present or cause to be presented a false or fraudulent claim;

(b)     No person shall knowingly engage in misrepresentation or make use or cause to be made or used a false record or statement material to a false claim.

273.    PharMerica violated La. Rev. Stat. 46:43 8.3 and knowingly caused false claims to be made, used and presented to the State of Louisiana by its deliberate and systematic violation of federal and state laws, including the FCA, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

274.    The State of Louisiana, by and through the Louisiana Medicaid program and other state healthcare programs, was unaware of PharMerica's conduct and paid the claims submitted by PharMerica and healthcare providers in connection therewith.

275.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Louisiana in connection with PharMerica's conduct. Compliance with applicable Louisiana statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Louisiana.

276.    Had the State of Louisiana known of PharMerica's wrongful conduct, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

277.    As a result of PharMerica's violation of La. Rev. Stat. 46:438.3 the State of Louisiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

278.    Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to La. Rev. Stat. 46: 439.1(A)

on behalf of themselves and the State of Louisiana.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To the State of Louisiana:

(a)    The amount of actual damages which the State of Louisiana has sustained as a result of PharMerica's conduct;

(b)    A civil penalty of up to $ 10,000 for each false claim which PharMerica caused to be presented to the State of Louisiana;

(c)    Prejudgment interest; and

(d)    All costs incurred in bringing this action.

To Relators:

(e)    The maximum amount allowed pursuant to La. Rev. Stat. § 439.4(A) and/or any other applicable provision of law;

(f)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(g)    An award of reasonable attorney's fees and costs; and

(h)    Such further relief as this Court deems equitable and just.

## COUNT XV
## MARYLAND FALSE HEALTH CLAIMS ACT

279.    Relators reassert the foregoing allegations as if fully set forth herein.

280.    This is a *qui tam* action brought by Relators and the State of Maryland to recover treble damages and civil penalties under the Maryland False Health Claims Act, Md. Health-General Code § 2-601— *et. seq.* (the "MD Act").

281.    The MD Act provides liability for any person who (1) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval; (2) knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim.

282.    PharMerica violated Md. Health-General Code § 2-602 by engaging in the illegal conduct described herein and by virtue of the fact that none of the claims submitted in

connection with its illegal conduct were even eligible for reimbursement by the Government Health Care Programs.

283.    PharMerica violated Md. Health-General Code § 2-602 and knowingly caused false claims to be made, used and presented to the State of Maryland by its deliberate and systematic violation of federal and state laws, including the FCA, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government Health Care Programs

284.    Maryland, by and through the Maryland Medicaid program and other state healthcare programs, was unaware of PharMerica's illegal conduct and paid the claims submitted by PharMerica and healthcare providers in connection therewith.

285.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to Maryland in connection with PharMerica's illegal conduct. Compliance with applicable Maryland statutes, regulations and Pharmacy Manuals was also an express condition for payment of claims submitted to Maryland.

286.    Had the State of Maryland known of PharMerica's wrongful conduct, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

287.    As a result of PharMerica's violation of, Md. Health-General Code § 2¬602, Maryland has been damaged in an amount far in excess of millions of dollars exclusive of interest.

288.    Relators are each private citizens with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to Md. Health-General Code

§ 2-604 on behalf of themselves and the State of Maryland.

WHEREFORE, Relators respectfully request this Court to award the following damages

to the following parties and against PharMerica:

To Maryland:

(a)     Three times the amount of actual damages which Maryland has sustained as a
result of PharMerica's illegal conduct;

(b)     A civil penalty of not more than $10,000 for each false claim which PharMerica
caused to be presented to Maryland;

(c)     Prejudgment interest; and

(d)     All costs incurred in bringing this action.

To Relators:

(e)     The maximum amount allowed pursuant to Md. Health-General Code § 2¬605
and/or any other applicable provision of law;

(f)     Reimbursement for reasonable expenses which Relators incurred in connection
with this action;

(g)     An award of reasonable attorney's fees and costs; and

(h)     Such further relief as this Court deems equitable and just.

## COUNT XVI
## MASSACHUSETTS FALSE CLAIMS ACT

289.    Relators reassert the foregoing allegations as if fully set forth herein.

290.    This is a *qui tam* action brought by Relators on behalf of the Commonwealth of

Massachusetts for treble damages and penalties under Massachusetts False Claims Act, Mass.

Gen. Laws Chap. 12 § 5(A)— *et seq.*

291.    Mass. Gen. Laws Chap. 12 § 5B provides liability for any person who-

(a)     knowingly presents, or causes to be presented, a false or fraudulent claim for

payment or approval;

(b)     knowingly makes, uses, or causes to be made or used, a false record or statement

material to a false or fraudulent claim.

