# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STURGEON, et al., | : | |
| **Plaintiff,** | : | |
| v. | : | **CIVIL ACTION NO. 15-6829** |
| | : | |
| PHARMERICA CORP., | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

**Rufe, J.**                                                                                                **February 5, 2020**

Relators Lena Sturgeon, Anthony Ferrante, Anthony Sciole, and Nathan Niles bring this *qui tam* action against PharMerica Corporation alleging violations of the federal False Claims Act[1] and the false claims statutes of twenty-six states.[2] Relators allege that PharMerica, a long-term care pharmacy, submitted false claims for government reimbursement for prescriptions it illegally altered without physician consent. Relator Sturgeon also alleges that PharMerica retaliated against her after she attempted to bring to its attention alleged instances of fraudulent activity. The state and federal governments declined to intervene and PharMerica has moved to dismiss the Amended Complaint.

---

[1] 31 U.S.C. §§ 3729(a)(1)(A), (B), (G).

[2] Cal. Gov't Code §§ 12650–56 (West 2019); Colo. Rev. Stat. §§ 25.5-4-303.5 to -310 (West 2019); Conn. Gen. Stat. §§ 4-274 to -289 (West 2019); Del. Code Ann. tit. 6, §§ 1201–11 (West 2019); Fla. Stat. Ann. §§ 68.081–.092 (West 2019); Ga. Code Ann. §§ 49-4-168 to -168.6 (West 2019); Haw. Rev. Stat. Ann. §§ 661-21 to -31 (West 2019); 740 Ill. Comp. Stat. Ann. 175/1–175/8 (West 2019); Ind. Code Ann. §§ 5-11-5.5-1 to 5-11-5.5-18 (West 2019); Iowa Code Ann. §§ 685.1–.7 (West 2019); La. Stat. Ann. §§ 46:437.1–440.16 (2019); Mass. Gen. Laws Ann. ch. 12, §§ 5A–5O (West 2019); Mich. Comp. Laws Ann. §§ 400.601–.615 (West 2019); Minn. Stat. Ann. §§ 15C.01–.16 (West 2019); Mont. Code Ann. §§ 17-8-401 to -416 (West 2019); Nev. Rev. Stat. Ann. §§ 357.010–.250 (West 2019); N.H. Rev. Stat. Ann. §§ 167:61-A to -E (2019); N.J. Stat. Ann. §§ 2A:32C-1 to -18 (West 2019); N.M. Stat. Ann. §§ 44-9-1 to -14 (West 2019); N.C. Gen. Stat. Ann. §§ 1-605 to -618 (West 2019); Okla. Stat. Ann. tit. 63, §§ 5053–54 (West 2019); 9 R.I. Gen. Laws Ann. §§ 9-1.1-1 to -1.1-9 (West 2019); Tenn. Code Ann. §§ 4-18-101 to -108, 71-5-181 to -185 (West 2019); Tex. Hum. Res. Code Ann. §§ 36.001–.132 (West 2019); Va. Code Ann. § 8.01-216.1 to -216.19 (West 2019); Wash. Rev. Code Ann. § 74.66.005–.130 (West 2019). Relators also brought claims under the Maryland False Claims Act. Md. Code Ann., Health–Gen. § 2-601 to -611 (West 2019). That statute requires that claims be dismissed if the state does not elect to intervene. *See* Doc. No. 81. Accordingly, Relators' claims under Maryland's false claims statute were dismissed by stipulation of the parties. *See* Doc. No. 82.

## I.  BACKGROUND[3]

### A.  PharMerica Is a Long-Term Care Pharmacy

PharMerica is the second largest institutional pharmacy in the United States.[4] It fills prescription orders only for nursing homes and other long-term care facilities and is not open to the general public.[5]

Nursing home physicians submit prescriptions to PharMerica electronically through a "widely-used nursing home platform" called PointClickCare.[6] PharMerica also uses its own "proprietary medicine dispensing system known as the LTC400" to fill prescriptions received through PointClickCare.[7] Prescription data transmitted via PointClickCare is not migrated automatically to the LTC400 to create an order for filling a prescription. Instead, when a prescription is received through the PointClickCare system, a pharmacy technician or data entry clerk at PharMerica manually inputs the prescription information into the LTC400.[8]

### B.  Overview of Medicare Part D

"Medicare is a federally funded and administered health insurance program for certain groups, primarily elderly and disabled persons."[9] "The Department of Health and Human Services ('HHS') administers the Medicare program through the Centers for Medicare and Medicaid Services ('CMS')."[10] Relevant here are two components of the Medicare program: Part

---

[3] The facts set forth below are drawn from the Amended Complaint and assumed true for purposes of resolving this Motion to Dismiss.

[4] *See* Amend. Compl. ¶ 38.

[5] *See id.* ¶ 37; *see* PharMerica Mem. Supp. Mot. to Dismiss [Doc. No. 51-1] at 2.

[6] Amend. Compl. ¶ 46.

[7] *Id.* ¶ 48.

[8] *Id.* ¶¶ 48–49.

[9] *See United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 131 (E.D. Pa. 2012).

[10] *Id.*

A, the hospital insurance benefits program,[11] and Part D, the voluntary prescription drug benefit program.[12]

"Medicare Part D is based on a private market model, wherein Medicare contracts with private entities, known as Part D 'sponsors,' to administer prescription drug plans."[13] "Part D [p]lan sponsors subcontract with many entities to provide drugs to the Medicare Part D beneficiaries enrolled in their plans."[14] PharMerica is one such subcontractor.[15] Its contracts with Part D plan sponsors "require PharMerica to comply with applicable federal laws, regulations, and CMS instructions."[16] This is also true of PharMerica's contracts under the analogous state Medicaid programs.[17]

PharMerica certifies its compliance with applicable laws and regulations each time it submits a claim for reimbursement. When a pharmacy like PharMerica "dispenses drugs to a Medicare beneficiary, it submits an electronic claim to the beneficiary's Part D plan and receives reimbursement from the plan sponsor for the costs not paid by the beneficiary."[18] That claim submission must be accompanied by a certification of compliance with applicable laws and regulations,[19] including compliance with the requirement that drugs be dispensed only pursuant to a valid prescription.[20] This is also true of PharMerica's claims under the analogous state

---

[11] 42 U.S.C. §§ 1395c, 1395d; *see* Amend. Compl. ¶¶ 138, 141.

[12] 42 U.S.C. § 1395w-101 et seq.; *see* Amend. Compl. ¶¶ 138–42.

[13] *Spay*, 913 F. Supp. 2d at 132.

[14] *Id.* at 133.

[15] Amend. Compl. ¶¶ 138–40.

[16] *Id.* ¶ 138.

[17] *Id.* ¶ 144.

[18] *Spay*, 913 F. Supp. 2d at 132.

[19] Amend. Compl. ¶ 141.

[20] *Id.* ¶ 142.

Medicaid programs.[21] PharMerica also receives direct payments from nursing home facilities using Medicare Part A funds with analogous requirements.[22]

### C. Relator Sturgeon's Investigation

Reliant Health Management Services is the owner and operator of more than twenty nursing homes in Pennsylvania.[23] In June 2013, Reliant began using PharMerica as its institutional pharmacy.[24] Soon after Reliant switched to PharMerica, it noticed that its "nursing home facilities experienced a significant increase in pharmacy costs ranging from $2.00-$3.00 per patient per day."[25] Reliant complained.[26] PharMerica's Senior Vice President for Sales and Marketing Mark Lindemoen asked Sturgeon, who by that time was working at PharMerica as its Executive Vice President, to review the issue.[27]

As she reviewed Reliant's complaint, Sturgeon began to notice "significant discrepancies" between prescription order data received via PointClickCare and prescription fill data in the LTC400.[28] That is, it appeared to Sturgeon that on some occasions PharMerica had dispensed medications different from those prescribed. These discrepancies "consistently favored PharMerica's bottom line."[29] Sturgeon brought her findings to Lindemoen, who "refused to acknowledge the problems" or investigate further.[30] When Sturgeon raised the issue with him

---

[21] *Id.* ¶ 144.

[22] *Id.* ¶¶ 138, 141.

[23] *Id.* ¶¶ 24, 33.

[24] *Id.* ¶ 33.

[25] *Id.* ¶ 67.

[26] *Id.*

[27] *Id.* ¶¶ 29, 67.

[28] *Id.* ¶¶ 68–69.

[29] *Id.* ¶ 68.

[30] *Id.* ¶¶ 70–71.

again after returning from a brief medical leave, Lindemoen "shut down the meeting and ordered Sturgeon to stop her investigation."[31] Other senior-level management executives responded similarly.[32]

After Sturgeon reported her findings to management, "there was an unexplained and sudden diminution of Sturgeon's duties and responsibilities."[33] Sturgeon was "removed from the Mid-Atlantic region sales and marketing strategies and development initiatives" and stripped of her authority to negotiate and terminate contracts and to review and approve capital expenditures and development projects and of her responsibility for "all customer relationships in Florida."[34] This diminution in her job responsibilities was "retaliatory."[35] Sturgeon resigned her position.[36]

After leaving PharMerica, Sturgeon began working as a consultant in the nursing home and pharmacy industries.[37] Reliant retained her to audit its relationship with PharMerica.[38] Relators Ferrante, Sciole, and Niles are corporate officers at Reliant and appear to have been involved in the audit.[39] In conducting the audit, Sturgeon confirmed the discrepancies she had identified while employed at PharMerica and discovered the source of those discrepancies: an alleged scheme to alter prescriptions systematically so as to increase reimbursements.[40]

---

[31] *Id.* ¶¶ 72–74.

[32] *Id.* ¶¶ 75–76, 80–81.

[33] *Id.* ¶ 83.

[34] *Id.* ¶ 86.

[35] *Id.* ¶ 89.

[36] *Id.* ¶¶ 85, 87–88.

[37] *Id.* ¶ 100.

[38] *Id.*

[39] *Id.* ¶¶ 33, 101.

[40] *Id.* ¶ 101.

### D. Alleged Prescription Alteration Scheme

Relators' audit revealed that PharMerica systematically altered prescriptions "and did so to enhance its profit margins and increase its rebates from manufacturers and suppliers."[41] The use of both the PointClickCare system and the LTC400 made this possible in two ways. First, the system of manually entering prescription data received via PointClickCare allowed PharMerica to direct its clerks to alter the data intentionally.[42] That is, in some instances, the data as originally entered in the LTC400 did not match the prescription data received via PointClickCare. Second, the LTC400 itself was programmed so that whenever an ordered drug was out of stock, the platform would prompt clerks to replace it with the most profitable alternative, even if the data was correctly transcribed.[43] In either case, PharMerica did not comply with applicable laws and regulations requiring that pharmacists get the prescribing physician's consent before altering any essential element of a prescription.[44]

Relators allege that PharMerica illegally altered prescriptions in this manner for both controlled and non-controlled substances, sometimes altering the drug's dosage and other times altering its form (i.e., tablet vs. capsule) or the drug itself (i.e., brand name vs. generic).[45] Specifically, Relators allege that their audit turned up at least 5,687 instances of PharMerica altering dosages without notice to the prescribing physician;[46] 10,540 instances of PharMerica

---

[41] *Id.*

[42] *Id.* ¶ 59.

[43] *Id.* ¶¶ 54–56.

[44] *Id.* ¶¶ 150–53; *see, e.g.*, 55 Pa. Code § 1121.52(c).

[45] Amend. Compl. ¶ 101–03, 110, 118, 127.

[46] *Id.* ¶ 106.

altering drug forms without notice;[47] and an unspecified number of instances of PharMerica dispensing a brand-name drug instead of the prescribed generic drug.[48]

### E. Procedural Background

Relators filed this *qui tam* action in 2015. The case was voluntarily dismissed in 2018 after Relators' attorney informed them that the United States had declined to intervene, but Relators then moved for relief pursuant to Federal Rule of Civil Procedure 60(b), arguing that their counsel never informed them that he was filing a notice of dismissal.[49] Indeed, when the notice of dismissal was filed, Relators were in the process of seeking replacement counsel, as their counsel would no longer represent them after the United States declined to intervene.[50] The Court granted the motion and reopened the case.[51]

After the case was reopened, Relators filed the First Amended Complaint, which is the operative pleading here.[52] PharMerica moved to dismiss the First Amended Complaint and requested judicial notice of a number of documents in support of its Motion to Dismiss.[53] The Court held oral argument limited to three disputed issues related to the Motion to Dismiss.[54]

## II. MOTION FOR JUDICIAL NOTICE

PharMerica requests judicial notice of a number of documents to support its motion to dismiss. A court may take judicial notice of facts that are not subject to reasonable dispute

---

[47] *See id.* ¶ 119.