292.    PharMerica violated Mass. Gen. Laws Chap. 12 § 5B and knowingly caused false

60

claims to be made, used and presented to the Commonwealth of Massachusetts by its deliberate and systematic violation of federal and state laws, including the FCA, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

293.    The Commonwealth of Massachusetts, by and through the Massachusetts Medicaid program and other state healthcare programs, was unaware of PharMerica's conduct and paid the claims submitted by PharMerica and healthcare providers in connection therewith.

294.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Massachusetts in connection with PharMerica's conduct. Compliance with applicable Massachusetts statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the Commonwealth of Massachusetts.

295.    Had the Commonwealth of Massachusetts known of PharMerica's wrongful conduct, it would not have paid the claims submitted by PharMerica and healthcare providers.

296.    As a result of PharMerica's violation of Mass. Gen. Laws Chap. 12 § 5B, the Commonwealth of Massachusetts has been damaged in an amount far in excess of millions of dollars exclusive of interest.

297.    Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Mass. Gen. Laws Chap. 12 § 5(C)(2) on behalf of themselves and the Commonwealth of Massachusetts.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To the Commonwealth of Massachusetts:

(a) Three times the amount of actual damages which the Commonwealth of Massachusetts has sustained as a result of PharMerica's conduct;

(b) A civil penalty of not less than $5500 and not more than $11,000 for each false claim which PharMerica caused to be presented to the Commonwealth of Massachusetts;

(c) Prejudgment interest; and

(d) All costs incurred in bringing this action.

To Relators:

(e) The maximum amount allowed pursuant to Mass. Gen. Laws Chap. 12, §5F and/or any other applicable provision of law;

(f) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(g) An award of reasonable attorney's fees and costs; and

(h) Such further relief as this Court deems equitable and just.

## COUNT XVII
## MICHIGAN MEDICAID FALSE CLAIMS ACT

298. Relators reassert the foregoing allegations as if fully set forth herein.

299. This is a *qui tam* action brought by Relators on behalf of the State of Michigan to recover treble damages and civil penalties under the Michigan Medicaid False Claims Act. MI State. Ch. 400.603— *et seq.*

1. Section 400.603 provides liability in pertinent part as follows:

(a) Sec. 3. (1) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for Medicaid benefits;

(b) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a Medicaid benefit. . . .

300. PharMerica violated, MI Stat. Ch. 400.603— et seq. and knowingly caused false

claims to be made, used and presented to the State of Michigan by its deliberate and systematic violation of federal and state laws, including the FCA, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

301.    The State of Michigan, by and through the Michigan Medicaid program and other state healthcare programs, was unaware of PharMerica's conduct and paid the claims submitted by PharMerica and healthcare providers in connection therewith.

302.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Michigan in connection with PharMerica's conduct. Compliance with applicable Michigan statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Michigan.

303.    Had the State of Michigan known of PharMerica's wrongful, it would not have paid the claims submitted by PharMerica and healthcare providers.

304.    As a result of PharMerica's violation of MI Stat. Ch. 400.603— *et seq*. the State of Michigan has been damaged in an amount far in excess of millions of dollars exclusive of interest.

305.    Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to MI Stat. Ch. 400.610a on behalf of themselves and the State of Michigan.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To the State of Michigan:

(a) Three times the amount of actual damages which the State of Michigan has sustained as a result of PharMerica's conduct;

(b) A civil penalty equal to the full amount received for each false claim which PharMerica caused to be presented to the State of Michigan;

(c) Prejudgment interest; and

(d) All costs incurred in bringing this action.

To Relators:

(e) The maximum amount allowed pursuant to MI ST Ch. 400.610a and/or any other applicable provision of law;

(f) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(g) An award of reasonable attorney's fees and costs; and

(h) Such further relief as this Court deems equitable and just.

## COUNT XVIII
## MINNESOTA FALSE CLAIMS ACT

306. Relators reassert the foregoing allegations as if fully set forth herein.

307. This is a *qui tam* action brought by Relators and the State of Minnesota to recover treble damages and civil penalties under the Minnesota False Claims Act, § 15C.01— *et seq.* (the "MN Act").

308. The MN Act provides liability for any person who: (1) knowingly presents or causes to be presented, a false or fraudulent claim for payment or approval; and (2) knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

309. PharMerica violated § 15C.02 by engaging in the illegal conduct described herein and by virtue of the fact that none of the claims submitted in connection with its illegal conduct were even eligible for reimbursement by the Government Health Care Programs.

310. Minnesota, by and through the Minnesota Medicaid program and other state healthcare programs, was unaware of PharMerica's illegal conduct and paid the claims submitted by PharMerica and healthcare providers in connection therewith.

311.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to Minnesota in connection with PharMerica's illegal conduct. Compliance with applicable Minnesota statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to Minnesota.

312.     Had the State of Minnesota known of PharMerica's wrongful conduct, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

313.     As a result of PharMerica's violation of Minn. Stat. § 15C.02, Minnesota has been damaged in an amount far in excess of millions of dollars exclusive of interest.