[48] *Id.* ¶ 127.

[49] Doc. No. 39 at 1–2.

[50] *Id.*

[51] *Id.* at 3–4.

[52] Doc. No. 43.

[53] Doc. Nos. 51, 52.

[54] Doc. Nos. 74, 80.

because they are either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."[55] A court "must" take judicial notice if a party requests it and supplies the court with the necessary information.[56]

The Third Circuit has cautioned that taking judicial notice "should be done sparingly at the pleadings stage. Only in the clearest of cases should a district court reach outside the pleadings for facts necessary to resolve a case at that point."[57] Courts will, however, take judicial notice of certain matters of public record on a motion to dismiss; examples of matters of public record include "Securities and Exchange Commission filings, court-filed documents, and Federal Drug Administration reports published on the FDA website."[58]

## A. Materials from Prior Judicial Proceedings

Courts may take judicial notice of public records, including "publicly available records and transcripts from judicial proceedings."[59] In particular, publicly available records from other judicial proceedings may be judicially noticed in the context of a motion to dismiss.[60] Such records may only be judicially noticed to show "what was in the public realm at the time, not whether the contents of those documents are true."[61] Thus, "on a motion to dismiss, [a court] may take judicial notice of another court's opinion—not for the truth of the facts recited therein,

---

[55] Fed. R. Evid. 201(b)(2).

[56] Fed. R. Evid. 201(c)(2).

[57] *Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007).

[58] *United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 139 (internal citations omitted) (quoting *McGehean v. AF & L Ins. Co.*, No. 09-1792, 2009 WL 3172763, at *2 (E.D. Pa. Oct. 2, 2009)).

[59] *Golden v. Cook*, 293 F. Supp. 2d 546, 551 (W.D. Pa. 2003); *see Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007).

[60] *Spay*, 913 F. Supp. 2d at 139–40.

[61] *Id.* (citing *Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt., L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006).

but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity."[62]

PharMerica requests judicial notice of four filings from a prior False Claims Act case, *United States ex rel. Denk v. PharMerica*, which it argues precludes Relators' claims as discussed below.[63] Those filings are: Relator Denk's original Complaint; Relator Denk's First Amended Complaint; the Government's Notice of Election to Intervene in Part and Decline to Intervene in Part; and the Government's Complaint. Copies of all four filings are included as exhibits to the Motion for Judicial Notice, and all are unsealed and publicly available. The Court can—in fact, it must—evaluate the content of these records in assessing whether the public disclosure bar applies.[64] Judicial notice, however, extends only as far as recognizing what the parties in *Denk* pled and argued—in other words, what was publicly disclosed—and not to the truth of the judicially noticed records. Relators do not object to the Court taking notice of these documents for this purpose.[65]

PharMerica also requests judicial notice of four filings from Relator Sturgeon's prior employment action against PharMerica, which it argues preclude her retaliation claims here. Those filings are: the Complaint; the First Amended Complaint; the Verdict Slip; and the Judgment. Copies of all four filings are included as exhibits to the Motion for Judicial Notice, and all four are publicly available. The Court must consider these documents in determining whether Relator Sturgeon's retaliation claim is precluded by the jury verdict in her prior

---

[62] *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp., Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999).

[63] Civil Action No. 09-720 (E.D. Wis. filed July 23, 2009).

[64] *United States ex rel. Kraxberger v. Kan. City Power & Light Co.*, 756 F.3d 1075, 1083 (8th Cir. 2014).

[65] Relators' Reply Mem. Opp. Mot. for Judicial Notice [Doc. No. 58] at 2–3.

employment action.[66] They may only be judicially noticed, however, to establish their existence, "and not for the truth of the facts asserted" in those filings.[67] Relators do not object to the Court taking notice of these documents for this purpose.[68] Accordingly, the Court will take judicial notice of these eight documents.

### B. Administrative Reports

Courts may also take judicial notice of "records and reports of administrative bodies."[69] PharMerica requests judicial notice of three documents in this category. Two are administrative guidance manuals issued by CMS.[70] The third is a report on standard practices within the long-term care pharmacy industry, which appears to have been commissioned by CMS and prepared by a consultant, the Lewin Group.[71]

Relators argue that the Court should decline to take judicial notice of these reports because they are not authenticated.[72] PharMerica responds that information found on government

---

[66] *M & M Stone Co. v. Pennsylvania*, 388 F. App'x 156, 162 (3d Cir. 2010) ("In the context of deciding a Rule 12(b)(6) motion that raises issue preclusion concerns, and where a plaintiff has not included the existence or substance of the prior adjudications in the body of, or attachments to, its complaint, it is axiomatic that a court must still consider the prior adjudication in order to determine whether issue preclusion bars that plaintiff's claims.").

[67] *Id.*

[68] Relators' Reply Mem. Opp. Mot. for Judicial Notice [Doc. No. 58] at 2–3.

[69] *Golden*, 293 F. Supp. 2d at 551; *see Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1197 (3d Cir. 1993).

[70] Doc. No. 77, Ex. I (U.S. Dep't of Health & Human Servs., CMS, Pub. No. 100-07, State Operations Manual: Appendix PP – Guidance to Surveyors for Long-Term Care Facilities (Rev. 173, Nov. 22, 2017)); *id.*, Ex. J (U.S. Dep't of Health & Human Servs., CMS, Pub. No. 100-07, State Operations Manual: Chapter 7 – Survey and Enforcement Process for Skilled Nursing Facilities and Nursing Facilities (Rev. 185, Nov. 16, 2018)).

[71] *Id.*, Ex. K (The Lewin Group, CMS Review of Current Standards of Practice for Long-Term Care Pharmacy Services (Dec. 30, 2004)).

[72] Relators' Mem. Opp. Mot. for Judicial Notice [Doc. No. 58] at 4–6. Relators also objected that PharMerica had provided only hyperlinks to the reports online but had not attached copies of the documents. It is obviously problematic to take judicial notice of materials found online based only on hyperlinks. After all, one of the hyperlinks PharMerica provided in its Memorandum stopped working after PharMerica filed its Motion on July 22, 2019, and another hyperlink in its Reply Memorandum stopped working sometime after September 26, 2019. The Court assumes, of course, that both hyperlinks worked when PharMerica filed its briefs. The concern is not so much that the documents themselves might change, but that their location on the internet might change—as it apparently has here—leaving unclear to future readers what was in the record before the court. The best practice would be for a party seeking judicial notice to both attach copies as exhibits to the motion for judicial notice and hyperlink to the

websites is considered authenticated, and that these three reports are reliable in that they are not subject to change at any time, like most websites, because they are either archived or contain a "change log that tracks all revisions."[73]

PharMerica is correct that information found on government websites is widely considered both self-authenticating and subject to judicial notice.[74] Indeed, these CMS reports are not just information on a government website—they are published reports of a federal agency that happen to be available online.[75] The question remains, however, whether to take judicial notice of these reports only for their existence, or also for the truth of their contents. PharMerica cites these three reports in its briefs to support factual assertions about the business model of the long-term care pharmacy industry and the regulatory environment in which long-term care pharmacies operate,[76] based on which it argues that pharmacy fraud is inherently implausible because the pharmacy industry is so closely regulated.[77]

It would be one thing to rely on the CMS manuals as showing what was publicly known at a given time in order to prove, for example, that the defendants were not on notice that certain conduct was fraudulent.[78] But PharMerica seeks to rely on them as substantive evidence that comprehensive regulations governing the pharmacy industry make pharmacy fraud categorically

---

website where the material can be found. Since that was not done here, the Court ordered PharMerica to provide copies of the documents for which it sought judicial notice and PharMerica did so. Doc. No. 74; Doc. Nos. 77, 78.

[73] PharMerica's Reply Mem. Supp. Mot. for Judicial Notice [Doc. No. 61] at 1–2.

[74] *See* Gregory P. Joseph, *Judicial Notice of Internet Evidence*, 82 U.S. Law Week No. 34, at 2 (Mar. 11, 2014) (collecting cases); *see also United States v. Allergan*, 746 F. App'x 101, 108 (3d Cir. 2018) (taking judicial notice of CMS administrative guidance); *Spay*, 913 F. Supp. 2d at 139–40 (same).

[75] *See In re Wellbutrin SR/Zyban Antitrust Litig.*, 281 F. Supp. 2d 751, 754 n.2 (E.D. Pa. 2003) ("The fact that an agency report is 'published' on the world wide web does not affect the Court's ability to take judicial notice of the contents of that report.").

[76] *See* PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 2–4, 28–29.

[77] *Id.* at 28–29.

[78] *See Allergan*, 746 F. App'x at 108 (taking judicial notice of CMS guidance manuals in a False Claims Act case in order to determine whether available guidance put the defendants on inquiry notice that their conduct was unlawful).

implausible. The Court declines to foreclose all proof on such a central question by looking outside the record at the motion-to-dismiss stage, so these materials will be judicially noticed only for their existence and not for their truth.

### C.  Materials from the PointClickCare Website

Courts may consider documents "'integral to or explicitly relied upon in the complaint' . . . 'without converting the motion [to dismiss] into one for summary judgment.'"[79] Although generally courts avoid looking at evidence outside the complaint at the motion-to-dismiss stage, an exception can be made where a plaintiff would be "able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent."[80] In that case, fairness would require examining the whole document, even if the plaintiff did not attach it as an exhibit to the complaint. This narrow exception is limited, however, to cases where "the claims in the complaint are '*based*' on an extrinsic document," and does not apply where the complaint merely *cites* an extrinsic document.[81] For example, in *In re Burlington Coat Factory Securities Litigation*, the plaintiffs alleged that the company had omitted material information from its annual financial report.[82] Even though the plaintiffs had not attached the report to the complaint or explicitly cited it, the report could be considered in ruling on a motion to dismiss because the claims in the complaint were necessarily based on the report.[83]

---

[79] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis omitted) (quoting *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

[80] *Id.*

[81] *Id.* (emphasis added).

[82] *Id.* at 1415.

[83] *Id.* at 1426.

PharMerica requests judicial notice of three documents it argues fall into this category.[84] The three documents appear to be promotional brochures from the PointClickCare website that explain how the PointClickCare platform works. PharMerica argues that these brochures are "integral" to Relators' claims, which are "premised on their analysis of information contained in" the PointClickCare platform.[85] As PharMerica acknowledges, however, Relators do not cite these (or any) PointClickCare brochures in the Amended Complaint.[86] Nor can Relators' claims be said to be "based on" the brochures. This is unlike *Burlington*, where the court looked to the document that constituted the alleged fraud in order to place the statements quoted in the complaint in their proper context. Of course, the existence of the PointClickCare system and the way it functions are relevant to Relators' claims—but Relators base their allegations on their first-hand knowledge of the platform, not on PointClickCare's promotional brochures.

Moreover, the Third Circuit warned in *Victaulic* against taking judicial notice of exactly this kind of information.[87] There, the court held that it was improper for the district court to take judicial notice of facts found on a company's website for several reasons. First, "[a]nyone may purchase an internet address," so authentication of internet materials was particularly important.[88] Second, "a company's website is a marketing tool" and the information found therein might well be "full of imprecise puffery that no one should take at face value."[89] Finally,

---

[84] *See* PharMerica's Mem. Supp. Mot. for Judicial Notice [Doc. No. 52] at 3–4. As noted above, PharMerica provided only hyperlinks to online PDFs of these documents and the Court ordered it to provide copies filed as exhibits.

[85] *Id.* at 7–8.

[86] *Id.* at 7.

[87] *Victaulic*, 499 F.3d at 236.