314.     Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Minn. Stat. § 15C.05 on behalf of themselves and the State of Minnesota.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To Minnesota:

(a)     Three times the amount of actual damages which Minnesota has sustained as a result of PharMerica's illegal conduct;
(b)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which PharMerica caused to be presented to Minnesota;
(c)     Prejudgment interest; and
(d)     All costs incurred in bringing this action.

To Relators:

(a)     The maximum amount allowed pursuant to Minn. Stat. § 15C.13 and/or any other applicable provision of law;
(b)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;
(c)     An award of reasonable attorney's fees and costs; and

(d)     Such further relief as this Court deems equitable and just.

## COUNT XIX
## MONTANA FALSE CLAIMS ACT
## MONT. CODE ANN. & 17-8-401

315.    Relators reassert the foregoing allegations as if fully set forth herein.

316.    This is a *qui tam* action brought by Relators on behalf of the State of Montana to recover treble damages and penalties under the Montana False Claims Act, Mont. Code Ann. § 17-8-403(1)(a)-(b).

317.    Section 17-8-403 provides liability for any person who:

(a)     knowingly presenting or causing to be a false claim for payment or approval;

(b)     knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim.

318.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Montana in connection with PharMerica's conduct. Compliance with applicable Montana statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Montana.

319.    Had the State of Montana known of PharMerica's wrongful conduct, it would not have paid the claims submitted by PharMerica and healthcare providers in connection with that conduct.

320.    The Montana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by PharMerica, paid and continues to pay the claims that would not be paid but for PharMerica's conduct.

321.    By reason of PharMerica's acts, the State of Montana has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

322.    The State of Montana is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, by PharMerica.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To the State of Montana:

(a)    Not less than two times and not more than three times the amount of actual damages which the State of Montana has sustained as a result of PharMerica's conduct;
(b)    A civil penalty of not less than $5500 and not more than $11,000 for each false claim which PharMerica caused to be submitted;
(c)    Prejudgment interest; and
(d)    All costs incurred in bringing this action.

To Relators:

(e)    The maximum amount allowed pursuant to Montana Code Ann. § 17-8¬410 and/or any other applicable provision of law;
(f)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;
(g)    An award of reasonable attorney's fees and costs; and
(h)    Such further relief as this Court deems equitable and just.

### COUNT XX
### NEVADA FALSE CLAIMS ACT

323.    Relators reassert the foregoing allegations as if fully set forth herein.

324.    This is a *qui tam* action brought by Relators on behalf of the State of Nevada to recover treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat. § 357.010 -- *et seq*.

325.    Nev. Rev. Stat. § 357.040(1) provides liability for any person who-

> (a)     knowingly presents or causes to be presented a false claim for payment or
>         approval;
>
> (b)     knowingly makes or uses, or causes to be made or used, a false record or
>         statement that is material to a false or fraudulent claim.

326.    PharMerica violated Nev. Rev. Stat. § 357.040(1) and knowingly caused false claims to be made, used and presented to the State of Nevada by its deliberate and systematic violation of federal and state laws, including the FCA, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

327.    The State of Nevada, by and through the Nevada Medicaid program and other state healthcare programs, was unaware of PharMerica's conduct and paid the claims submitted by PharMerica and healthcare providers in connection therewith.

328.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Nevada in connection with PharMerica's conduct. Compliance with applicable Nevada statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Nevada.

329.    Had the State of Nevada known of PharMerica's wrongful conduct, it would not have paid the claims submitted by PharMerica and healthcare providers.

330.    As a result of PharMerica's violation of Nev. Rev. Stat. § 357.040(1) the State of Nevada has been damaged in an amount far in excess of millions of dollars exclusive of interest.

331.    Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Nev. Rev. Stat. §

357.080(1) on behalf of themselves and the State of Nevada.

WHEREFORE, Relators respectfully request this Court to award the following damages

to the following parties and against PharMerica:

To the State of Nevada:

(a)     Three times the amount of actual damages which the State of Nevada has
        sustained as a result of PharMerica's conduct;
(b)     A civil penalty of not less than $5,500 and not more than $11,000 for each false
        claim which PharMerica caused to be presented to the State of Nevada;
(c)     Prejudgment interest; and
(d)     All costs incurred in bringing this action.

To Relators:

(e)     The maximum amount allowed pursuant to Nev. Rev. Stat. § 357.210 and/or any
        other applicable provision of law;
(f)     Reimbursement for reasonable expenses which Relators incurred in connection
        with this action;
(g)     An award of reasonable attorney's fees and costs; and
(h)     Such further relief as this Court deems equitable and just.