[88] *Id.*

[89] *Id.*

the court was particularly troubled that such materials were judicially noticed at the motion-to-dismiss stage.[90]

These concerns apply squarely to the PointClickCare brochures, which are promotional business materials from PointClickCare's corporate website. Such "private corporate websites, particularly when describing their own business, generally are not the sorts of 'sources whose accuracy cannot reasonably be questioned' that our judicial notice rule contemplates."[91] This is especially true when a party seeks to use promotional materials found online for their truth, as PharMerica does here.[92] Accordingly, the Court will not take judicial notice of the PointClickCare website materials.

## III.   MOTION TO DISMISS

### A.   Motion to Dismiss Pursuant to 31 U.S.C. § 3730(e)

The False Claims Act "empowers a person, or 'relator,' to sue on behalf of the United States those who defraud the government, and to share in any ultimate recovery."[93] That financial incentive, of course, creates the risk that individuals without knowledge of new, unremedied frauds might piggy-back on others' discoveries, earning a payout for themselves without contributing any information of real value.[94] The Act's design therefore aims at

---

[90] *Id.* at 236–37. It is certainly true that taking judicial notice of internet materials has become vastly more common and more accepted over the years, and even since the Third Circuit decided *Victaulic* in 2007. *See* Joseph, *supra* note 74, at 1–2. But concerns about puffery in promotional business materials remain valid, and courts are just as cautious now as they were in 2007 about looking to materials outside the complaint in deciding a motion to dismiss.

[91] *Victaulic*, 499 F.3d at 236 (internal citation omitted) (citing Fed. R. Evid. 201(b)).

[92] *See* PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 28–29 & n.14 (citing pamphlets from PointClickCare website as evidence that the PointClickCare platform "is specifically designed to assist the nursing home in complying with [regulatory] requirements"); *cf.* Joseph, *supra* note 74, at 3 ("Pages of a corporate website offered by the corporation to prove the truth of self-serving advertising claims are inherently dubious, but the same pages may be appropriate for judicial notice when offered or used to show that the claims were made . . . .").

[93] *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 296 (3d Cir. 2016).

[94] *See United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 719 F.3d 31, 33 (1st Cir. 2013).

"promot[ing] private citizen involvement in exposing fraud against the government, while at the same time prevent[ing] parasitic suits by opportunistic late-comers who add nothing to the exposure of the fraud."[95] To that end, the Act bars *qui tam* actions in two circumstances relevant here.[96] First, the "government action bar" prevents suits "based upon allegations or transactions which are the subject of a civil suit . . . in which the Government is already a party."[97] Second, the "public disclosure bar" prevents suits "when the alleged fraud has been publicly disclosed in at least one of several enumerated sources—*unless* the relator is an original source of certain information underlying the action."[98] PharMerica argues that both the government action bar and public disclosure bar preclude this action because an earlier *qui tam* suit against PharMerica, in which the Government intervened, alleged substantially the same fraudulent scheme.

### 1. Legal Standard: Government Action Bar

Section 3730(e)(3) bars *qui tam* suits "based upon allegations or transactions which are the subject of a civil suit . . . in which the Government is already a party." But "the breadth with

---

[95] *United States ex rel. Int'l Bhd. of Elec. Workers v. Farfield Co.*, No. 09-4230, 2013 WL 3327505, at *10 (E.D. Pa. July 2, 2013) (quoting *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 675–76 (8th Cir. 1998)); *see also United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 651 (D.C. Cir. 1994) (Wald, J.) ("The history of the FCA *qui tam* provisions demonstrates repeated congressional efforts to walk a fine line between encouraging whistle-blowing and discouraging opportunistic behavior. . . . They must be analyzed in the context of these twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own.").

[96] The public disclosure bar originally imposed jurisdictional limitations on False Claims Act cases. *See Moore*, 812 F.3d at 297. Congress amended the bar in 2010 as part of the Affordable Care Act, altering the language so as to make the bar nonjurisdictional. *Id.* at 297–300. By contrast, the language of the government action bar was never explicitly jurisdictional. *See* 31 U.S.C. § 3730(e)(3). Nevertheless, perhaps because it was interpreted in tandem with the pre-ACA public disclosure bar, the government action bar has sometimes been described as jurisdictional. *See Farfield*, 2013 WL 3327505, at *9–10. The statutory language strongly suggests, however, that the government action bar is not jurisdictional. *Cf. United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 120 (D.C. Cir. 2015) (holding that the FCA's first-to-file bar is not jurisdictional because that provision, like the government action bar, lacks the express jurisdictional language of other statutory bars to FCA actions).

[97] 31 U.S.C. § 3730(e)(3); *see Farfield*, 2013 WL 3327505, at *11.

[98] *Moore*, 812 F.3d at 297; *see* 31 U.S.C. § 3730(e)(4).

which we should read the phrase 'allegations or transactions which are *the subject of* a civil suit' is not readily apparent from the text of the statute."[99]

To determine whether an action is "based upon" the same allegations or transactions as an action to which the government was a party, many courts have followed the First Circuit in looking for signs of a "host/parasite relationship."[100] Such a relationship exists if the relator's case is "receiving 'support, advantage, or the like' from the 'host' case (in which the government is a party) 'without giving any useful or proper return' to the government (or at least having the potential to do so)."[101] Similarly, the Ninth Circuit has described the bar as preventing *qui tam* suits "based on the same underlying facts" as a government action.[102] Thus, the government action inquiry is essentially a test of factual similarity. If a relator's allegations are the same as allegations already made by the government, or are similar enough to be characterized as feeding off of the government's allegations, the government action bar applies. By contrast, if a relator's case "is seeking to remedy fraud that the government has not yet attempted to remedy," the government action bar does not apply.[103]

PharMerica argues that an earlier *qui tam* suit against it brought by another relator, *United States ex rel. Denk v. PharMerica*,[104] bars this action because the government intervened in that case. There is no dispute that the government was a party to *Denk*.[105] Thus, the question is

---

[99] *United States ex rel. S. Prawer & Co. v. Fleet Bank of Maine*, 24 F.3d 320, 326 (1st Cir. 1994).

[100] *E.g.*, *Farfield*, 2013 WL 3327505, at *11 (quoting *Prawer*, 24 F.3d at 327); *see also* Claire M. Sylvia, The False Claims Act: Fraud Against the Government § 11:32 *Allegations already the subject of Government litigation: 31 U.S.C.A. § 3730(e)(3)—Allegations or transactions*.

[101] *Prawer*, 24 F.3d at 327–28 (quoting *Parasite*, Random House Dictionary of the English Language 1409 (2d ed. Unabridged 1987).

[102] *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 746 (9th Cir. 1993).

[103] *Prawer*, 24 F.3d at 328; *see also Costner*, 153 F.3d at 676.

[104] Civil Action No. 09-720 (E.D. Wis. filed July 23, 2009).

[105] Relators' Mem. Opp. Mot. to Dismiss [Doc. No. 57] at 13 n.2.

whether the allegations in this case are sufficiently similar to those in *Denk* to conclude that Relators are receiving support or advantage from *Denk*.

### 2. Legal Standard: Public Disclosure Bar

Section 3730(e)(4)(A) provides that a court "shall dismiss" a *qui tam* suit "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" in any of several sources, including federal civil proceedings. In other words, the public disclosure bar applies when there has been (1) a public disclosure (2) in one of the statute's specified fora (3) of allegations or transactions of fraud (4) that are substantially the same as those alleged by the relator.[106] When the public disclosure bar is triggered, however, the action can nonetheless proceed if the relator is an "original source of the information."[107] An "original source" is one who "has voluntarily disclosed information to the Government or one 'who has knowledge that is independent of and materially adds to' information already publicly disclosed."[108]

The public disclosure bar is relevant here because both the Relator's Complaint and the Government Complaint in *Denk* were (1) public disclosures (2) in a federal civil proceeding.[109] There can be no question that the public disclosures in *Denk* consisted of (3) "allegations or

---

[106] *See United States ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 235 (3d Cir. 2013). As noted above, the public disclosure bar was amended in 2010. *Zizic* defined the fourth element of the test as requiring "that the relator's action be 'based upon'" the public disclosures. *Id.* That comported with the pre-2010 version of the statute. The amended version, which applies to this case, provides that "the relator's fraud need only be 'substantially the same' as, rather than 'based on,' the publicly disclosed allegations or transactions in order to trigger the public disclosure bar." *United States ex rel. Silver v. Omnicare*, 903 F.3d 78, 85 n.6 (3d Cir. 2018), *cert. denied sub nom. PharMerica Corp. v. United States ex rel. Silver*, 140 S. Ct. 202 (2019). That change, the Third Circuit has observed, "merely codified the law as it already existed in this Circuit," since "based upon" had been interpreted to mean "supported by" or "substantially similar to." *Id.* (citing *United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 519 (3d Cir. 2007)). For clarity, the Court has used the updated "substantially the same" language.

[107] 31 U.S.C. § 3730(e)(4)(A).

[108] *United States v. Premier Educ. Grp., L.P.*, No. 11-3523, 2016 WL 2747195, at *6 (D.N.J. May 11, 2016) (quoting 31 U.S.C. § 3730(e)(4)(B)); *see Moore*, 812 F.3d at 298–99.

[109] Relators' Mem. Opp. Mot. to Dismiss [Doc. No. 57] at 17 n.4; *see* 31 U.S.C. § 3730(e)(4)(A)(i); *Atkinson*, 473 F.3d at 519.

transactions" of fraud—in this case, allegations—as opposed to more general information.[110]

"An allegation of fraud is an explicit accusation of wrongdoing."[111] The *Denk* disclosures were allegations of fraud in the most literal sense—explicit accusations of fraud, itemized and filed in federal court.

The question here, then, is whether Relators' claims are substantially the same as the allegations of fraud made public in *Denk*.[112] Courts examine the similarity of the allegations on a claim-by-claim basis.[113] "Where some, but not all, allegations in a complaint have been publicly disclosed, [the public disclosure bar] does not prohibit the remaining allegations from proceeding."[114]

Several courts have cautioned against conducting the substantial similarity inquiry at too high a level of generality.[115] After all, cast in unduly general terms, any two fraud allegations

---

[110] *Zizic*, 728 F.3d at 235 n.6 ("The FCA 'bars suits based on publicly disclosed "allegations or transactions," not information.'" (quoting *United States ex rel. Dunleavy v. County of Delaware*, 123 F.3d 734, 740 (3d Cir. 1997), *abrogated on other grounds by Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280 (2010))); Sylvia, *supra* note 100, § 11:52, *Allegations publicly disclosed in certain hearings, reports or the news media: 31 U.S.C.A. § 3730(e)(4)—Allegations or transactions underlying the complaint*.

[111] *Zizic*, 728 F.3d at 235–36.

[112] *See Omnicare*, 903 F.3d at 83.

[113] *See, e.g., Atkinson*, 473 F.3d at 520–31 (proceeding claim by claim); *Premier*, 2016 WL 2747195, at *9–10 (citing *United States ex rel. Merena v. SmithKline Beecham Corp.*, 205 F.3d 97, 102 (3d Cir. 2000)). PharMerica argues based on the Third Circuit's decision in *Zizic* that if Relators' allegations are "even partly based upon" the *Denk* allegations, they should be dismissed. PharMerica's Mem. Supp. Mot. to Dismiss at 18 (quoting *Zizic*, 728 F.3d at 238). But that observation in *Zizic* referred to relators who allege the same scheme as one previously disclosed, while merely adding undisclosed factual details. *Zizic* did not hold that a complaint alleging two schemes—one previously disclosed and one never before disclosed—should be dismissed in its entirety. *See also United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 210 (1st Cir. 2016) ("[A] complaint that targets a scheme previously revealed through public disclosures is barred even if it offers greater detail about the underlying conduct.").

[114] Sylvia, *supra* note 100, § 11:54, *Allegations publicly disclosed in certain hearings, reports or the news media: 31 U.S.C.A. § 3730(e)(4)—Allegations or transactions underlying the complaint—Which allegations in the complaint are barred*.