## COUNT XXI
## THE NEW HAMPSHIRE HEALTH CARE FALSE CLAIMS ACT

332.    Relators reassert the foregoing allegations as if fully set forth herein.

333.    This is a *qui tam* action brought by Relators on behalf of the State of New

Hampshire to recover treble damages and civil penalties under the New Hampshire Health Care

False Claims Law, N.H. Rev. Stat. Ann. § 167:61-b— *et seq.*

334.    Section 167:61-b provides: 1. Any person shall be liable who:

(a)     knowingly presents, or causes to be presented, to an officer or employee of the

        department a false or fraudulent claim for payment or approval;

(b)     knowingly makes, uses, or causes to be made or used, a false record or statement

        to get a false or fraudulent claim paid or approved by the department.

335.    PharMerica violated N.H. Rev. Stat. Ann. § 167:61-b, and knowingly caused false

claims to be made, used and presented to the State of New Hampshire by its deliberate and systematic violation of federal and state laws, including the FCA, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

336.    The State of New Hampshire, by and through the New Hampshire Medicaid program and other state healthcare programs, was unaware of PharMerica's conduct and paid the claims submitted by PharMerica and healthcare providers and in connection therewith.

337.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Hampshire in connection with PharMerica's conduct. Compliance with applicable New Hampshire statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of New Hampshire.

338.    Had the State of New Hampshire known of PharMerica's wrongful conduct, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

339.    As a result of PharMerica's violation of N.H. Rev. Stat. Ann. § 167:61-b -- et seq., the State of New Hampshire has been damaged in an amount far in excess of millions of dollars exclusive of interest.

340.    Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.H. Rev. Stat. Ann. §167:61-c on behalf of themselves and the State of New Hampshire.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To the State of New Hampshire:

(a)   Three times the amount of actual damages which the State of New Hampshire has sustained as a result of PharMerica's conduct;

(b)   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which PharMerica caused to be presented to the State of New Hampshire;

(c)   Prejudgment interest; and

(d)   All costs incurred in bringing this action.

To Relators:

(e)   The maximum amount allowed pursuant to N.H. Rev. Stat. Ann § 167:61-e and/or any other applicable provision of law;

(f)   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(g)   An award of reasonable attorney's fees and costs; and

(h)   Such further relief as this Court deems equitable and just.

## COUNT XXII
## NEW JERSEY FALSE CLAIMS ACT

345.   Relators reassert the foregoing allegations as if fully set forth herein.

346.   This is a *qui tam* action brought by Relators on behalf of the State of New Jersey to recover treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. § 2A:32C-1— *et seq.* (2008).

347.   Stat. § 2A:32C-3 provides liability for any person who:

(a)   knowingly presents, or causes to be presented, to an employee, officer, or agent of the State or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

(b)   knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State.

120924406_2

348.    PharMerica violated N.J. Stat. § 2A:32C-3 and knowingly caused false claims to be made, used and presented to the State of New Jersey by its deliberate and systematic violation of federal and state laws, including the FCA, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

349.    The State of New Jersey, by and through the New Jersey Medicaid program and other state healthcare programs, was unaware of PharMerica's conduct and paid the claims submitted by PharMerica and healthcare providers in connection therewith.

350.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Jersey in connection with PharMerica's conduct. Compliance with applicable New Jersey statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of New Jersey.

351.    Had the State of New Jersey known of PharMerica's wrongful conduct, it would not have paid the claims submitted by PharMerica and healthcare providers.

352.    As a result of PharMerica's violation of N.J. Stat. § 2A:32C-3, the State of New Jersey has been damaged in an amount far in excess of millions of dollars exclusive of interest.

353.    Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.J. Stat. § 2A:32C-5 on behalf of themselves and the State of New Jersey.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To the State of New Jersey:
- (a)  Three times the amount of actual damages which the State of New Jersey has sustained as a result of PharMerica's conduct;
- (b)  A civil penalty of not less than and not more than the civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729 - *et seq*.) which PharMerica caused to be presented to the State of New Jersey;
- (c)  Prejudgment interest; and
- (d)  All costs incurred in bringing this action.

To Relators:
- (a)  The maximum amount allowed pursuant to N.J. Stat. § 2A:32C-7 and/or any other applicable provision of law;
- (b)  Reimbursement for reasonable expenses which Relators incurred in connection with this action;
- (c)  An award of reasonable attorney's fees and costs; and
- (d)  Such further relief as this Court deems equitable and just.

## COUNT XXIII
## NEW MEXICO FRAUD AGAINST TAXPAYERS ACT

354.   Relators Relators reassert the foregoing allegations as if fully set forth herein.

355.   This is a *qui tam* action brought by Relators on behalf of the State of New Mexico to recover treble damages and civil penalties under the New Mexico Medicaid False Claims Act N.M. Stat. Ann. §§ 44-9-1— *et seq*.

356.   Section 44-9-3 provides liability in pertinent part as follows:

357.   A person . . . shall not:

- (a)  knowingly present, or cause to be presented, to an employee, officer or agent of the state or a contractor, grantee or recipient of state funds, a false or fraudulent claim for payment or approval;

- (b)  knowingly make, use or cause to be made or used a false, misleading or fraudulent record or statement to obtain or support the approval of a payment on a false or fraudulent claim.