[115] *United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 577 (9th Cir. 2016); *United States ex rel. Goldberg v. Rush Univ. Med. Ctr.*, 680 F.3d 933, 935–36 (7th Cir. 2012) ("[B]oosting the level of generality in order to wipe out *qui tam* suits that rest on genuinely new and material information is not sound."); *United States ex rel. Baltazar v. Warden*, 635 F.3d 866, 868–69 (7th Cir. 2011).

against the same defendant begin to sound similar. Although two complaints might seem similar "at first blush," courts must nevertheless take a careful look at the details of each alleged fraud.[116] For example, in *Leveski v. ITT Educational Services*, the Seventh Circuit noted the superficial similarities between the relator's claims and an earlier False Claims Act case alleging violations of the Higher Education Act ("HEA"). Both relators were "former employees of [the defendant]—and even held the same job title," and both alleged that the defendant "violated the incentive compensation provision of the HEA."[117] Nevertheless, the court held that "the details of *how* [the defendant] allegedly violated the HEA [were] quite different in Leveski's case" than in the earlier one.[118] Because Leveski had alleged "a more sophisticated, second-generation method of violating the HEA," the court concluded that the district court had "view[ed] the allegations at too high a level of generality" when it dismissed the complaint.[119]

The Third Circuit endorsed this particularized, fact-specific approach to the substantial similarity inquiry in both *Zizic* and *United States v. Omnicare*.[120] By requiring courts to look carefully at the factual similarity between a relator's allegations and a public disclosure, this approach strikes the proper balance between "encouraging private persons to root out fraud and stifling parasitic lawsuits."[121]

---

[116] *Leveski v. ITT Educ. Servs.*, 719 F.3d 818, 832 (7th Cir. 2013).

[117] *Id.*

[118] *Id.* (emphasis added).

[119] *Id.*

[120] *See Omnicare*, 903 F.3d at 89–90 (citing with approval the Seventh Circuit's approach in *Baltazar* and *United States ex rel. Gear v. Emergency Medical Associates of Illinois, Inc.*, 436 F.3d 726 (7th Cir. 2006), and relying on *Mateski*, 816 F.3d 565, which adopted the Seventh Circuit's approach); *Zizic*, 728 F.3d at 237–38 (analogizing to *Gear* and *Baltazar* to determine whether relator's allegations were substantially similar to public disclosures).

[121] *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 413 (2011) (quoting *Graham Cty.*, 559 U.S. at 295).

Based on these cases, the Court is not persuaded by PharMerica's argument that disclosures that merely "set government investigators on the trail of fraud" are enough to bar subsequent *qui tam* suits.[122] That kind of superficial similarity is contrary to the statutory language, which bars suits that allege "*substantially* the same" fraud as the public disclosure in question.[123] Allowing any tip, however factually different, to preclude subsequent *qui tam* suits would not accord with the careful approach of *Zizic* and *Omnicare*, nor with the heightened particularity requirements that apply to False Claims Act cases.[124]

### 3. The *Denk* Allegations

As noted above, PharMerica argues that an earlier *qui tam* suit against it, *United States ex rel. Denk v. PharMerica*,[125] concerned essentially the same alleged fraudulent scheme. As PharMerica characterizes them, both actions relate a scheme to submit false claims for Medicare and Medicaid reimbursement for medications that were dispensed in the absence of a legally

---

[122] *Quinn*, 14 F.3d at 655; *see* PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 19 (citing *Dingle v. Bioport Corp.*, 388 F.3d 209, 214 & n.3 (6th Cir. 2004)). PharMerica has argued that a public disclosure that merely puts the government on notice of the possibility of fraud and allows it to investigate could bar any subsequent *qui tam* suits (within a certain time frame, presumably) regarding any fraudulent scheme, because once the government was on the case, it had the opportunity to investigate any and all potential frauds that might be afoot. This is a misconception. The "on the trail of fraud" concept is part of the third element (allegations or transactions) of the public disclosure bar analysis, not the fourth element (substantial similarity). *See Quinn*, 14 F.3d at 655; *Dingle*, 388 F.3d at 212–14. Publicly disclosed information is enough to constitute an "allegation" if it gave adequate notice to set the government on the trail of fraud. But a relator's allegations are not substantially similar to a public disclosure merely because the disclosure could have set the government on the trail of the separate fraud alleged by the relator. *See also* Sylvia, *supra* note 100, § 11:52, *Allegations publicly disclosed in certain hearings, reports or the news media: 31 U.S.C.A. § 3730(e)(4)—Allegations or transactions underlying complaint*.

[123] 31 U.S.C. § 3730(e)(4)(A).

[124] *See Omnicare*, 903 F.3d at 91 ("Finally, our refusal to afford preclusive effect to information that discloses merely a potential or possibility of fraud, without any indication of who is perpetrating it or how they are doing so, accords with the heightened showing required by Federal Rule of Civil Procedure 9(b) when pleading a claim of fraud in FCA actions.").

[125] Civil Action No. 09-720 (E.D. Wis. July 23, 2009).

valid prescription in violation of state and federal law.[126] As a result, it contends, Relators' suit is precluded under either the government action bar, the public disclosure bar, or both.

A careful review of both Relator Denk's Complaint and the Government's Complaint in *Denk* reveals that *Denk* disclosed a number of allegations of fraud unrelated to invalid prescriptions and therefore irrelevant here.[127] Relator Denk's Complaint also, however, disclosed two alleged fraudulent schemes that do implicate prescription validity.

*The Emergency Scheme*

Denk alleged that PharMerica submitted false claims for reimbursement in situations where it had violated federal regulations governing dispensation of Schedule II–V narcotics in emergencies. PharMerica was alleged to have violated those emergency regulations in several different ways. Specifically, Denk alleged (1) that PharMerica relied on regulations allowing narcotics to be dispensed on only an oral prescription in emergency situations but failed to secure a written prescription within seven days thereafter as required;[128] (2) that PharMerica dispensed narcotics on an emergency basis without even an oral prescription, instead using old prescriptions and order forms;[129] and (3) that PharMerica dispensed narcotics on an emergency basis without indicating the justification for an emergency dispense and/or without verifying that an emergency in fact existed.[130]

---

[126] PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 18.

[127] *See* Denk Compl. ¶¶ 99–123 (alleging scheme of unlawful kickbacks); *id.* ¶¶ 125–37 (alleging retaliation against Relator Denk); *id.* ¶¶ 46, 81–90 (alleging that PharMerica failed to credit the United States for drugs returned unused and that PharMerica sometimes re-billed the United States for those unused drugs).

[128] Denk Compl ¶¶ 30, 36, 46, 55, 60–65, 67.

[129] *Id.* ¶ 56.

[130] *Id.* ¶¶ 30, 36, 46, 54.

*The "Narc Box" Scheme*

Narcotics boxes are emergency supplies of medications kept on-site at long-term care facilities. Both Denk and the Government alleged that PharMerica "provided staff at long-term care facilities with access to narcotics boxes for emergency situations but did not ensure that the prescriber had an oral communication with a PharMerica pharmacist prior to dispensing the Schedule II drug."[131] The government also alleged that "[o]nce the drug was dispensed from a narcotics box, PharMerica routinely failed to obtain written prescriptions from the prescriber within 7 days as required under the [Controlled Substances Act]."[132]

Further, the Government's Complaint in *Denk* also alleged a third fraudulent scheme related to prescription validity:

*The Order Form Scheme*

The government alleged that PharMerica dispensed medications to residents of long-term care facilities "based only on requests from the long-term care facility, rather than . . . upon a valid prescription from a practitioner."[133] This took different forms, including dispensing drugs based solely on "order forms";[134] "Prescription Fax Request" sheets, "EZ Refill" forms, or "monthly physician orders from the resident's chart at the facility";[135] or residents' hospital discharge orders or "replenishment stickers" previously provided by PharMerica,[136] as opposed

---

[131] Govt. Compl. ¶ 118; *see* Denk Compl. ¶¶ 39, 53, 112–17.

[132] Govt. Compl. ¶ 119. Denk also alleged that "PharMerica billed the United States for one type of medication while providing the patient with a different type of medication," Denk Compl. ¶¶ 46, 94–95, and that "PharMerica billed the United States for medications allegedly administered to one patient when the medications were actually administered to other patients, including those not eligible for government payments," *id.* ¶ 46.

[133] Govt. Compl. ¶ 5.

[134] *Id.* ¶ 5.

[135] *Id.* ¶ 79.

[136] *Id.* ¶ 5.

to a legally valid prescription signed by a practitioner. Upon receipt of a medication order that was not a legally valid prescription, PharMerica would simultaneously dispense the drug and send a "template" to the resident's physician for signature.[137] Even if these templates had been returned signed, they would not have constituted valid prescriptions, but they often were not returned at all or were returned only after the drug was dispensed.[138]

After the government intervened in *Denk*, the government and PharMerica "entered into a series of settlements to resolve the entirety" of the action in 2015.[139]

### 4. Analysis

PharMerica argues that this case is barred by *Denk* under both the public disclosure bar and the government action bar. As explained, the public disclosure inquiry requires the Court to determine whether the allegations in *Denk* are substantially similar to Relators' allegations. They are not.

*Denk* disclosed allegations of several fraudulent schemes by PharMerica, each of which is factually different from the scheme Relators allege. Each of the three prescription-related schemes disclosed in *Denk* concerned dispensations of medication in the absence of any prescription by a variety of means—by using narcotics boxes without following the applicable regulations; by dispensing drugs on an emergency basis without a written follow-up prescription; and by dispensing drugs upon receipt of an order form, as opposed to a valid prescription. Here, by contrast, Relators allege a scheme to alter valid prescriptions so as to maximize reimbursements. In other words, whereas *Denk* concerned dispensing medication with no prescription at all, Relators base their allegations on incidents in which PharMerica did receive a

---

[137] *Id.* ¶ 79.

[138] *Id.*

[139] PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 13.

valid prescription, but altered that prescription illegally using the LTC400 so as to dispense the most profitable version of the drug in question.

This is not, therefore, a case in which a relator "makes a similar allegation [to the public disclosure], but expands on it substantially."[140] It is not, in other words, *Denk* with added details. Instead, it is a case alleging "a more sophisticated, second-generation method" of fraud, separate and apart from any existing public disclosure.[141] Both *Denk* and Relators do allege—at a high level—schemes that resulted in dispensing drugs without a valid prescription. But, of course, there are many different ways a pharmacy might accomplish that. The mode and means of the scheme alleged here make it wholly different from the ones alleged in *Denk*.

Indeed, to find the similarities between *Denk* and this matter, PharMerica massages the facts. For example, PharMerica characterizes both *Denk* and this action as alleging that "PharMerica dispensed medications to Medicare Part D and Medicaid beneficiaries pursuant to orders that lacked an essential element of a prescription such as strength, dosage form, or quantity prescribed."[142] That is technically true: *Denk* alleged that PharMerica dispensed medications without *any* prescription; those orders lacked *all* the essential elements of a prescription in that there was, allegedly, no prescription at all.[143] Therein lies the problem—the allegations of fraud in *Denk* and those in this matter are substantially similar only after abstracting away from the facts of one or both cases to cast them in the most general possible terms.[144] At a high enough level of generality, any two False Claims Act cases against the same

---

[140] *Premier*, 2016 WL 2747195, at *11.

[141] *Leveski*, 719 F.3d at 832.

[142] PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 12 (citing Denk Compl. ¶¶ 48–51, 75–76).

[143] Denk Compl. ¶¶ 48–51.

[144] *See* PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 18 ("[T]he *Denk* Action and this litigation advance substantially the same theories of fraud: PharMerica submitted claims for payment to Medicare Part D and Medicaid for medications dispensed without legally valid prescriptions and, consequently, violated the FCA because

defendant can be said to allege substantially the same conduct.[145] *Denk* and this action may be two branches of the same family tree, but only if a vague, generic charge of "pharmacy fraud" or "Medicare fraud" is the common ancestor. Thus, the public disclosure bar does not apply.

For the same reason, the government action bar does not preclude this action. Relators' allegations are not "based on the same underlying facts" as those in *Denk*.[146] Nor do they have the qualities of a "host/parasite relationship" in which one case feeds off of or draws support from another.[147] The schemes alleged in each case are distinct from each other and *Denk* therefore has no preclusive effect with respect to Relators' claims.

### B. Motion to Dismiss for Failure to State a Claim

#### 1. Legal Standard

PharMerica has also moved to dismiss the Amended Complaint for failure to state a claim under Rule 12(b)(6) and for failure to satisfy the heightened pleading standard of Rule 9(b).