358.   PharMerica furthermore violated, N.M. Stat. Ann. §§ 44-9-3 and knowingly caused false claims to be made, used and presented to the State of New Mexico by its deliberate

73

and that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

359.    The State of New Mexico, by and through the New Mexico Medicaid program and other state healthcare programs, was unaware of PharMerica's conduct and paid the claims submitted by PharMerica and healthcare providers in connection therewith.

360.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Mexico in connection with PharMerica's conduct.

361.    Compliance with applicable New Mexico statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of New Mexico.

362.    Had the State of New Mexico known of PharMerica's wrongful conduct, it would not have paid the claims submitted by PharMerica and healthcare providers in connection with that conduct.

363.    As a result of PharMerica's violation of N.M. Stat. Ann§§ 44-9-3, the State of New Mexico has been damaged in an amount far in excess of millions of dollars exclusive of interest.

364.    Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.M. Stat. Ann. §§ 44-9-5 on behalf of themselves and the State of New Mexico.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To the State of New Mexico:

(a)    Three times the amount of actual damages which the State of New Mexico has
       sustained as a result of PharMerica's conduct;
(b)    A civil penalty of not less than $5,000 and not more than $10,000 for each false
       claim which PharMerica caused to be presented to the State of New Mexico;
(c)    Prejudgment interest; and
(d)    All costs incurred in bringing this action.

To Relators:

(e)    The maximum amount allowed pursuant to N.M. Stat. Ann. §§ 44¬9-7 and/or any
       other applicable provision of law;
(f)    Reimbursement for reasonable expenses which Relators incurred in connection
       with this action;
(g)    An award of reasonable attorney's fees and costs; and
(h)    Such further relief as this Court deems equitable and just.

## COUNT XXIV
## NORTH CAROLINA FALSE CLAIMS ACT

365.    Relators reassert the foregoing allegations as if fully set forth herein.

366.    This is a *qui tam* action brought by Relators and the State of North Carolina to
recover treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen.
Stat. § 1-605 – *et seq*. (the "Act").

367.    The Act provides liability for any person who (1) knowingly presents or causes to
be presented a false or fraudulent claim for payment or approval; and (2) knowingly makes or
uses, or causes to be made or used, a false record or statement material to a false or fraudulent
claim.

368.    PharMerica violated N.C. Gen. Stat. § 1-607 by engaging in the illegal conduct
described herein and by virtue of the fact that none of the claims submitted in connection with its
illegal conduct were even eligible for reimbursement by the Government Health Care Programs.

369.    PharMerica violated N.C. Gen. Stat. § 1-607 and knowingly caused false claims
to be made, used and presented to the State of North Carolina by its deliberate and systematic

75

violation of federal and state laws, including the FCA, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government Health Care Programs

370.    North Carolina, by and through the North Carolina Medicaid program and other state healthcare programs, was unaware of PharMerica's illegal conduct and paid the claims submitted by PharMerica and healthcare providers in connection therewith.

371.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to North Carolina in connection with PharMerica's illegal conduct. Compliance with applicable North Carolina statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to North Carolina.

372.    Had the State of North Carolina known of wrongful conduct, it would not have paid the claims submitted by PharMerica and healthcare providers in connection with that conduct.

373.    As a result of PharMerica's violation of N.C. Gen. Stat. §1-607, North Carolina has been damaged in an amount far in excess of millions of dollars exclusive of interest.

374.    Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.C. Gen. Stat § 1-608 on behalf of themselves and the State of North Carolina.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To North Carolina:

(a)    Three times the amount of actual damages which North Carolina has sustained as a result of PharMerica's illegal conduct;

(b)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which PharMerica caused to be presented to North Carolina;

(c)    Prejudgment interest; and

(d)    All costs incurred in bringing this action.

To Relators:

(e)    The maximum amount allowed pursuant to N.C. Gen. Stat. § 1-610 and/or any other applicable provision of law;

(f)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(g)    An award of reasonable attorney's fees and costs; and

(h)    Such further relief as this Court deems equitable and just.

## COUNT XXV
## OKLAHOMA MEDICAID FALSE CLAIMS ACT

375.    Relators reassert the foregoing allegations as if fully set forth herein.

376.    This is a *qui tam* action brought by Relators on behalf of the State of Oklahoma to recover treble damages and civil penalties under the Oklahoma Medicaid False Claims Act 63 Okl. St. § 5053— *et seq.* (2008)

377.    Okl. St. § 5053.1 (2)(B) provides liability for any person who:

(a)    knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;

(b)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State.

378.    PharMerica violated 63 Okl. St. § 5053.1-- *et seq.* and knowingly caused false claims to be made, used and presented to the State of Oklahoma by its deliberate and systematic violation of federal and state laws, including the FCA, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

379.    The State of Oklahoma, by and through the Oklahoma Medicaid program and other state healthcare programs, was unaware of PharMerica's conduct and paid the claims submitted by PharMerica and healthcare providers in connection therewith.