Under Federal Rule of Civil Procedure 12(b)(6), dismissal of a complaint for failure to state a claim upon which relief can be granted is appropriate where a plaintiff's "plain statement" lacks enough substance to demonstrate that he is entitled to relief.[148] In determining whether a motion to dismiss should be granted, the court must consider only those facts alleged in the complaint, accepting the allegations as true and drawing all logical inferences in favor of the

---

these programs only pay for medications when the dispensing pharmacy is in compliance with applicable laws requiring a valid prescription.").

[145] *See Mateski*, 816 F.3d at 576 ("[W]hether [relator's] Complaint is substantially similar to prior public reports depends on the level of generality at which the comparison is made."); *United States ex rel. Dorsey v. Dr. Warren E. Smith Cmty. Mental Health/Mental Retardation & Substance Abuse Ctrs.*, No. 95-7446, 1997 WL 381761, at *4 (E.D. Pa. June 25, 1997) ("In short, the only similarities between these two actions are . . . that the defendant is the same . . . [and] that both plaintiffs have accused the defendant of submitting false claims to receive federal and state reimbursement.").

[146] *Kelly*, 9 F.3d at 746.

[147] *Prawer*, 24 F.3d at 327–28.

[148] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

non-moving party.[149] Courts are not, however, bound to accept as true legal conclusions framed as factual allegations.[150] Something more than a mere *possibility* of a claim must be alleged; a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."[151]

Additionally, claims under the False Claims Act are subject to the heightened pleading standard of Rule 9(b).[152] To satisfy that standard in this context, a relator must plead "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."[153] This can be accomplished in two ways—either by "pleading the date, place, or time of the fraud," or by using an "alternative means of injecting precision and some measure of substantiation into their allegations of fraud."[154]

A plaintiff need not present specific fraudulent claims for payment at the pleading stage; indeed, this is not necessarily required to prevail even at trial.[155] After all, "[s]tanding alone, raw bills—even with numbers, dates, and amounts—are not fraud without an underlying scheme to submit the bills for unperformed or unnecessary work."[156] It is that underlying scheme that must be pled with particularity to give defendants fair notice of the claims against them, protect defendants from reputational harm, and prevent the filing of baseless suits that amount to fishing expeditions.[157]

---

[149] *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994); *Fay v. Muhlenberg Coll.*, No. 07-4516, 2008 WL 205227, at *2 (E.D. Pa. Jan. 24, 2008).

[150] *Twombly*, 550 U.S. at 555, 564.

[151] *Id.* at 570.

[152] *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 155 (3d Cir. 2014).

[153] *Id.* at 157–58 (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).

[154] *United States v. Loving Care Agency*, 226 F. Supp. 3d 357, 363 (D.N.J. 2016) (quoting *Flanagan v. Bahal*, No. 12-2216, 2015 WL 9450826, at *3 (D.N.J. Dec. 22, 2015)).

[155] *Grubbs*, 565 F.3d at 190.

[156] *Id.*

[157] *Id.*

## 2. Analysis: Claims Under 31 U.S.C. §§ 3729(a)(1)(A) and (B)

Relators allege violations of 31 U.S.C. §§ 3729(a)(1)(A) and (B) and their state law equivalents. To establish a violation of § 3729(a)(1)(A), a relator must show that "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent."[158] To establish a violation of § 3729(a)(1)(B), a relator must show that the defendant "(1) made, used, or caused to be made or used, a false record or statement; (2) the defendant knew the statement to be false[;] and (3) the statement was material to a false or fraudulent claim."[159] A claim may be factually false or legally false. "A claim is factually false when the claimant misrepresents what goods or services . . . it provided to the Government."[160] By contrast, "a claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment."[161] That latter express false certification theory is the basis of Relators' claims here, because Relators allege that PharMerica sought and received reimbursement upon falsely certifying that it had complied with the applicable laws and regulations governing its dispensation of medications.[162]

Relators allege that PharMerica submitted false claims for payment for filling prescription orders that were altered in one of three ways: by substituting a different form or

---

[158] *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011) (quoting *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 (3d Cir. 2004)), *abrogated on other grounds by Universal Health Servs., Inc. v. United States & Massachusetts ex rel. Escobar*, 136 S. Ct. 1989 (2016).

[159] *United States ex rel. Zwirn v. ADT Sec. Servs., Inc.*, No. 10-2639, 2014 WL 2932846, at *5 (D.N.J. June 30, 2014).

[160] *Wilkins*, 659 F.3d at 305.

[161] *Id.*

[162] Amend. Compl. ¶ 63.

dosage of a non-controlled substance than the one prescribed; by substituting a different form or dosage of a controlled substance than the one prescribed; or by substituting a brand name drug for a generic drug.[163] By altering prescriptions in these three ways for the purpose of maximizing PharMerica's reimbursement and without consulting with the prescribing physician, Relators allege, PharMerica violated the False Claims Act.[164]

### a. Non-Controlled Substances

Relators claim that PharMerica illegally altered the elements of prescriptions for non-controlled substances such as "stomach medication [e.g., Ranitidine] and anti-depressants [e.g., Fluoxetine]."[165] Relators allege that PharMerica systematically substituted alternative forms of the prescribed drugs (e.g., capsules instead of tablets) or alternative dosages or quantities of the prescribed drugs because those alternatives were more profitable for PharMerica to dispense.[166] Each time PharMerica submitted a claim for reimbursement for a dispensation pursuant to an altered prescription, Relators claim, PharMerica falsely certified that the dispensation complied with all applicable laws and regulations.

PharMerica first argues that this claim should be dismissed because there is no federal law that governs the prescribing of non-controlled drugs. Rather, PharMerica argues, it is state pharmacy laws that govern the dispensing of these non-controlled substances. Since under Pennsylvania law, the form of a non-controlled drug is not an essential element of a prescription, substituting the capsule form of a non-controlled drug for the tablet form does not violate any law and therefore cannot support Relators' assertion that PharMerica submitted false claims.

---

[163] *Id.* ¶ 103.

[164] *Id.* ¶¶ 105–07.

[165] *Id.* ¶¶ 118–19.

[166] *Id.* ¶¶ 119–26.

PharMerica does not explain the basis for its assertion that Pennsylvania pharmacy laws and regulations apply exclusively to Relators' claims, which are based on conduct that allegedly occurred nationwide.[167] However, even if Pennsylvania law does apply, and even if under Pennsylvania law pharmacists may alter the form of a non-controlled substance at will, PharMerica has not shown that this claim should be dismissed. Relators allege not only that PharMerica altered the drug form on prescriptions for non-controlled substances, but also that PharMerica altered the dosage and quantity, which are undisputedly required elements of a valid prescription.[168] Moreover, Relators allege this conduct with adequate specificity. Although they are not required to point to specific fraudulent claims at this stage, Relators identify an example of a prescription whose dosage was allegedly altered without the consent of the prescribing physician.[169] By supplying the date and prescription number of a particular altered prescription combined with the details of the broader alleged scheme to alter prescriptions, Relators have met the pleading standards of Rule 9(b) for this category of claims.

PharMerica also argues that these non-controlled substances claims are based on an incorrect statement of law by Relators. According to PharMerica, the Amended Complaint inaccurately asserts that a pharmacist "must obtain a discontinue order and a new prescription from the physician before varying in any respect from the details of the original order."[170] PharMerica argues that no state or federal law or regulation requires this. Accordingly, it argues, this category of alleged false claims fails, as it was entirely permissible for PharMerica to simply

---

[167] *Id.* ¶ 133–35; *see* PharMerica's Reply Mem. Supp. Mot. to Dismiss [Doc. No. 59] at 5.

[168] Relators' Mem. Opp. Mot. to Dismiss [Doc. No. 57] at 25–26; *see Pharmacy Liability for Punitive Damages-Pennsylvania Practice Pointers*, 71 PA. B.A. Q. 1, 3 (2000) ("A pharmacist does not prescribe medication, and thus may not amend, edit, or interpret a treating physician's prescription order.").

[169] Amend. Compl. ¶ 121.

[170] PharMerica's Reply Mem. Supp. Mot. to Dismiss [Doc. No. 59] at 4–5; *see* PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 23.

alter prescriptions where necessary rather than discontinuing them and obtaining a brand-new prescription from the prescribing physician.

It is true that the Amended Complaint in several places claims that a discontinue order and new prescription are always required and that this procedure was not followed.[171] But the Amended Complaint also alleges more broadly that PharMerica's prescription alterations were unlawful in that they were made without the prescribing physician's consent.[172] Thus, even accepting PharMerica's argument that obtaining a discontinue order and new prescription is not legally required, Relators still have alleged that PharMerica violated federal and state laws requiring that pharmacists "first obtain approval from the prescribing medical practitioner" before "deviat[ing] from a prescription."[173] Indeed, even the sources on which PharMerica seeks to rely (some of which are not in the record at this stage) confirm that this is required.[174]

Finally, PharMerica argues broadly that the Amended Complaint lacks the requisite specificity throughout. As noted, Rule 9(b) may be satisfied by pleading "particular details of a

---

[171] Amend. Compl. ¶¶ 51, 111–12, 120.

[172] *See, e.g.*, *id.* ¶ 121 ("PharMerica altered the prescription and dispensed Morphine 10 mg/ml without the consent of the prescribing physician."); *id.* ¶ 124 ("Instead of dispensing the exact drug prescribed by the physician, a data clerk—without medical training—entered an altered order into the LTC400 and dispense[d] a different prescription without the prescribing physician's consent.").

[173] *Id.* ¶ 150.

[174] *See* PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 27 (citing 55 Pa. Code § 1121.52(c) ("For payment to be made for filling altered prescriptions, the pharmacy shall certify in writing on the prescription that the change was made by the licensed prescriber. Changes in the nature or brand of a medication, the strength of a medication, directions or quantity dispensed are acceptable only if the consent of the prescriber was obtained before dispensing. The written explanation of the pharmacy on the prescription must state that this was done and give the reasons for the change.")); PharMerica's Reply Mem Supp. Mot. to Dismiss [Doc. No. 59] at 5 (citing Joseph T. Rannazzisi, U.S. Dep't of Justice, Drug Enforcement Admin., Dear Colleague Policy Letter on Permissible Changes to Controlled Substance Prescriptions (Oct. 15, 2008), https://web.archive.org/web/20110417110418/https://www.deadiversion.usdoj.gov/faq/multiple_rx_clarification_ltr_102010.pdf (describing apparent conflict between DEA regulations, which stated that a pharmacist *may not* modify the elements of a schedule II prescription on a physician's oral instruction, and the policy posted on the DEA's website, which noted that a pharmacist *may* modify a schedule II prescription "only after oral consultation with and agreement of the prescribing practitioner," and instructing pharmacists to "adhere to state regulations or policy regarding those changes that a pharmacist may make to a schedule II prescription *after oral consultation with the prescriber*" in the meantime (emphasis added))).

scheme to submit false claims" combined with "reliable indicia that lead to a strong inference that claims were actually submitted."[175] Based on that standard, PharMerica catalogues the factual details that it believes are missing from Relators' Amended Complaint, both as to the "scheme" and as to the "reliable indicia."

First, PharMerica argues that Relators fail to plead a "scheme" because the Amended Complaint makes only two conclusory allegations: that the LTC400 was designed to prompt clerks to fill prescriptions in the most profitable way and that PharMerica "instructed their clerical personnel to physically alter the prescriptions to make it appear as though the physician had prescribed the drug in a different form, quantity and/or dosage." Beyond those "cursory allegations," PharMerica suggests, the Amended Complaint omits details like the names of individuals who "concocted the alleged scheme" and "oversaw its implementation," the names of pharmacists who altered prescriptions, and the names of nursing home employees who "signed for" and administered the altered prescriptions.[176] But listing other factual details that might also have been pled is not a productive way to analyze the sufficiency of a complaint. A careful review of the Amended Complaint shows that Relators describe the alleged scheme in adequate detail, explaining the mechanism of the alleged fraud and the generic identities of those involved (i.e., data clerks, pharmacists, etc.).[177] PharMerica cites no authority for the proposition that Relators must identify by name the particular PharMerica employees who designed the LTC400 or those who allegedly altered prescriptions.