380.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Oklahoma in connection with PharMerica's conduct. Compliance with applicable Oklahoma statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Oklahoma.

381.    Had the State of Oklahoma known of PharMerica's wrongful conduct, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

382.    As a result of PharMerica's violation of 63 Okl. St. § 5053.1 (2)(B), the State of Oklahoma has been damaged in an amount far in excess of millions of dollars exclusive of interest.

383.    Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 63 Okl. St. § 5053.2B1 on behalf of themselves and the State of Oklahoma.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To the State of Oklahoma:

(a)    Three times the amount of actual damages which the State of Oklahoma has sustained as a result of PharMerica's conduct;
(b)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which PharMerica caused to be presented to the State of Oklahoma;
(c)    Prejudgment interest; and
(d)    All costs incurred in bringing this action.

To Relators:

(a)    The maximum amount allowed pursuant to 63 Okl. St. § 5053.4 and/or any other
       applicable provision of law;
(b)    Reimbursement for reasonable expenses which Relators incurred
(c)    An award of reasonable attorney's fees and costs; and
(d)    Such further relief as this Court deems equitable and just.

## COUNT XXVI
## RHODE ISLAND STATE FALSE CLAIMS ACT

384.    Relators reassert the foregoing allegations as if fully set forth herein.

385.    This is a *qui tam* action brought by Relators on behalf of the State of Rhode Island

to recover treble damages and civil penalties under the Rhode Island State False Claims Act R.I.

Gen. Laws § 9-1.1-1— *et seq.*

386.    Gen. Laws § 9-1.1-3 provides liability for any person who:

(a)    knowingly presents, or causes to be presented, a false or fraudulent claim for

       payment or approval;

(b)    knowingly makes, uses, or causes to be made or used, a false record or statement

       material to a false or fraudulent claim.

387.    PharMerica violated R.I. Gen. Laws § 9-1.1-1 and knowingly caused false claims

to be made, used and presented to the State of Rhode Island by its deliberate and systematic

violation of federal and state laws, including the FCA, and by virtue of the fact that none of the

claims submitted in connection with its conduct were even eligible for reimbursement by the

government-funded healthcare programs.

388.    The State of Rhode Island, by and through the Rhode Island Medicaid program

and other state healthcare programs, was unaware of PharMerica's conduct and paid the claims

submitted by PharMerica and healthcare providers in connection therewith.

120924406_2

389.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Rhode Island in connection with PharMerica's conduct. Compliance with applicable Rhode Island statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Rhode Island.

390.    Had the State of Rhode Island known of PharMerica's wrongful conduct, it would not have paid the claims submitted by PharMerica and healthcare providers.

391.    As a result of PharMerica's violation of R.I. Gen. Laws § 9-1.1-3, the State of Rhode Island has been damaged in an amount far in excess of millions of dollars exclusive of interest.

392.    Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to R.I. Gen. Laws § 9-1.1-4 on behalf of themselves and the State of Rhode Island.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To the State of Rhode Island:

(a)    Three times the amount of actual damages which the State of Rhode Island has sustained as a result of PharMerica's conduct;
(b)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which PharMerica caused to be presented to the State of Rhode Island;
(c)    Prejudgment interest; and
(d)    All costs incurred in bringing this action.

To Relators:

(a)    The maximum amount allowed pursuant to R.I. Gen. Laws §9-1.1-4(d) and/or any other applicable provision of law;

(b)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(c)    An award of reasonable attorney's fees and costs; and

(d)    Such further relief as this Court deems equitable and just.

## COUNT XXVII
## TENNESSEE FALSE CLAIMS ACT

393.    Relators reassert the foregoing allegations as if fully set forth herein.

394.    This is a *qui tam* action brought by Relators on behalf of the State of Tennessee to recover treble damages and civil penalties under the Tennessee False Claims Act, Tenn. Code Ann. § 4-18-101 et seq. and Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 et seq.

395.    Section 4-18-103(a) provides liability for any person who:

(a)    knowingly presents, or causes to be presented to an officer or employee of the state. . . ., a false claim for payment or approval;

(b)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false claim paid or approved by the state or by any political subdivision.

396.    Section 71-5-182(a)(1) provides liability for any person who-

(a)    presents, or causes to be presented to the state, a claim for payment under the Medicaid program knowing such claim is false or fraudulent;

(b)    makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false.

397.    PharMerica violated Tenn. Code Ann. § 4-18-103(a) and § 71-5-1 82(a)(1) and knowingly caused false claims to be made, used and presented to the State of Tennessee by its deliberate and systematic violation of federal and state laws, including the FCA, and by virtue of

81

the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

398.    The State of Tennessee, by and through the Tennessee Medicaid program and other state healthcare programs, was unaware of PharMerica's conduct and paid the claims submitted by PharMerica and healthcare providers in connection therewith.