Second, PharMerica argues that even if the Amended Complaint does plead a "scheme," it lacks "reliable indicia" that claims were actually submitted. It is true that a relator must do

---

[175] *Foglia*, 754 F.3d at 156 (quoting *Grubbs*, 565 F.3d at 190).

[176] PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 31.

[177] Amend. Compl. ¶¶ 45–65.

more than "identif[y] a general sort of fraudulent conduct [while] specif[ying] no particular circumstances of any discrete fraudulent statement."[178] Thus, PharMerica argues, even if the alleged scheme is adequately pled, it amounts to no more than a "mere opportunity for fraud" without specific instances of claims actually submitted to the government for reimbursement.[179]

To support this argument, PharMerica cites *United States ex rel. Schmidt v. Zimmer, Inc.*[180] There, the court found fault with the complaint for not including "details concerning the dates of the claims, the content of the forms or bills submitted, their identification numbers, [or] the amount of money they charged to the government," among other things.[181] But *Schmidt* explicitly relied on the rigid interpretation of Rule 9(b)'s particularity requirement then adhered to by the First Circuit, the same rigid interpretation rejected by the Third Circuit in *Foglia v. Renal Ventures Management, LLC.*[182] On this point, therefore, *Schmidt* does not reflect the current state of the law.

Rather, *Foglia* is controlling. There, the relator alleged that the defendant, Renal Ventures Management, submitted false claims for reimbursement for vials of the medication Zemplar. Renal's inventory logs showed that it was using fewer vials of Zemplar per day than it would need to had it been using a single vial per patient. Therefore, the relator concluded, Renal must have been harvesting the leftover Zemplar from partially used vials and administering it to other patients. This presented a profitable opportunity for fraud, since "Medicare will reimburse

---

[178] *United States ex rel. Judd v. Quest Diagnostics, Inc.*, 638 F. App'x 162, 169 (3d Cir. 2015) (quoting *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1057 (9th Cir. 2011)).

[179] *See Foglia*, 754 F.3d at 158.

[180] No. 00-1044, 2005 WL 1806502 (E.D. Pa. July 29, 2005).

[181] *Id.* at *2 n.2 (quoting *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.,* 360 F.3d 220, 233 (1st Cir. 2004)).

[182] *Id.*; *see Foglia*, 754 F.3d at 156 n.3 (identifying *Karvelas* as an example of the rigid "representative samples" requirement employed by several other Circuits and noting that the First Circuit later overruled *Karvelas* and adopted the same "nuanced" understanding of Rule 9(b) embraced by the Third Circuit).

for the full vial of Zemplar, regardless of whether all of the Zemplar is used."[183] That is, Renal could have submitted a claim for a full vial of Zemplar for each patient while purchasing fewer vials, reusing the leftovers, and pocketing the difference. By itself, however, this was not enough to create a "strong inference" that Renal had submitted false claims, because harvesting extra Zemplar was permitted so long as certain guidelines were followed. But the relator had also alleged that Renal was not complying with those guidelines. Taking that as true, the court found that the complaint met the requirements of Rule 9(b) and adequately alleged that Renal was fraudulently submitting claims as if it had used exactly one vial per patient.[184]

Notably, like the Amended Complaint here, the *Foglia* complaint did not identify particular claims for payment by the government. Instead, it identified "particular details of a scheme to submit false claims"—there, a scheme to reuse vials of Zemplar while submitting claims for payment as if a new vial were used for each patient—combined with "reliable indicia that lead to a strong inference that claims were actually submitted"—there, the inventory logs and the allegation that Renal had not complied with the guidelines for reusing Zemplar vials.

The allegations here are strikingly similar. Relators allege a scheme to alter prescriptions, including the specific time frame of the scheme and the number and type of alterations their audit revealed, with some specific examples identified by RX number. They also allege that PharMerica did not obtain the prescribing physician's consent before altering prescriptions. Relators here have offered at least as much as in *Foglia* and have cleared the bar of Rule 9(b). Accordingly, the non-controlled substances claims will proceed.

---

[183] *Foglia*, 754 F.3d at 158.

[184] *Id.*

## b. Controlled Substances

Relators also allege that PharMerica illegally altered prescriptions for controlled substances. They claim that PharMerica's systematic practice was to alter the essential elements of the prescription, such as the form or dosage specified, so as to substitute a more profitable alternative.[185] Each time PharMerica submitted a claim for reimbursement for a dispensation pursuant to an altered prescription, Relators claim, PharMerica falsely certified that the dispensation complied with all applicable laws and regulations.[186]

In its reply memorandum, PharMerica argues for the first time that this claim should be dismissed because PharMerica has uncovered evidence that the two specific controlled-substance prescriptions Relators identify by RX number in the Amended Complaint were altered legally or not altered at all.[187] PharMerica asks the Court to consider this evidence outside the Amended Complaint at the motion-to-dismiss stage on the grounds that the prescription documents are "integral to or explicitly relied upon in the complaint."[188] Even if the Court were to consider this evidence at this stage, PharMerica's attempt to rebut Relators' two examples would not support dismissing Relators' entire category of claims based on illegally altered prescriptions for controlled substances. Relators allege that they have identified 924 instances in which PharMerica illegally altered prescriptions for Schedule II controlled substances, not just the two for which RX numbers are offered, and as already explained, Relators need not identify any

---

[185] Amend. Compl. ¶¶ 110–17.

[186] *Id.* ¶¶ 138–45.

[187] *See* Amend. Compl. ¶¶ 111–12; *See* PharMerica's Reply Mem. Supp. Mot. to Dismiss [Doc. No. 59] at 6–7; Decl. of Ahmed Aleemuddin Supp. Reply Mem. [Doc. No. 59-1].

[188] *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (emphasis omitted) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426).

specific claim for payment at the pleading stage.[189] In this category of claims, as in the preceding

one, Relators have described "particular details of a scheme to submit false claims"—that is, the

design of the LTC400 and the widespread practice of prompting clerks to alter prescriptions to

make them more profitable[190]—and have paired that alleged scheme with "reliable indicia that

lead to a strong inference that claims were actually submitted." Here, some of those "reliable

indicia" include the specific time frame of the alleged fraudulent claims (March 2014 through

September 2015); a definite number of claims allegedly submitted (924); and the further

specification that 143 of those claims involved prescriptions for the drugs OxyContin and

Morphine.[191]

Next, PharMerica argues that any allegation of widespread fraud in the pharmacy

industry is inherently implausible under *Iqbal* because that industry is so closely regulated at

both the federal and state level.[192] This argument is belied by the fact that False Claims Act cases

against pharmacy defendants—including some against PharMerica in particular—often survive

motions to dismiss.[193] Nor is it at all implausible that Reliant, the long-term care facility at which

Relators worked, could have administered "*thousands* of incorrect doses of controlled substances

---

[189] *Foglia*, 754 F.3d at 156–57; *see United States ex rel. Budike v. PECO Energy*, 897 F. Supp. 2d 300, 320 (E.D. Pa. 2012) (noting that providing a "single claim example" would not put defendants "in a better position to answer and defend against Relator's claims," especially if "[t]he fraud of the instant claims does not turn on anything unique to an individual claim or anything that would be revealed from an examination of any claim.") Indeed, to allow PharMerica to win dismissal of this entire group of Relators' claims by rebutting the two specific examples Relators offer would punish Relators for going above and beyond the pleading standards the Third Circuit has required in False Claims Act cases. This would perversely disincentivize specific, careful pleading.

[190] Amend. Compl. ¶¶ 113–17.

[191] *Id.* ¶ 110.

[192] PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 28–30; *see* 556 U.S. 662 (2009).

[193] *See United States ex rel. Silver v. Omnicare, Inc. et al.*, No. 11-1326, 2014 WL 4827410, at *1 (D.N.J. Sept. 29, 2014) (denying Defendant PharMerica's motion to dismiss except as to statute-of-limitations grounds); *United States ex rel. Denk v. PharMerica Corp.*, No. 09-720, 2014 WL 4355342 (E.D. Wis. Sept. 3, 2014); *see also, e.g.*, *United States ex rel. Garbe v. Kmart Corp.*, 968 F. Supp. 2d 978 (S.D. Ill. 2013); *United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125 (E.D. Pa. 2012).

to its residents without anyone noticing or taking action," as PharMerica argues.[194] Even if staff at Reliant had been careful to double-check the brand, dosage, and quantity of each medication against the original prescription information, they could very reasonably have assumed that any discrepancies were the result of PharMerica pharmacists conferring with the prescribing physician and getting his or her consent to alter the prescription. That would be noted in PharMerica's files, but not necessarily on the label of the bottle.

PharMerica's argument that these claims broadly do not meet the particularity requirement of Rule 9(b) fails for the same reasons explained above.[195] Accordingly, the controlled substances claims will proceed.

### c. Brand Names vs. Generics

Finally, Relators allege that PharMerica illegally altered prescriptions for generic drugs, substituting brand-name drugs in violation of applicable federal and state law.[196] This was a widespread practice at PharMerica, Relators claim; indeed, PharMerica's computerized drug dispensing system was allegedly designed to prompt clerks to make profitable substitutions even though pharmacists are supposed to consult with the prescribing physician before altering certain

---

[194] PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 29.

[195] PharMerica's argument that the controlled substances claims must be dismissed because PointClickCare orders are not prescriptions and therefore are not a valid point of comparison for the actual dispensation is too clever by half. *See* PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 27. As Relators point out, the allegations in the Amended Complaint—including the allegation that PointClickCare is the system by which long-term care facilities transmit prescriptions to PharMerica—must be taken as true at this stage. Even to meet the heightened pleading standard of Rule 9(b), Relators need not allege that prescriptions in the PointClickCare system meet all the legal requirements to be called a "prescription" or that no other, more legally valid prescription exists elsewhere in the world. Such ticky-tack—indeed, logically impossible—pleading standards have been rejected by the Third Circuit, which cautioned against requiring complaints to offer "a level of proof not demanded to win at trial." *Foglia*, 754 F.3d at 156.

Likewise, undue skepticism of the statistical validity of Relators' audit is "misplaced at the Rule 12(b)(6) stage." *Victaulic*, 839 F.3d at 257; *see* PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 35.

[196] Amend. Compl. ¶¶ 127–30, 152.

elements of a prescription.[197] Each time PharMerica submitted a claim for reimbursement for a dispensation pursuant to an altered prescription, Relators allege, PharMerica falsely certified that the dispensation complied with all applicable laws and regulations.

Relators support this claim with two main factual allegations. First, Relators claim that PharMerica "routinely altered and dispensed brand name drugs in lieu of the generic drugs ordered and already on the market."[198] Second, they claim that these alterations were made "without a legal prescription."[199] Relators also identify two particular substitutions that were allegedly made—the brand-name drug Abilify for the generic Aripiprazole, and the brand-name drug Namenda XR for regular Namenda.[200]

This kind of substitution—a brand name for a generic—might be unlawful for two reasons. First, to be eligible for government reimbursement, federal and state regulations require that pharmacies dispense generic drugs that are therapeutically equivalent to brand-name drugs when the generic is cheaper.[201] If a pharmacy were intentionally dispensing more expensive brand-name drugs to maximize its reimbursements, that would constitute a false claim. Second, as discussed in more detail below, pharmacists are generally not permitted to alter prescriptions without the consent of the prescribing physician.[202] If a pharmacy substituted alternative drugs

---

[197] *See id.* ¶¶ 53–62, 150–53.

[198] *Id.* ¶ 127 (emphasis omitted).

[199] *Id.*

[200] Namenda and Namenda XR both appear to be brand-name drugs; the Court understands Relators' allegation to mean that shortly before Namenda's generic equivalent was released, PharMerica began substituting Namenda XR, which had no generic equivalent, for Namenda in order to avoid the requirement that a cheaper generic be substituted. *See* Amend. Compl. ¶ 129.

[201] Amend. Compl. ¶¶ 146–53.

[202] *Id.*

without the physician's consent, the dispensation would not be pursuant to a valid prescription and the pharmacy could not legally seek reimbursement from Medicare or Medicaid.