399.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Tennessee in connection with PharMerica's conduct. Compliance with applicable Tennessee statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Tennessee.

400.    Had the State of Tennessee known of PharMerica's wrongful conduct, it would not have paid the claims submitted by PharMerica and healthcare providers.

401.    As a result of PharMerica's violation of Tenn. Code Ann. § 4-18-103(a) and § 71-5-182(a)(1), the State of Tennessee has been damaged in an amount far in excess of millions of dollars exclusive of interest.

402.    Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Tenn. Code Ann. § 4-18 -103 (a) and § 71-5-183(b)(1) on behalf of themselves and the State of Tennessee.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To the State of Tennessee:

(a)    Three times the amount of actual damages which the State of Tennessee has sustained as a result of PharMerica's conduct;

(b)    A civil penalty of not less than $2,500 and not more than $10,000 for each false claim which PharMerica caused to be presented to the State of Tennessee;

(c)     Prejudgment interest; and
(d)     All costs incurred in bringing this action.

To Relators:

(e)     The maximum amount allowed pursuant to Tenn. Code Ann. §71-5-183(d) and/or any other applicable provision of law;
(f)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;
(g)     An award of reasonable attorney's fees and costs; and
(h)     Such further relief as this Court deems equitable and just.

## COUNT XXVIII
## TEXAS MEDICAID FRAUD PREVENTION LAW

403.    Relators reassert the foregoing allegations as if fully set forth herein.

404.    This is a *qui tam* action brought by Relators on behalf of the State of Texas to recover double damages and civil penalties under Tex. Hum. Res. Code § 36.001 et seq.

405.    Tex. Hum. Res. Code § 36.002 provides liability for any person who-

(1)     knowingly or intentionally makes or causes to be made a false statement or misrepresentation of a material fact:

(a)     on an application for a contract, benefit, or payment under the Medicaid program; or

(b)     that is intended to be used to determine its eligibility for a benefit

(2)     knowingly or intentionally concealing or failing to disclose an event:

(A)     that the person knows affects the initial or continued right to a benefit or payment under the Medicaid program of

(i)     the person, or

(ii)    another person on whose behalf the person has applied for a benefit or payment or is receiving a benefit or payment; and

(B)     to permit a person to receive a benefit or payment that is not authorized or that is greater than the payment or benefit that is authorized;

\* \* \*

(4)      knowingly or intentionally makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:

\* \* \*

(B)      information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program.

406.    PharMerica violated Tex. Hum. Res. Code § 36.002 and knowingly caused false claims to be made, used and presented to the State of Texas by its deliberate and systematic violation of federal and state laws, including the FCA, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

407.    The State of Texas, by and through the Texas Medicaid program and other state healthcare programs, was unaware of PharMerica's conduct and paid the claims submitted by PharMerica and healthcare providers in connection therewith.

408.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Texas in connection with PharMerica's conduct. Compliance with applicable Texas statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Texas.

409.    Had the State of Texas known of PharMerica's wrongful conduct, it would not have paid the claims submitted by PharMerica and healthcare providers.

410.    As a result of PharMerica's violation of Tex. Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

411.    PharMerica did not, within 30 days after it first obtained information as to such violation, furnish such information to officials of the State responsible for investigating false

claims violation, did not otherwise fully cooperate with any investigation of the violation, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

412.    Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Tex. Hum. Res. Code § 36.101 on behalf of themselves and the State of Texas.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To the State of Texas:

(a)    Two times the amount of actual damages which the State of Texas has sustained as a result of PharMerica's conduct;

(b)    A civil penalty of not less than $5,500 or more than $ 15,000 pursuant to Tex. Hum. Res. Code § 36.025(a)(3) for each false claim which PharMerica cause to be presented to the State of Texas;

(c)    Prejudgment interest; and

(d)    All costs incurred in bringing this action.

To Relators:

(e)    The maximum amount allowed pursuant to Tex. Hum. Res. Code §36.110, and/or any other applicable provision of law;

(f)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(g)    An award of reasonable attorney's fees and costs; and

(h)    Such further relief as this Court deems equitable and just.

## COUNT XXIX
## VIRGINIA FRAUD AGAINST TAXPAYERS ACT

413.    Relators reassert the foregoing allegations as if fully set forth herein.

414.    This is a *qui tam* action brought by Relators on behalf of the Commonwealth of Virginia for treble damages and penalties under Va. Code Ann. § 8.01-216.1– *et seq.*

415.    Section 216.3A provides liability for any person who:

> (a)     Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;
>
> (b)     Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

416.     PharMerica violated Va. Code Ann. § 8.01-216.3A and knowingly caused false claims to be made, used and presented to the Commonwealth of Virginia by its deliberate and systematic violation of federal and state laws, including the FCA, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

417.     The Commonwealth of Virginia, by and through the Virginia Medicaid program and other state healthcare programs, was unaware of PharMerica's conduct and paid the claims submitted by PharMerica and healthcare providers in connection therewith.