To state a claim for this alleged scheme of swapping brands for generics, then, Relators must allege either (1) that the generic equivalent prescribed was cheaper than the brand dispensed, so that the substitution violated the requirement to dispense cheaper equivalents,[203] or (2) that the generic dispensed was not a therapeutic equivalent so that substitution required the prescribing physician's consent, which was not obtained.[204] Although this portion of the Amended Complaint is sparser than the controlled substances and non-controlled substances allegations, discussed below, Relators do allege that the brand-name drugs PharMerica dispensed were more expensive than their available generic equivalents.[205] This allegation serves the same purpose as the allegation of non-compliance with the Zemplar reuse guidelines in *Foglia*: It elevates an opportunity for fraud into an allegation of fraud.[206] Accordingly, these claims will also proceed.

---

[203] PharMerica points out that the costs of a drug to any given Part D sponsor depend on its own formulary development process. *See* PharMerica's Mem. Supp. Mot. to Dismiss [Doc. No. 51] at 25–26. It may well turn out that under the relevant formulary, the brand-name drugs dispensed were no more expensive than the generics allegedly prescribed, in which case PharMerica could be entitled to summary judgment on those claims. But Relators have alleged that the generics were in fact cheaper, which the Court must accept as true at this stage.

[204] *Cf. United States ex rel. Gohil v. Sanofi-Aventis U.S. Inc.*, 96 F. Supp. 3d 504, 519 (E.D. Pa. 2015) (noting that while relators were not required to plead specific false claims, in order to prove fraud based on promoting drugs for unapproved uses, relator was required to "plead for what unaccepted medical indications Aventis promoted Taxotere").

[205] Relators allege this in two places. First, they allege that "PharMerica also made it its practice of dispensing brand name drugs, including Abilify, Namenda, and Cymbalta, in lieu of their cheaper generic drug equivalent for many months after the generic-equivalents had entered the market." Amend. Compl. ¶ 5. Second, the heading above paragraph 127 of the Amended Complaint reads: "PharMerica Systematically and Illegally Altered Prescriptions by Filling Generic Drug Prescriptions with the More Expensive and Profitable Brand Name Drug."

[206] *Foglia*, 754 F.3d at 158.

### 3. Analysis: Claims under 31 U.S.C. § 3729(a)(1)(G)

Relators also allege violations of 31 U.S.C. § 3729(a)(1)(G), the so-called reverse false claims provision of the False Claims Act. Whereas §§ 3729(a)(1)(A) and (B) are violated when a person fraudulently requests payment *from* the government, § 3729(a)(1)(G) is violated when a person withholds payment that is owed *to* the government:

> [A]ny person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government . . . .[207]

Based on the same alleged prescription alteration scheme that forms the basis of the claims already discussed, Relators allege two separate violations of § 3729(a)(1)(G) here. First, they allege that PharMerica violated the Corporate Integrity Agreement ("CIA") it entered into as a result of *Denk* and failed to pay the ensuing penalties to the government. Second, they allege that PharMerica improperly retained the same payments it received as a result of the prescription alteration scheme. In one sense, both of these are based on the same alleged conduct—illegally altering prescriptions. Each alleged violation, however, rests on a separate financial obligation that was allegedly owed to the government—first, the penalties under the CIA, and second, the general obligation to return to the government money it paid out based on fraud or in error. Since the "obligation" is the touchstone of the reverse false claims provision,[208] these two alleged violations are considered separately.

---

[207] 31 U.S.C. § 3729(a)(1); *see Victaulic*, 839 F.3d at 247 ("In this case, by contrast, the allegation is not that Victaulic is obtaining monies from the government to which it is not entitled, but rather that it is retaining money it should have paid the government in the form of marking duties. Wrongful retention cases such as these are known as 'reverse false claims' actions.").

[208] *See United States ex rel. Boise v. Cephalon, Inc.*, No. 08-287, 2015 WL 4461793, at *2 (E.D. Pa. July 21, 2015) ("'A prerequisite for liability under [a reverse false claim] theory is a legal obligation' to pay or credit the government." (quoting *United States ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432, 444 (3d Cir. 2004))).

### a. Obligations Under the Corporate Integrity Agreement

As part of the resolution of *Denk*, PharMerica entered into a CIA with the Office of the Inspector General ("OIG") of the Department of Health and Human Services.[209] That CIA required, among other things, that PharMerica bring itself into compliance with the Controlled Substances Act and related regulations.[210] Instead, Relators allege, PharMerica embarked on a new scheme to handle prescriptions illegally, this time by altering them without physician consent so as to maximize reimbursements. That conduct, Relators argue, not only violated §§ 3729(a)(1)(A) and (B) of the False Claims Act, but also violated the CIA, subjecting PharMerica to an obligation to pay penalties to the government.[211] By concealing that it had violated the CIA and incurred an obligation to pay, PharMerica thus violated § 3729(a)(1)(G) as well, according to Relators. PharMerica argues that this claim must be dismissed for two reasons: first, because the stipulated penalties in the CIA are contingent obligations that cannot be the basis of a claim under § 3729(a)(1)(G), and second, because the Amended Complaint "does not identify any failure of compliance" with the CIA.

As noted, the reverse false claims provision hinges on the "obligation" to pay money to the government. In 2009, Congress passed the Fraud Enforcement and Recovery Act ("FERA"),[212] which amended the False Claims Act and supplied a definition of the term "obligation":

> [T]he term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee

---

[209] Amend. Compl. ¶ 93.

[210] *Id.* ¶ 94.

[211] Relators' Mem. Opp. Mot. to Dismiss [Doc. No. 57] at 32; *see* Amend. Compl. ¶¶ 96–98, 178.

[212] Pub. L. No. 111-21, 123 Stat. 1617 (2009).

> relationship, from a fee-based or similar relationship, from statute or regulation, or
> from the retention of any overpayment . . . .[213]

That definition expanded the meaning of "obligation" beyond the limited construction some courts had given it.[214] In particular, it included "established dut[ies], whether or not fixed," in contrast to the Sixth Circuit's decision in *American Textile Manufacturers Institute, Inc. v. The Limited, Inc.*, which had restricted the meaning of "obligation" to the kinds of duties "that gave rise to actions of debt at common law"[215]—that is to say, fixed obligations. The Senate Judiciary Committee Report on the FERA amendments explained that this definition was framed so as to include "contingent, non-fixed obligations" spanning a "spectrum" from "the fixed amount debt obligation where all particulars are defined to the instance where there is a relationship between the Government and a person that 'results in a duty to pay the Government money, whether or not the amount owed is yet fixed.'"[216] At least some contingent, non-fixed obligations are now, therefore, actionable under the reverse false claims provision of the FCA.[217]

Contingent obligations are only actionable within reason, however—future duties to pay that are too speculative may not be a valid basis for claims under § 3729(a)(1)(G). The Third Circuit explained this limitation in *United States ex rel. Petras v. Simparel, Inc.*[218] There, the relator was the chief financial officer of a software company in which the Small Business Administration, a federal agency, became a preferred shareholder. Under the company's

---

[213] 31 U.S.C. § 3729(b)(3).

[214] *See Victaulic*, 839 F.3d at 253.

[215] 190 F.3d 729, 736 (6th Cir. 1999).

[216] S. Rep. No. 111-10, at 14 (2009), *reprinted in* 2009 U.S.C.C.A.N. 430, 441; *see United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 505 (3d Cir. 2017) (explaining that the phrases "established duty" and "whether or not fixed" are ambiguous, so the provision's legislative history may be considered).

[217] *Victaulic*, 839 F.3d at 253–54.

[218] 857 F.3d 497.

certificate of incorporation, it was required to pay accrued dividends to preferred shareholders under two specified conditions. The relator alleged that the company "engaged in certain fraudulent conduct—to which he objected—in order to avoid paying the SBA these contingent dividends."[219] He did not, however, allege that either of the two conditions had occurred.[220] In considering the statutory language, the court concluded that the phrase "an established duty, whether or not fixed" excluded "obligation[s that] did not exist when the defendants' alleged misconduct occurred."[221] In other words, the obligation to pay must have existed at the time of the misconduct—that is, it was "established"—but the *amount* need not have been fixed.

Since FERA's enactment, courts have split on the question whether stipulated penalty provisions of a CIA are "obligations" for reverse false claims purposes. All agree that that "a breach of [a government] contract can give rise to an 'obligation'" under the reverse false claims provision.[222] Further, CIAs are contracts with the government. Beyond that, the cases diverge. A few have concluded that the contractual nature of the stipulated penalties by itself makes them "obligations."[223] Most, however, have looked beyond the fact of the contract to its terms, concluding that where stipulated penalties are contingent on the exercise of governmental discretion, they are not "obligations."[224]

---

[219] *Id.* at 500.

[220] *Id.*

[221] *Id.* at 504–06.

[222] *Ruscher v. Omnicare, Inc.*, No. 08-3396, 2014 WL 4388726, at *5 (S.D. Tex. Sept. 5, 2014).

[223] *See Boise*, 2015 WL 4461793, at *3–7; *Ruscher*, 2014 WL 4388726, at *5.

[224] *See United States ex rel. Keen v. Teva Pharmaceuticals USA Inc.*, No. 15-2309, 2017 WL 36447, at *5–6 (N.D. Ill. Jan. 4, 2017); *United States ex rel. Landis v. Tailwind Sports Corp.*, 160 F. Supp. 3d 253, 268–72 (D.D.C. 2016); *United States ex rel. Booker v. Pfizer Inc.*, 9 F. Supp. 3d 34, 49–50 (D. Mass. 2014), *aff'd on other grounds*, *United States ex rel. Booker v. Pfizer, Inc.*, 847 F.3d 52, 55–56 (1st Cir. 2017); *see also United States ex rel. Niazi v. CVS Pharmacy, Inc.*, No. 15-5518, 2018 WL 654289, at *6 (C.D. Cal. Jan. 31, 2018); *United States ex rel. Zayas v. Astrazeneca Biopharmaceuticals, Inc.*, 2017 WL 1378128, at *3 (E.D.N.Y. Apr. 17, 2017).

The majority position is more persuasive. It is true that ordinarily, a contract with a standard liquidated damages clause creates a present obligation to pay upon breach, whether the nonbreaching party exercises its discretion to sue for enforcement or not. The minority position holds by analogy that even if a CIA conditions the payment of penalties on OIG's exercise of discretion—that is, even if the penalties become due only after OIG determines that they are appropriate—an obligation exists. The minority position, however, is "insufficiently attentive to the language" that is typical of CIAs.[225] Unlike a standard liquidated damages clause, the CIA between PharMerica and the government provides that failure to comply with the CIA "*may* lead to the imposition of . . . monetary penalties."[226] Similarly, it provides that "[u]pon a finding that PharMerica has failed to comply" with any term of the CIA "*and after determining that Stipulated Penalties are appropriate*," OIG will notify PharMerica of "OIG's exercise of its contractual right to demand payment of the Stipulated Penalties."[227] These terms do not describe an "established duty" to pay money to the government—at the time of breach, the penalties are not yet due. Instead, these contract provisions describe a possible future duty. Despite the contractual relationship between PharMerica and the government, therefore, these stipulated penalties are more akin to regulatory fines than to typical contractual liquidated damages.[228]

---

[225] *Keen*, 2017 WL 36447, at *6.

[226] Doc. No. 78 at 27 (emphasis added).

[227] *Id.* at 30 (emphasis added). Although the CIA does use the term "obligations" here, Relators conflate the two meanings of that word. As the CIA uses it, "obligations" refers to PharMerica's substantive duties under the CIA—for example, to appoint a compliance officer and to submit implementation reports. These are not "obligations" under § 3729(a)(1)(G), which speaks only of obligations to pay money to the government.

[228] *Cf. United States ex rel. Marcy v. Rowan Companies, Inc.*, 520 F.3d 384, 391 (5th Cir. 2008) (noting that "the government still must choose whether to impose a penalty" after a regulatory violation and that "[o]ther courts have held that when potential fines depend on intervening discretionary governmental acts, they are not sufficient to create 'obligations to pay' under the False Claims Act").