418.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief; also an express condition of payment of claims submitted to the Commonwealth of Virginia in connection with PharMerica's conduct. Compliance with applicable Virginia statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the Commonwealth of Virginia.

419.     Had the Commonwealth of Virginia known of PharMerica's wrongful conduct, would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

120924406_2

420.    As a result of PharMerica's violation of Va. Code Ann. § 8.01-216.3A, the Commonwealth of Virginia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

421.    Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Va. Code Ann. § 8.01-216.5 on behalf of themselves and the Commonwealth of Virginia.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To the Commonwealth of Virginia:

(c)     Three times the amount of damages which the Commonwealth of Virginia has sustained as a result of PharMerica's conduct;
(d)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which PharMerica caused to be presented to the Commonwealth of Virginia;
(e)     Prejudgment interest; and
(f)     All costs incurred in bringing this action.

To Relators:

(g)     The maximum amount allowed pursuant to Va. Code Ann. § 8.01-216.7 and/or any other applicable provision of law;
(h)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;
(i)     An award of reasonable attorney's fees and costs; and
(j)     Such further relief as this Court deems equitable and just.

## COUNT XXX
## WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT

422.    Relators reassert the foregoing allegations as if fully set forth herein.

423.    This is a *qui tam* action brought by Relators on behalf of the State of Washington to recover treble damages and penalties under the Washington Medicaid Fraud False Claims Act RCW § 74.66.005 et seq. 412. RCW § 74.66.020 provides liability for any person who:

(a)     knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(b)     knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim.

424.    The State of Washington was unaware of PharMerica's conduct and paid the claims submitted by PharMerica and providers.

425.    Compliance with the applicable Medicare, Medicaid and other state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Washington in connection with PharMerica's conduct. Compliance with applicable Washington statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Washington.

426.    Had the State of Washington known of PharMerica's conduct, it would not have paid the claims submitted in connection with that conduct.

427.    As a result of PharMerica's violation of RCW § 74.66.0220, the State of Washington has been damaged in an amount far in excess of millions of dollars exclusive of interest.

428.    Relators are each private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to RCW § 74.66.50 et seq. on behalf of the State of Washington.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against PharMerica:

To the State of Washington:

(a)     Three times the amount of actual damages which the State of Washington has sustained as a result of PharMerica's conduct;

88

120924406_2

(b)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which PharMerica caused to be presented to the State of Washington;
(c)     Prejudgment interest; and
(d)     All costs incurred in bringing this action.

To Relators:

(e)     The maximum amount allowed pursuant to RCW § 74.66.070 and/or any other applicable provision of law;
(f)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;
(g)     An award of reasonable attorney's fees and costs; and
(h)     Such further relief as this Court deems equitable and just.

## COUNT XXXI
## RELATOR STURGEON V. PHARMERICA
## RETALIATION AND VIOLATION OF 31 U.S.C. 3730(H)

429.     Relators reassert the foregoing allegations as if fully set forth herein.

430.     At all times material hereto, PharMerica was an employer covered by 31 U.S.C. § 3730(h). Section 3730(h) precludes retaliation, suspension, threats, harassment and other discriminatory conduct against employees who investigate, provide testimony or assistance in any action filed or to be filed under the FCA.

431.     The involuntary termination of Sturgeon's employment, threats and harassment, as set forth above, were in violation of 31 U.S.C. § 3730(h).

432.     As a direct and proximate result of the retaliation, harassment and threats by PharMerica, Sturgeon suffered and incurred and continues to suffer and incur loss of compensation and other benefits, harm and damage to reputation and emotional distress.

433.     PharMerica's conduct was and is malicious, fraudulent and oppressive in violation of public policy and in violation of 31 U.S.C. § 3730(h).

WHEREFORE, Sturgeon requests that judgment be entered against PharMerica in her favor and that she be awarded any and all relief pursuant to 31 U.S.C.§ 3730(h) including, but not limited to:

120924406_2

(a)     Two times the amount of back pay;
(b)     Interest on back pay;
(c)     Any and all other compensatory and special damages;
(d)     All litigation and reasonable attorney's fees;
(e)     Punitive damages; and
(f)     Any such further relief that this Court deems appropriate.

                                    Respectfully submitted,

Dated:  May 31, 2019                By  /s/ Catherine Pratsinakis
                                    Catherine Pratsinakis (No. 88086)
                                    Jesse N. Silverman
                                    DILWORTH PAXSON LLP
                                    1500 Market Street, Suite 3500E
                                    Philadelphia, PA 19102
                                    Telephone:  (215) 575-7000
                                    Facsimile:  (215) 575-7200
                                    cpratsinakis@dilworthlaw.com
                                    jsilverman@dilworthlaw.com
                                    *Attorneys for Plaintiffs*

: 20924406 2