Because there is no "established duty" until the government exercises its discretion to demand payment, the stipulated penalties are not "obligations."[229]

The Court recognizes the unfortunate implications of so holding. When it enters into a CIA like this one, the Government cannot enforce any stipulated penalties without notice that the CIA was violated. Where a party to a CIA fails to give notice voluntarily, it may be that a *qui tam* action under the reverse false claims provision is the only mechanism for recovering the stipulated penalties due. Shielding alleged recidivist fraudsters from *qui tam* liability for "improperly avoid[ing]" the stipulated penalties of a CIA may not be desirable as a matter of policy. This outcome, however, could easily be avoided if CIAs were structured so that stipulated penalties would become due upon breach, not merely upon the exercise of discretion by OIG, like most liquidated damages. For whatever reason, the Government has chosen to make these stipulated penalties contingent. As a result, no "obligation" can exist for § 3729(a)(1)(G) purposes until OIG exercises its discretion to demand payment. Because Relators have not alleged that such an exercise of discretion occurred, they have not stated a claim under this provision based on the CIA.

### b. Retention of Payments for Claims Based on Altered Prescriptions

Relators also allege that PharMerica violated § 3729(a)(1)(G) by retaining the fraudulently obtained payments that form the basis of Relators' claims under §§ 3729(a)(1)(A) and (B). PharMerica argues that this alleged conduct does not support a claim under

---

[229] At oral argument, counsel for Relators emphasized the stipulated penalty provisions themselves, which state that they "*shall* begin to accrue on the day after the date the obligation became due." Doc. No. 78 at 28–29. While "shall" is mandatory, this does not suggest that the stipulated penalties are obligations. Rather, it merely supplies a rule for determining the amount of the penalties—once OIG exercises its discretion to impose the penalties, the amount due is calculated from the day after the date of the compliance failure.

§ 3729(a)(1)(G) because it merely duplicates the same alleged conduct that formed the basis of Relators' claims under §§ 3729(a)(1)(A) and (B).

The established rule prior to the 2009 FERA amendments was that a claim for mere retention of government payments that were fraudulently obtained in the first place did not state a claim under § 3729(a)(1)(G).[230] In other words, relators were barred from asserting that the same fraudulent claim for payment constituted both a "false claim" under § 3729(a)(1)(A) or (B), in the first instance, and a "reverse false claim" under § 3729(a)(1)(G), once a defendant received and retained payment on that claim. As explained above, however, in 2009 Congress added to the statute a definition of the term "obligation":

> [T]he term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, *or from the retention of any overpayment . . . .*[231]

The Patient Protection and Affordable Care Act then defined "overpayment" as "any funds that a person receives or retains under subchapter XVIII [Medicare] or XIX [Medicaid] of this chapter to which the person, after applicable reconciliation, is not entitled under such subchapter."[232] The ACA also clarified that a "repayment retained by a person after the deadline for reporting and returning the overpayment" is an "obligation" for False Claims Act purposes.[233] The parties dispute whether the anti-duplication rule survived these developments.

---

[230] *See United States ex rel. Thomas v. Siemens AG*, 708 F. Supp. 2d 505, 514–15 (E.D. Pa. 2010).

[231] 31 U.S.C. § 3729(b)(3) (emphasis added).

[232] Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111–148, § 6402, 124 Stat. 119, 753 (2010) (codified at 42 U.S.C. § 1320a-7k(d)(4)(B)); *see United States ex rel. Taul v. Nagel Enterprises, Inc.*, No. 14-061, 2017 WL 432460, at *10 (N.D. Ala. Feb. 1, 2017).

[233] 42 U.S.C. § 1320a-7k(d)(3); *see Taul*, 2017 WL 432460, at *10.

Every case the Court is aware of that expressly considered this issue concluded that the rule still applies[234]—relators may not use § 3729(a)(1)(G) as a "redundant basis" for liability.[235] The Court agrees that the logic of that rule still obtains. Rather than permitting a double recovery for conduct already covered by other provisions of the False Claims Act, the "retention of overpayments" language seems to impose liability in at least two situations not clearly covered before the FERA amendments. First, it allows for liability when a party unknowingly presents a false claim, realizes its mistake, and knowingly retains the resulting overpayment. Second, it allows for liability when a government contractor "receive[s] money from the government incrementally based upon cost estimates" and retains "money that is overpaid during the estimate process."[236] Recognizing that both these situations are "different from fraudulently obtaining the payment in the first place,"[237] this sensible interpretation gives independent meaning to each provision of the statute.[238]

Because this subset of Relators' claims merely recasts their §§ 3729(a)(1)(A) and (B) claims, these claims will also be dismissed.[239]

---

[234] *United States v. Berkeley Heartlab, Inc.*, 247 F. Supp. 3d 724, 732–33 (D.S.C. 2017); *United States ex rel. Scharber v. Golden Gate Nat'l Senior Care LLC*, 135 F. Supp. 3d 944, 965–66 (D. Minn. 2015); *United States ex rel. Myers v. America's Disabled Homebound, Inc.*, No. 14-8525, 2018 WL 1427171, at *3 (N.D. Ill. Mar. 22, 2018); *United States ex rel. Laporte v. Premier Educ. Grp., L.P.*, No. 11-3523, 2016 WL 2747195, at *18 (D.N.J. May 11, 2016); *cf. Taul*, 2017 WL 432460, at *10–11 (holding that retention of Medicare overpayments could be pled as a § 3729(a)(1)(G) claim but not as a § 3729(a)(1)(A) or (B) claim).

[235] *Thomas*, 708 F. Supp. 2d at 514.

[236] S. Rep. No. 111-10, at 15 (2009), *reprinted in* 2009 U.S.C.C.A.N. 430, 442.

[237] *Scharber*, 135 F. Supp. 3d at 966.

[238] *See Setser v. United States*, 566 U.S. 231, 239 (2012) (explaining that courts should "give effect . . . to every clause and word" of a statute (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955))).

[239] Relators argue that they are permitted to plead two alternative allegations: one in which PharMerica knowingly made false claims for payment in the first instance, and another in which PharMerica accidentally made false claims for payment, but became liable under § 3729(a)(1)(G) when it knowingly retained those overpayments. But the latter claim is raised for the first time in Relators' briefing on the Motion to Dismiss; it was not pled in the First Amended Complaint at all.

### C. Relator Sturgeon's Retaliation Claim

Relator Sturgeon finally alleges retaliation against her in violation of the False Claims Act for investigating and reporting PharMerica's alleged violations. PharMerica argues that Sturgeon has not stated a claim for retaliation, or, alternatively, that her retaliation claim is collaterally estopped.

#### 1. Sufficiency of Pleadings

To state a claim under the False Claims Act's retaliation provision,[240] a relator must allege (1) that she engaged in "protected conduct," that is, acts done "in furtherance of" a False Claims action, and (2) that she was "discriminated against because of" that protected conduct.[241] "Protected conduct" includes "investigation for, initiating of, testimony for, or assistance in" a *qui tam* action.[242] "Discrimination" includes actions "that might have dissuaded a reasonable worker from engaging in the protected conduct,"[243] and "[t]he cumulative impact of retaliatory acts may become actionable even though the actions would be *de minimis* if considered in isolation."[244] Both the "protected conduct" inquiry and the "discrimination" inquiry are fact specific and context dependent.[245]

Sturgeon has sufficiently alleged that she engaged in "protected conduct." The Amended Complaint recounts Sturgeon's internal investigation into potential false claims while working at PharMerica, during which she discovered the violations she alleges in this *qui tam* action.[246]

---

[240] 31 U.S.C. § 3730(h)(1).

[241] *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 186 (3d Cir. 2001).

[242] *Id.*

[243] *Difiore v. CSL Behring, U.S., LLC*, 171 F. Supp. 3d 383, 393 (E.D. Pa. 2016).

[244] *Brennan v. Norton*, 350 F.3d 399, 422 n.17 (3d Cir. 2003).

[245] *Hutchins*, 253 F.3d at 187; *Burglington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006).

[246] Amend. Compl. ¶¶ 67–81.

Sturgeon reported her findings to superiors at PharMerica at least four times during that period.[247] This kind of "internal reporting and investigation of an employer's false or fraudulent claims" is undoubtedly protected conduct under the retaliation statute.[248]

Sturgeon has also sufficiently alleged that PharMerica "discriminated" against her for that protected conduct. PharMerica attempts to characterize the Amended Complaint as alleging a workplace that was merely unpleasant but not discriminatory, picking out phrases like "discrediting [Sturgeon's] work" and "deliberately embarrassing [Sturgeon]." Fairly read, however, the Amended Complaint alleges a coordinated campaign to diminish Sturgeon's job responsibilities in response to her whistleblowing activity. It alleges that when Sturgeon brought the results of her review to the attention of Senior Vice President for Sales and Marketing Mark Lindemoen, he "shut down the meeting and ordered Sturgeon to stop her investigation," and "demanded that she stop conferring with management" about the "issues that she had identified."[249] When she persisted, management "sought to conceal her findings by discrediting her work, limiting her authority, redefining her role, [and] narrowing her responsibilities."[250] She experienced an "unexplained and sudden diminution" of her "duties and responsibilities."[251] Even more specifically, she alleges that the "diminishing of her job duties and responsibilities" was "retaliatory" and that it "created an intolerable work environment."[252]

---

[247] *Id.* ¶¶ 70–71, 73–74, 75, 80–81.

[248] *Hutchins*, 253 F.3d at 187.

[249] Amend. Compl. ¶ 74.

[250] *Id.* ¶ 78.

[251] *Id.* ¶ 83.

[252] *Id.* ¶ 89.

A direct order from a superior to stop investigating potential fraud would certainly dissuade "a reasonable worker from engaging in [that] protected conduct."[253] So would an otherwise unjustified decision to diminish her job responsibilities.[254] Accordingly, Sturgeon has adequately alleged both elements of a retaliation claim.

### 2. Collateral Estoppel

PharMerica next argues that Sturgeon's retaliation claim is collaterally estopped because it was adjudicated in an earlier action. Sturgeon previously sued PharMerica for breach of her employment agreement as well as violation of the Pennsylvania Wage Payment and Collection Law.[255] That employment action was resolved by jury trial, at which the sole question the jury answered was:

> Do you find that Lena Sturgeon resigned her position with PharMerica for "Good Reason," that is because of a material diminution in her authority, duties or responsibilities?

The jury answered "no."[256] PharMerica argues that that jury verdict precludes Sturgeon from asserting a diminution of her job responsibilities in this action.

Collateral estoppel applies when "(1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) it was determined by a final

---

[253] *Difiore*, 171 F. Supp. 3d at 393.

[254] *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (holding that "reassignment with significantly different responsibilities" can constitute adverse employment action); *Pitts v. Howard Univ.*, 111 F. Supp. 3d 9, 22 (D.D.C. 2015) (reassignment to position with "significantly diminished responsibilities" can constitute action in retaliation for protected conduct under False Claims Act retaliation provision). Mere alteration of job responsibilities might not be discrimination, *see Annett v. Univ. of Kan.*, 371 F.3d 1233, 1239 (10th Cir. 2004) (analogous Title VII context), but Sturgeon alleges that the curtailment of her responsibilities was "significant[]," Amend. Compl. ¶ 86.

[255] *See Sturgeon v. Millennium Pharmacy Sys., LLC et al.*, No. 16-375 (W.D. Pa. Mar. 31, 2016).

[256] PharMerica's Mot. for Judicial Notice [Doc. No. 52-1], Ex. G.

and valid judgment; and (4) the determination was essential to the prior judgment."[257] "A determination ranks as necessary or essential only when the final outcome hinges on it."[258]

The question posed to the jury in the Employment Action was not whether Sturgeon experienced a material diminution in her duties. Rather, the question was why she resigned her position. The phrasing of the question permitted the jury to conclude that, while Sturgeon did experience a material diminution in her duties, that diminution was not the reason she resigned. Therefore, based on the information available to the Court, the determination that Sturgeon did not experience a material diminution in her duties was not "essential" to the jury's verdict, and Sturgeon is not precluded from litigating that issue here. Accordingly, Sturgeon's retaliation claims can proceed.

## IV.    CONCLUSION

Relators' claims under the reverse false claims provision will be dismissed without prejudice. Relators' remaining claims are adequately pled and are not precluded, so they may proceed. An appropriate order follows.

---

[257] *United States ex rel. Doe v. Heart Solution, PC*, 923 F.3d 308, 316 (3d Cir. 2019).

[258] *Bobby v. Bies*, 556 U.S. 825, 835 (2009) (citing 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4421 (2d ed. 2002)).